**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

------------------------------------------------------------------ X

JAKUBOWICZ, *et al.*,

                               Plaintiffs,                Docket No:

                    -against-                18-cv-1450 (RDM)

ISLAMIC REPUBLIC OF IRAN, *et al.*,

                            Defendants.

------------------------------------------------------------------ X

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs respectfully submit the following Proposed Findings of Fact and Conclusions of Law in support of their Motion for Default Judgment against Islamic Rep. of Iran ("Iran"), the Iranian Ministry of Information and Security ("MOIS") and the Syrian Arab Republic ("Syria") pursuant to 28 U.S.C. § 1608(e); and their request to refer the assessment of damages to a special master pursuant to 28 U.S.C. § 1605A(e).

## I.

## PROCEDURAL POSTURE

This is a civil action for damages pursuant to the Foreign Sovereign Immunities Act ("FSIA") 28 U.S.C. § 1602 *et seq*. Plaintiffs are the victims, estate and families of U.S. nationals injured or murdered in four separate terror attacks between 2006 and 2015. Plaintiffs filed this action on June 19, 2018 against Defendants Iran, MOIS and Syria. (DE 1). Plaintiffs advance a cause of action under the FSIA, 28 U.S.C. § 1605A(c), as well as negligence and aiding and abetting under Israeli law. *Id*. at ¶¶ 1, 100-26.

None of the Defendants filed an answer or otherwise appeared. Plaintiffs moved for entry of default judgment by the Court against all Defendants. (DE 23-25). The Clerk noted the defaults of the Defendants on January 28, 2019. (DE 26, 27). In the context of a default setting under 28 U.S.C. § 1608(e), that provision requires a court to enter default judgment against a non-responding foreign state only where "the claimant establishes his claim or right to relief by evidence that is satisfactory to the court." 28 U.S.C. § 1608(e). Plaintiffs have presented evidence in the form of affidavits and documentary evidence, as well as credible expert reports from two experts concerning assistance to Hamas and the Palestinian Islamic Jihad ("PIJ") from Iran and MOIS (*Force v. Islamic Rep. of Iran, et al.*, DE 31, 32, Civ. No. 16-1468), two experts concerning Syria's assistance to Hamas and the PIJ (*Force v. Islamic Rep. of Iran, et al.*, DE 29, 30, Civ. No. 16-1468), an expert regarding Iran's material support of Hezbollah (DE 31), a retired member of the Israeli Defense Forces concerning the investigations into two of the terror attacks (*Force v. Islamic Rep. of Iran, et al.*, DE 33, Civ. No. 16-1468), an Israeli lawyer concerning relevant Israeli law (*Force v. Islamic Rep. of Iran, et al.*, DE 34, Civ. No. 16-cv-1468), a psychiatrist and a medical expert concerning the mental and physical effects of the attacks on individual Plaintiffs. (DE 45, 46). Based on the entire record, this Court makes the following findings of fact and conclusions of law.

## II.
## FINDINGS OF FACT

### A.    The Terrorist Attacks

#### 1.    The Shooting Attack on Akiva Jakubowicz

1.    On June 20, 2008, Raii Tayssir Abd al-Hafiz Zahran and Saleh Ali Yusuf Rabi' Zahran, agents and operatives of Hamas, opened fire on a group of five hikers in Wadi Zarka, northeast of the city of Modi'in, Israel. (Spitzen Decl. ¶¶ 33, 34, 58, 62, 67, 71) (DE 47).

2.      As a result of the attack, three of the hikers were wounded, including Plaintiff Akiva Jakubowicz, who was injured in the pelvis and right thigh. *Id*. at ¶ 33.

3.      Prior to the terror attack, the perpetrators of the terror attack accepted membership into Hamas' military cell. *Id*. at ¶¶ 37-39.

4.      During a meeting of this Hamas cell, members were told that the goal was to perpetrate attacks against Jewish settlers and Jewish settlements. (Spitzen Decl. ¶¶ 37-39) (DE 47).

5.      The perpetrators of the Wadi Zarka attack were recruited by Hamas cell commander Saleh Mustafa Ata. He supplied them with pistols and ammunition to perpetrate the attack and trained them how to shoot prior to the attack. (Spitzen Decl. ¶¶ 35, 37, 59, 68) (DE 47).

6.      Saleh Mustafa Ata was recruited into Hamas in 2005 by Yihya Atla and is active in the Izz a-Din al-Qassam Bridges of Hamas. (Spitzen Decl. ¶¶ 35-37, 52, 54) (DE 47).

7.      Saleh Mustafa Ata obtained the financing to acquire the pistols used in the Wadi Zarka attack from his superior in Hamas, Yihya Ata. (Spitzen Decl. ¶ 40).

8.      Saleh Mustafa Ata trained Hamas cell members Raii Tayssir Abd al-Hafiz Zahran and Saleh Ali Yusuf Rabi' Zahran on how to use the pistols he acquired for use in the terror attack. (Spitzen Decl. ¶¶ 35, 41, 42) (DE 47).

9.      Yihya Ata was the senior commander in charge of establishing and financing the cells of Hamas under Saleh Ata's command. (Spitzen Decl. ¶¶ 37, 40) (DE 47).

10.     Yihya Ata was convicted for being a Hamas member as of 2005 and was imprisoned for Hamas activities from December 2007 until February 2011. (Spitzen Decl. ¶ 79).

11.     Saleh Mustafa Ata discussed with Hamas cell members Raii Tayssir Abd al-Hafiz Zahran and Saleh Ali Yusuf Rabi' Zahran in advance of the attack on more than one occasion shooting hikers at a spring located in Wadi Zarka. They even discussed executing the terror attack

on Friday, June 20, 2008 because Friday was a popular day for Jewish hikers to go to Wadi Zarka. (Spitzen Decl. ¶¶ 42, 43, 45) (DE 47).

12.    After the terror attack was executed, Raii Tayssir Abd al-Hafiz Zahran and Saleh Ali Yusuf Rabi' Zahran informed Saleh Mustafa Ata that the attack had been completed and he picked them up with a vehicle and drove them back to their village. Saleh Mustafa Ata also made sure the two pistols were concealed. (Spitzen Decl. ¶ 47) (DE 47).

13.    After the terror attack, Saleh Mustafa Ata reported the attack to Samer al-Shawwa so he would see to Hamas taking responsibility for the attack. (Spitzen Decl. ¶ 52) (DE 47).

14.    Hamas' website lists Saleh Mustafa Ata as an activist of the organization that is serving a prison sentence in Israel. (Spitzen Decl. ¶ 56) (DE 47).

15.    Hamas' website lists Raji Zahran as a member of its organization and he is listed as a Hamas prisoner. (Spitzen Decl. ¶¶ 63, 64) (DE 47).

16.    Raji Zahran and Saleh Zahran are Saleh Mustafa Ata's nephews and were, along with Saleh Mustafa Ata and Yihya Ata, residents of the village Deir Abu Mash'al at the time of the terror attack. (Spitzen Decl. ¶¶ 34, 35, 38, 52, 54, 68) (DE 47).

17.    This Hamas cell, including Raji Zahran and Saleh Zahran, committed two prior terror attacks against Jewish people. (Spitzen Decl. ¶¶ 49, 61, 69, 70) (DE 47).

18.    Saleh Zahran was a member of the Palestinian National Security service at the time of the terror attack. (Spitzen Decl. ¶ 72) (DE 47).

19.    After the terror attack, Saleh Zahran was imprisoned by the Palestinian Authority ("PA"). Therefore, Saleh Zahran has not been arrested by Israeli security forces and he has not been interrogated or brought to trial in Israel for the attacks he perpetrated, including the Wadi Zarka attack. (Spitzen Decl. ¶¶ 73, 74) (DE 47).

20.    Various Hamas publications state Saleh Zahran is incarcerated in a PA prison "for participating in a shooting attack against a group of settlers" and Hamas websites identify him as a member of its organization. (Spitzen Decl. ¶¶ 75, 76) (DE 47).

21.    Saleh Ata and Raji Zahran were convicted in an Israeli Court for the terror attack and were also found to be members of the Izz a-Din al-Qassam Brigades, which is the military wing of Hamas. (Spitzen Decl. ¶ 51) (DE 47).

22.    Plaintiff Akiva Jakubowicz was the victim of a Hamas terror attack. *Id*. at ¶ 100.

### **2. The Shooting and Stabbing Murder of Richard Lakin**

23.    On the morning of October 13, 2015, agents and operatives of Hamas, Bilal Abu-Ghanem and Bahaa Alian, one armed with a gun and the other with a knife, boarded Jerusalem Bus number 78 and, acting on behalf of Hamas, began shooting and stabbing the passengers. Border Police officers and patrol policemen who arrived at the scene identified the terrorists and shot them, killing one terrorist, Bahaa' Muhammad Khalil Alyan, and seriously wounding the other, Bilal Omar Mahmoud Abu Ghanem. *See Force v. Islamic Rep. of Iran, et al.*, DE 33, Spitzen Decl. ¶ 70, Civ. No. 16-cv-1468.

24.    Two Israelis were killed instantly and at least 16 others were wounded, among them Richard Lakin. Richard Lakin was shot in the head, and his abdomen slashed open slicing vital internal organs, cutting major blood vessels, and injuring his liver, pancreas, and spleen. The doctors placed him in a medically induced coma and on life support, in an attempt to stabilize the functioning of his injured internal organs. He remained in a medically induced coma and underwent multiple emergency surgeries during the two weeks following the attack before he died on October 27, 2015. *See Force v. Islamic Rep. of Iran, et al.*, DE 33, Spitzen Decl. ¶¶ 70-71, Civ.

No. 16-cv-1468. *Id*. DE 55, Decl. of Micah Lakin, ¶¶ 1-2, 7, 10; DE 54, Decl. of Manya Lakin, ¶¶ 1, 8, 11, 12.

25.     The Bus 78 massacre was one of the first attacks in the 2015-16 wave of terror in Israel and set an example for those who perpetrated the attacks that followed. *See Force v. Islamic Rep. of Iran, et al.*, DE 33, Spitzen Decl. ¶ 71, Civ. No. 16-cv-1468. Hamas praised the attack, stating that it is "a message to anyone who harms out holy places," and calling for a continuation of "the intifadah." *Id*. at ¶ 102. Hamas further created a video reenactment of the attack and published it on the Facebook page of one of its West Bank affiliates. *Id* at ¶ 103.

26.     The advance planning, funds for the purchase of a weapon, statements by the terrorist to the police, his behavior and demeanor in custody, his previously incarceration as a Hamas operative, and his membership and activities in Hamas' Islamic Bloc all point to Abu Ghanem as a Hamas operative and Hamas' involvement in this attack. *Id*. at ¶¶ 79-103.

27.     Abu Ghanem's Hamas membership was also made public after the attack in a written declaration published by "The Popular Front for the Liberation of Palestine" terror organization which stated that Abu Ghanem was a commander in the Izz al-Din al-Qassam Brigades. *Id*. at ¶ 104.

28.     Terrorist Bilal Abu Ghanem, was the terrorist who in fact shot and used a firearm during the attack. Abu Ghanem was a Hamas operative for several years prior to the massacre. He was described by the Hamas organization as a commander in the Al-Kutla al-Islamiya (Hamas's Islamic students' bloc) at the Al-Quds University in Abu Dis. In 2013, he was arrested, interrogated and imprisoned due to his illegal activity within the Hamas organization (the Islamic students' bloc at the university). Hamas declared him as a Hamas prisoner on its website. *See Force v. Islamic Rep. of Iran, et al.*, DE 33, Spitzen Decl. ¶ 126, Civ. No. 16-cv-1468.

29.    Hamas, through its official spokesman, publicly praised the Bus 78 terrorists and described the attack as part of the wave of terror which they were encouraging. An official spokesman of Hamas issued calls to carry out further attacks similar to the Bus 78 massacre. *Id.*

30.    After the massacre, statements and pictures appeared in the Palestinian media depicting Abu Ghanem as a Hamas member, both in explicit words and in pictures, posters, and symbols that were made prominent in various publications by Hamas. *Id.*

31.    Hamas sources declared that one of the terrorists was a Hamas operative (a commander in the Islamic Bloc), effectively claiming responsibility for this attack though not saying this explicitly, in fear of Israeli retaliation and out of the other considerations related to the safety and security of Hamas operatives. *Id.*

32.    Richard Lakin was the victim of a Hamas terror attack. *Id.* at ¶ 127.

### 3.    The Shooting of Yehuda Glick

33.    On the evening of October 29, 2014, an agent and operative of PIJ, Mu'taz Hijazi, armed with a gun, and acting on behalf of PIJ, identified Yehuda Glick as the target by name, and then shot him at point blank range outside of the Menachem Begin Heritage Center in Jerusalem where Yehuda Glick was attending a conference he had organized and on behalf of the Temple Mount Foundation. The terrorist was an employee at the Center. Yehuda Glick was critically injured. *See Force v. Islamic Rep. of Iran, et al.*, DE 52, Yehuda Glick Decl. Civ. No. 16-cv-1468; *Id.* DE 33, Spitzen Decl. ¶¶ 316, 317, 320, Civ. No. 16-cv-1468.

34.    Yehuda Glick is a known public activist whose activities aim to encourage Jews to visit the Temple Mount, and to realize the rights of all religion to pray at the Temple Mount. *Id.* at ¶ 317.

35.     Mu'taz Hijazi, was killed in a shootout with Israeli police while attempting to avoid arrest. He had a history of terrorist activity having been released from Israeli prison in 2012 after serving 11 years for various security related offenses. *Id*. at ¶¶ 323-24.

36.     The assassination attempt on Yehuda Glick was a planned, premeditated terrorist attack. *Id*. at ¶ 325.

37.     Mu'taz Hijazi, was a known operative of the PIJ with a long history of terrorist activity against Jews. *Id*. at ¶¶ 331-34.

38.     Hijazi specifically targeted Glick, who is a symbol of the activity that encourages Jewish visits to the Temple Mount at a time when the matter of Jewish visits and prayers on the Temple Mount was the focal point of the terror wave. *Id*. at ¶ 325.

39.     Immediately after the assassination attempt on Yehuda Glick, and the killing of Mu'taz Hijazi, media outlets, Internet web sites (including web sites identified with the PIJ), and PIJ senior leaders-all referred to Mu'taz Hijazi as an operative of the PIJ's operational arm, known as the Saraya al-Quds (Al-Quds Brigades). *Id*. at ¶¶ 331-42.

40.     PIJ openly and publicly claimed responsibility for the attack. *Id*. at ¶¶ 345-55.

41.     The assassination attempt on the life of Yehuda Glick was a planned, premediated terrorist attack on behalf of the PIJ organization, which claimed responsibility for the attack. The attack was executed by the terrorist Mu'ta Hijazi, an operative of the PIJ's operational arm the Saraya al-Quds. *Id*. at ¶¶ 356, 360, 367.

### 4.     Hezbollah Rocket Attacks July-August 2006

42.     Between July 12, 2006 and August 14, 2006, Hezbollah fired thousands of rockets at civilians in northern Israel (collectively hereinafter "Hezbollah Rocket Attacks").

43.    Hezbollah carried out its barrage of rocket attacks utilizing funds, weapons, terrorist training and other material support, resources, aid and assistance provided by the Defendants Iran and MOIS for the specific purpose of carrying out these rockets' attacks and other such acts of extrajudicial killing and international terrorism. *See Kaplan v. Hezbollah*, 213 F. 27 (D.D.C. 2016); *Kaplan v. Hezbollah*, DE 33, 54, 107, Civ. No. 09-00646.

44.    Plaintiff Chana Liba Kumer, a resident of Safed, was five years old at the time of the Hezbollah Rocket Attacks. Chana Liba Kumer suffered severe psychological trauma and emotional injuries as a result of the continuous Hezbollah Rocket Attacks. *See* Declaration of Chana Liba Kumer (DE 41) and Dr. Strous' report for Ms. Kumer. (DE 13). Said injuries are the result of Defendants' conduct and are directly attributable to the trauma caused by the Hezbollah Rocket Attacks.

45.    Plaintiff Malka Kumer, a resident of Safed, was six years old at the time of the Hezbollah Rocket Attacks. Malka Kumer suffered severe psychological trauma and emotional injuries during and as a result of the continuous Hezbollah Rocket Attacks. *See* Declaration of Malka Kumer (DE42) and Dr. Strous' report for Ms. Kumer. (DE 51, Exhibit 14). Said injuries are the result of the Defendants' conduct and are directly attributable to the trauma caused by the Hezbollah Rocket Attacks.

**B.    Iran and MOIS's Role in Assisting Hamas in Israel**

**1.    Iran as a State Sponsor of Terrorism**

46.    Plaintiffs' expert witness testimony concerning the assistance of Iran and MOIS to both Hamas and PIJ in Israeli is compelling. From the evidence certain conclusions are clear. Iran and MOIS supported Hamas and PIJ by (1) facilitating recruitment, training and safe haven, and

(2) providing financial assistance. *See Force v. Islamic Rep. of Iran, et al.*, Clawson Decl., DE 32, Levitt Decl., DE 31, Civ. No. 16-1468.

47.    Iran is now, and since 1984 has been continuously listed, on the U.S. State Department list of state sponsors of terrorism. The CIA has described Iran as "the foremost state sponsor of terrorism." Clawson Decl. at ¶ 27 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468, Levitt Decl. ¶ 58 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

48.    It has been well-documented for decades that Iran has provided funding, weapons, and training for terrorism operations targeting United States and Israeli citizens, which has included support for Hamas and PIJ. *Id.* at ¶¶ 30-31, DE 32; Levitt Decl. ¶ 30 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

49.    The MOIS, Iran's foreign and domestic intelligence service, is one of the principal organizations Iran has used to carry out its terrorist support activities. Clawson Decl. at ¶ 22 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468.

50.    In providing support to Hamas and other terrorist groups, the MOIS acts as a ministry of the Iranian government whose activities are tightly and carefully controlled by the Iranian government through Iran's Supreme Leader and his representatives. The terrorism training provided to Hamas and other terrorist groups by the MOIS is an official policy of the Iranian government. *Id*. at ¶ 26.

51.    Iran supports anti-Israel terrorism of all sorts. In addition to its support for Hamas and PIJ, Iran has also offered to support unaffiliated individuals-sometimes referred to as "lone wolves" who attack Israeli-related targets. For example, in February 2016, Iran's ambassador to Lebanon Mohammad Fathali promised to provide financial support to those killed attacking

Israelis, stating "The decision firstly includes giving an amount worth $7,000 (£5,028) to every family of a martyr of the intifada in Jerusalem." *Id*. at ¶ 28.

52.     U.S. State Department annual reports on terrorism frequently refer to Iran's role as a sponsor of terrorism and to its support for the terrorist organizations Hamas and PIJ. *Id*. at ¶ 27.

### 2.    Iranian Support for Hamas

53.     The Islamic Resistance Movement (Arabic: Harakat al-Muqawama al-Islamiya), known by the Arabic acronym "Hamas," is a terrorist organization established in December 1987 by Palestinian Sunni Islamist militants opposing the establishment and existence of Israel. The organizing principle of Hamas was advocacy of terrorist attacks on Israeli civilians, with the goal of eliminating the State of Israel and establishing an Islamic state in all the territory that comprises Israel, the West Bank, and the Gaza Strip. *Id*. at ¶¶ 32-33; Levitt Decl. ¶ 19 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

54.     Hamas employs a three-pronged strategy to achieve this goal: (a) social welfare activity that builds grassroots support for the organization; (b) political activity that competes with the secular PA, and (c) guerilla and terrorist attacks that target Israeli soldiers and civilians. Levitt Decl. ¶ 19 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

55.     Since its founding, Hamas has committed countless acts of violence against both military and civilian targets, including bombings, suicide operations, and rocket and mortar attacks directed at Israeli civilian population centers. Hamas terror attacks are indiscriminate in nature because they are intended to terrorize not only the targeted individuals but the general Israeli population and to obtain concessions from the Israeli government. As such, Hamas attacks have killed innocent civilians from around the world, including civilians from the United States, the United Kingdom, etc. Hamas has purposely targeted many busy civilian venues, including buses,

bus and light rail stops, discotheques, restaurants, markets, universities, and even a hotel hosting a Passover Seder. *Id*. at ¶¶ 22-24.

56.     From 2008 through early 2016, Gaza-based Palestinian terrorist groups, including Hamas, fired over 8,500 rockets into Israel. This rocket fire has been indiscriminate, targeting Israeli Jews and Arabs, foreign workers, and tourists alike. *Id*. at ¶¶ 25-26.

57.     Hamas also carries out kidnapping operations for the express purpose of using the victim as leverage in prisoner swaps. *Id*. at ¶ 28.

58.     Hamas also employs and inspires vehicular attacks and in addition to terror attacks it carries out itself, Hamas also actively calls for and incites others to commit violent acts. Hamas celebrates and praises attacks against Israel. *Id*. at ¶¶ 29, 39-40.

59.     Hamas was named by the State Department as a Designated Foreign Terrorist Organization in the original list of such groups issued October 8, 1997. Clawson Decl. ¶ 63 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468.

60.     Iran's relationship with Hamas has waxed and waned over the years, but Iran never cut off all its support for Hamas even when the relationship was cool, and when the relationship was warm, Iran provided Hamas substantial financial and military support. *Id*. at ¶ 33.

61.     Without the significant funding it needs to carry out its terrorist, political, and social activities, which are interdependent and mutually reinforcing endeavors-Hamas could not function. Iran plays a critical role in funding, providing material support, arming, and training Hamas operatives. In addition to operational, social support, infrastructure, and other expenses, Hamas also invests significant amounts of money in its radicalization and incitement campaigns. For example, Hamas runs summer camps training children in violence against Israelis, produces radical textbooks, and operates media production companies and television channels that broadcast

constant incitement against Israel. Levitt Decl. ¶¶ 41, 42-48 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

62.     Iranian state sponsorship of Hamas is critical not only in terms of providing the material and funds with which to carry out terrorist operations, but also the rhetorical support necessary to sustain the pace of such operations and provide legitimacy to acts of terrorism. *Id.* at ¶¶ 49-53.

63.     From about 1993 until the late 1990s, Iran and Hamas became very close as a result of Hamas' willingness to perpetrate terrorist activities and bus bombings. Iran urgently desired to disrupt the Middle East peace process, which appeared to be moving forward at the time, and Iran considered terrorist activities a way to do so. Therefore, Iran strongly and publicly encouraged Hamas to carry out such activities. Throughout this period, Hamas operatives received military training in Iran. Clawson Decl. ¶ 35 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468.

64.     During this time, Iran gave Hamas millions of dollars, in addition to the hundreds of millions of dollars that Iran spent supporting other terrorist groups. The money, among other things, supported Hamas' terrorist activities, for example, by bringing Hamas into contact with potential terrorist recruits and by providing legitimate front activities behind which Hamas could hide its terrorist activities. Iran typically paid generously for "results," which Hamas provided by committing numerous bombings during this time. *Id.* at ¶ 38.

65.     U.S. Courts have concluded that "Iran provides ongoing terrorist training and economic assistance to Hamas," and found that Iran has "provided material support and resources to Hamas and its operatives, for the specific purpose of carrying out acts of extrajudicial killing." Levitt Decl. ¶ 67 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

66.    The Iran-Hamas relationship cooled for a brief time but deepened again in 2002. Clawson Decl. ¶ 39 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468.

67.    In July 2003, the Israeli Ministry of Foreign Affairs estimated that Iran provided Hamas with $3 million a year. *Id*. at ¶ 40; Levitt Decl. ¶ 59 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

68.    With a fall-off in Hamas terrorist activities largely due to a fierce Israeli campaign against Hamas, the Iran-Hamas relationship cooled briefly after 2003, but warmed again within a few years. In December 2005, Hamas' leader Khaled Mashal visited Tehran. Clawson Decl. ¶ 41 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468.

69.    Iranian support, finances, and arms rose exponentially after Hamas won a plurality in the Palestinian parliament in 2006, and Iran reportedly pledged $250 million to Hamas' Prime Minister Ismail Haniya in 2006 and 2007. Although Egyptian authorities reportedly confiscated some of these funds, large sums of Iranian money flowed into the Gaza Strip earmarked for Hamas. *Id*. at ¶ 42.

70.    In November 2006, Israel's UN Ambassador reported that Iran had contributed $120 million to Hamas, and that 30 tons of weaponry had been smuggled into Gaza in just the past month. Levitt Decl. ¶ 68 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

71.    The Iran-Hamas relationship grew even closer after Hamas took complete control of the Gaza Strip in a 2007 coup, with Iran providing more money, arms, and training to Hamas. Clawson Decl. ¶¶ 43-45 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468.

72.    Iran's provision of substantial military training, arms, and money to Hamas continued throughout 2008 and 2009. Hamas personnel received extensive training in Iran, and

many mortar shells and rockets fired by Hamas at Israel during 2008 were designed and manufactured by Iran. *Id*. at ¶¶ 45-47.

73.    In May 2008, Iran reportedly decided to increase its financial support for Hamas to $150 million for the second half of 2008. In early 2008, Hamas agreed to a ceasefire with Israel, during which time many reports suggest that smuggling-including arms smuggling-by tunnels from Egypt into Hamas-controlled Gaza increased substantially. *Id*. at ¶ 48.

74.    By December 2008, Hamas resumed terror attacks on Israel civilians. Israeli retaliation turned into a substantial three-week military confrontation from December 2008 to early January 2009. Soon after a ceasefire was arranged, Hamas leader Khaled Mashal visited Tehran in February 2009 and thanked Iran for its support during the conflict, calling Iran a "partner in victory." *Id*. at ¶ 49; Levitt Decl. ¶ 54 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

75.    As part of its weapon supply activities, Iran smuggled weapons through Sudan and Egypt, and Iran designed and provided Hamas rockets that could be fit through tunnels used to smuggled goods from Egypt into Gaza. Clawson Decl. ¶¶ 50-52 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468.

76.    The Lebanese-Hezbollah movement is another important intermediary Iran uses for smuggling arms into Gaza. *Id*. at ¶ 54.

77.    In 2010, the seizure by Cyprus of a ship carrying munitions led to a UN Security Council committee to conclude that Iran had violated a Security Council ban on Iranian arms exports. In March 2011, the Israeli Navy intercepted a ship heading towards Egypt with more than 50 tons of weapons from Iran, including advanced anti-ship missiles, mortars, tens of thousands of rounds of ammunition for Kalashnikovs, and instruction manuals in the Persian language. The

military supplies and weapons on these ships were believed to be destined to support terror groups in Gaza to be used against Israel. *Id*. at ¶ 54; Levitt Decl. ¶ 71 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

78.     Iran's support for Hamas, including military support and weapons training, continued unabated in 2011. Clawson Decl. ¶ 54 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468.

79.     The Iranian-Hamas relationship went through a rough spot in 2012, but Iranian funding for Hamas never completely stopped, particularly for Hamas' military wing. *Id*. at ¶ 55; Levitt Decl. ¶¶ 73-74, 81-83 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

80.     The Iran Hamas relationship improved during Hamas-Israel fighting in November 2012, and Iranian and Hamas officials became blunter about Iranian support for Hamas rocket attacks on Israel. Clawson Decl. ¶ 56 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468.

81.     In November 2012, Iranian Parliament Speaker Ali Larigani told reporters: "We proudly say we support the Palestinians, militarily and financially." IRGC commander Mohammed Ali Jafari proclaimed that missile technology "has been transferred to the resistance, and an unlimited number of these missiles are being built." On November 21, Hamas Political Bureau Chairman Khaled Mashal thanked Iran for "arms and funding." *Id*.; Levitt Decl. ¶ 72 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

82.     The Iran-Hamas relationship improved further after the Egyptian military's July 2013 overthrow of the Morsi government which has been close to Hamas, leaving Hamas quite dependent on Iranian aid. Clawson Decl. ¶ 57 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468.

83.    Hamas-Iranian relations were further strengthened in the course of 2014 as Hamas stepped up its terror activities. After Hamas' June 12, 2014 kidnapping and murder of three teenagers including Naftali Fraenkel, Hama rocket attacks and Israeli air strikes escalated into an Israeli invasion of Gaza that lasted from July 8 until August 26. Iran issued statements strongly supporting Hamas' activities during this time and in the aftermath. On September 29, 2014, Major General Ghola Ali Rashid of Iran's Armed Forces General Staff Headquarters stated, "Today some of our commanders are providing advisory assistance to Iraq and its army, in addition to the resistance in Lebanon, Hezbollah, and the Palestinian resistance movement." Iran's Supreme Leader Khamenei stated on November 25, 2014: "Islamic Rep. of Iran, with divine grace, has not become prisoner of sectarian limitations and divisions. Just as it aids Shi's Hizbollah in Lebanon, it aids Hamas and Islamic Jihad [PIJ] and other Sunni groups in Palestine." *Id.* at ¶ 58.

84.    On December 14, 2014, Abu Obeida, the spokesman for Hamas' military wing, the Izz ad-Din al-Qassam Brigades, expressed his thanks to Iran for supporting Hamas with money and weapons and providing it with rockets and anti-tank missiles. *Id.* at 59; Levitt Decl.  ¶ 57 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

85.    In 2015, the Hamas-Iran relationship was strained as Iran's relationship with the oil-rich monarchies of the Persian Gulf deteriorated during that year. However, that by no means meant an end to Iranian material support for Hamas, which reportedly included tens of millions of dollars transferred to Hamas' Izz al-Din a-Qassam Brigades for training, military diving gear, advanced weaponry and electronic equipment. *Id.* at ¶¶ 87-88; Clawson Decl. ¶ 60 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468.

86.    Quite a few Hamas officials visited Tehran in 2017. The high point was an October 2017 visit by a Hamas delegation led by Hamas Political Bureau deputy head, Saleh Al Arouri,

which met with Iranian Parliament Speaker Ali Larijani, Iran's Supreme National Security Council Secretary Admiral Ali Shamkhani, and Advisor to the Leader of the Islamic Revolution in Iran, Ali Akbar Velayati. Velayati stated: "We are proud of supporting the Palestinian resistance and Hamas Movement. The Iranian leadership and our people will continue to support the resistance led by Hamas and Islamic Jihad [PIJ]." *Id.*

87.    The Court accepts and adopts Dr. Clawson's and Dr. Levitt's expert opinions that Iran has supplied substantial material support to Hamas, including in the period 2008-17. *Id.* at ¶ 61.

### 3.    Iranian Support for PIJ

88.    PIJ was founded in about 1981 by two Gaza residents who greatly admired the Iranian revolution, Fathi Shiqaqi and Abd al-Aziz Awda. PIJ's determination to attack Israelis helped it secure Iranian financial and material support. After the PIJ's leadership was arrested in 1986-1987 and transferred to Lebanon, they came into direct contact with Iranian officials and formed close relations with the Iranian Revolutionary Guard and the Iranian-directed Hezbollah in Lebanon, and from this time PIJ increasingly adopted the use of terrorist actions, including suicide bombings, to promote its cause. These relations continued after PIJ moved its headquarters to Damascus in 1989, where it remains to this day. *Id.* at ¶ 62; Levitt Decl. ¶¶ 90-94 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

89.    PIJ operatives began training at Hezbollah camps in Lebanon under the supervision of Iranian Revolutionary Guards and carried out some joint operations with Hezbollah against Israeli forces in south Lebanon in the 1990s. PIJ had soon established itself as one of the most violent and fundamentalist of all the Palestinian rejectionist groups. *Id.* at ¶¶ 95-96.

90.     After the 1993 Palestinian-Israeli deal under which most of Gaza was largely under the control of the Palestinian Authority, Iran stepped up its support for PIJ, providing millions of dollars for each attack on Israel. Clawson Decl. ¶ 62 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468.

91.     As early as 1993, PIJ leader Shiqaqi acknowledged that he received money and support from Iran, and that "the money and arms" were then channeled to operatives in Gaza and the West Bank. Levitt Decl. at ¶ 110 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468). PIJ is widely recognized as a terrorist group and is known for executing terrorist attacks targeting Israeli civilians. The U.S. Treasury Department designated PIJ as a Specially Designated Terrorist ("SDT") in 1995, and the U.S. State Department designated the group as a Foreign Terrorist Organization ("FTO") in 1997. *Id.* at ¶¶ 101, 107; Clawson Decl. ¶ 63 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468.

92.     While there was a dramatic drop-off in PIJ attacks in the late 1990s after the assassination of PIJ leader Shiqaqi, PIJ attacks picked up sharply with the beginning of the second Palestinian uprising in September 2000 and after the release of key PIJ operatives from jail in 2000 and 2001. For example, from September 2002 until October 2003, more than 440 terrorist attacks (including suicide bombings and other attacks) were attributed to PIJ, killing over 130 Israelis and wounding about 880 more. PIJ has carried out many more deadly terrorist attacks since that time. Levitt Decl. ¶¶ 100-03, 109 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

93.     According to American officials, Iran began paying PIJ millions of dollars in cash bonuses for each attack against Israel during the second Intifada that began in September 2000. *Id.* at ¶ 111.

94.     PIJ concentrates almost exclusively on terror attacks against Israel. PIJ has never been successful at raising substantial support in Gaza and has long been seen in Gaza as being fully controlled by Iran. Clawson Decl. ¶ 64 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468.

95.     Since PIJ had no responsibilities for governing, it did not worry about Israeli retaliation for rocket attacks. PIJ was eager to launch rockets to show that it, unlike Hamas, was actively attacking Israel. What constrained PIJ from rocket launching was Hamas' crackdown if PIJ acted without Hamas approval—Hamas did not want to take the blame, in the eyes of Gazans, for Israeli retaliation. The result was that Hamas would allow PIJ to act only during periods of active confrontation between Hamas and Israel. This is what happened in April 2008 (216 rockets launched, not all of which reached Israel), March 2012 (about 200), March 2014 (at least 130), and most especially July-August 2014, when PIJ claimed it launched 3,000 rockets. *Id.* at ¶ 65.

96.     As the Iranian-Hamas relationship declined somewhat in the wake of the Syrian civil war in 2011, Iran increased its support to the PIJ. Levitt Decl. ¶ 112 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

97.     In November 2012, PIJ spokesman Daud Shihad stated on the Lebanese pro-Iranian channel Al Mayaden: "It is no secret that we say that the military assistance that Iran has provided to the Palestinian resistance, from A to Z, from a rifle round to a rocket, is assistance from Islamic Republic." PIJ Secretary-General Ramadan Abdullah told Al Jazeera television: "Iran has given us all the support, the arms that serve the resistance—all the world knows that its principal source is Iran, or weaponry that has arrived with Iranian financing… weapons that have reached the [Gaza] Strip arrived via Egypt of today or of former times, and this will continue for the future too." *Id.* at ¶ 66.

98.     In May 2013, Shihad told al-Monitor: "All of the weapons in Gaza are provided by Iran, be they weapons intended for the Hamas movement or for the PIJ…everyone knows that Iran is financing us." He added that "the largest share" of financial and military support to Palestinian terror groups was coming from Iran. Levitt Decl. ¶ 113 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

99.     The U.S. State Department reported in 2013 that Iran is the primary sponsor of weapons and funding to the PIJ. *Id.* at 30. PIJ leaders frequently visited Tehran, where they met top Iranian officials. For example, on February 5-6, 2014, PIJ leader Ramadan Abdullah met with Iranian President Hassan Rouhani, Iranian Foreign Minister Javid Zarif, and Iranian Parliament Speaker Ali Larijani. *Id.* at ¶ 114; Clawson Decl. ¶ 68 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468.

100.    PIJ was also actively trying to extend its activities to the West Bank. That became particularly important for PIJ after the Israeli-Hamas Gaza ceasefire in August 2014. At that time, Iranian Brigadier General Mohammad Reza Naqdi, commander of Iran's Basij force confirmed that "arming the West Bank has started and weapons will be supplied to the people of this region." This was the context for the October 29, 2014 terrorist shooting of Yehuda Glick in Jerusalem by Moataz Haejazi, whom PIJ claimed was a member of the group. *Id.* at ¶ 67; Levitt Decl. ¶ 115 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

101.    On October 14-20, 2014, just a few weeks before the terrorist shooting of Yehuda Glick in Jerusalem, PIJ leader Abdullah met Iran's Supreme Leader Ali Khamenei, who according to the official Iranian Press TV, "once again emphasized the necessity for planning to provide the West Bank of River Jordan with the necessary equipment to counter the occupying regime of Israel." Palestinians consider Jerusalem to be in the West Bank. PIJ leader Abdullah also met Iran's

Supreme National Security Council Secretary Ali Shamkhani, who pledged: "Rebuilding Gaza and improving its defense capabilities...are on Iran's agenda." Abdullah also met former Iranian president and Expediency Council Chairman Ali Akbar Hashemi Rafsanjani, who told him: 'If you want Israel to fall to its knees of its own, then you have to plan new steps that will take them by surprise." Clawson Decl. ¶ 68 in *Force v. Islamic Rep. of Iran, et al.*, DE 32, Civ. No. 16-1468.

102.    In 2015, Iran and PIJ had a tense moment as PIJ refused Iran's request to condemn Saudi Arabia for its intervention in Yemen, but they soon patched up relations. During May 1-6, 2016, PIJ leader Abdullah saw Iran's defense minister, foreign minister, president, and Supreme Leader in Tehran. On December 15, 2016, Abdullah once again saw the Iranian Supreme Leader, with each pledging their commitment to "resistance" as the only route for Gaza. *Id.* at ¶ 69.

103.    The Court accepts and adopts Dr. Clawson's expert opinion that Iran has supplied substantial material support to PIJ, including in the period 2014-2016. *Id.* at ¶ 70.

104.    The Court also accepts and adopts Dr. Levitt's expert opinion stated as follows: Over the course of many years, Iran has provided significant financial and material support to both Hamas and PIJ, among other groups, without which neither group could have carried the kind of sophisticated and effective terrorist attacks for which they have become known. This support enables these groups to carry out a wide range of attacks from shootings and stabbings and bombings, to kidnappings and car ramming's and rocket attacks. These attacks sometimes target soldiers but often civilians, in an effort to terrorize the Israeli population and seek the establishment of an Islamic state in the place of Israel. While Iranian support for Hamas and PIJ has fluctuated, it has never fully ceased. Without Iran's support—including funding, weapons and more—groups like Hamas and PIJ would never be able to carry out the scale and scope of incitement and terrorism

for which they have become famous. Levitt Decl. ¶ 128 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

### 4.    Iranian Support for Hezbollah

105.    Since 1979 and until the present time, Iran had continuously been governed by a militant Islamic regime which believes that Islam should be the sole world religion, that all non-Islamic nations and peoples should become Islamic and be destroyed if they refuse to do so, and that the Islamic nations, led by Iran, should rule the world exclusively. Clawson Decl. ¶¶ 22 (DE 31).

106.    Since 1979 and until the present time Iran has been and remains, as a matter of official policy, extremely hostile to the United States (which Iran terms "the Great Satan") and to the State of Israel (which Iran terms "the Little Satan"). Clawson Decl. ¶ 23 (DE 31).

107.    Since 1979 and until the present time it has been the continuous and official policy and goal of Iran:

a.    To weaken, harm and undermine the United States militarily, economically and politically;

b.    To bring about and cause the eradication of the State of Israel and its replacement with an Islamic state; and

c.    To bring about and cause the murder and/or expulsion of the Jewish residents of the State of Israel.

Clawson Decl. ¶ 23 (DE 31).

108.    The policy and goals described in the previous paragraph are referred to collectively hereinafter as "Iran's Policy and Goal." Clawson Decl. ¶ 24 (DE 31).

109.    Iran is a highly ideological and authoritarian state that does not tolerate dissent and all political subdivisions of the Iranian government, all agencies and instrumentalities of Iran and all corporations controlled or directly or indirectly owned by Iran therefore support, and seek to advance the policies and goals of Iran, including Iran's Policy and Goals. Accordingly, MOIS (which is a political subdivision of the Iranian government) supports and seeks to advance Iran's Policy and Goals. Clawson Decl. ¶¶ 20, 52-53 (DE 31).

110.    Since 1979 and until the present time, it has been the continuous and official policy of Iran to use terrorism to achieve Iran's Policy and Goals. Specifically, since 1979 and until the present time, it has been the continuous and official policy of Iran to use terrorism: (a) to intimidate and influence the United States government and public and thereby to weaken, harm and undermine the United State militarily, economically and politically, and (b) to intimidate and influence the Israeli government and public and thereby to bring about the eventual eradication of the State of Israel and its replacement with an Islamic state and the murder and/or expulsion of the Jewish residents of the State of Israel. Clawson Decl. ¶ 23 (DE 31).

111.    In order to carry out and achieve Iran's Policy and Goals using terrorism, Iran established the Hezbollah terrorist organization in 1982. Since 1982 and until the present day, Hezbollah has been controlled, funded and operated by Iran. Since 1982 and until the present day, Iran has used Hezbollah to carry out thousands of terrorist attacks against Americans and Israeli targets, in which hundreds of innocent victims have been murdered and thousands more maimed. *See* Decl. of Professor Barry Rubin and Decl. of Claudia Rossett in *Kaplan v. Hezbollah*, 213 F. 27 (D.D.C. 2016), DE 36 at Exhibits 10 and 12, DE 54, DE 107, Civ. No. 09-00646. Clawson Decl. ¶¶ 20, 40, 41, 43, 45-47, 49 (DE 31).

112.    In 1982, Iran and Hezbollah entered into an agreement that remains in force today, pursuant to which Hezbollah undertook to carry out acts of terrorism against American and Israeli targets, and in return Iran undertook to provide Hezbollah with financial and other material support to carry out such terrorist attacks ("Hezbollah Agreement"). The purpose of the Hezbollah Agreement was and is to achieve Iran's Policy and Goals. *See* Decl. of Professor Barry Rubin and Decl. of Claudia Rossett in *Kaplan v. Hezbollah*, 213 F. 27 (D.D.C. 2016), DE 36 at Exhibits 10 and 12, DE 54, DE 107, Civ. No. 09-00646. Clawson Decl. ¶¶ 40-41, 43, 45-47, 49 (DE 31).

113.    The Court accepts and adopts Dr. Clawson's expert opinion that Iran has supplied substantial material support to Hezbollah, including in the period 1982-2006. Clawson Decl. ¶¶ 1, 20 (DE 31).

114.    The courts of the United States have published numerous decisions finding that Hezbollah was responsible for carrying out terrorist attacks in which U.S. citizens were murdered or harmed. This Court has found that "Hezbollah is an Iranian proxy organization, controlled, funded and operated by Iran…Iran's control over Hezbollah is so far-reaching that [the federal courts have] repeatedly held Iran vicariously liable, under the doctrine of *respondent superior*, for actions of Hezbollah." *Stern v. Islamic Rep. of Iran*, 271 F. Supp. 2d 286, 292 (D.D.C. 2003). *See also e.g., Estate of Heiser v. Islamic Rep. of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).

115.    This Court in *Kaplan v. Central Bank of Iran, et al.*, 55 F. Supp. 3d 189 (D.D.C. 2014), found Iran liable to other plaintiffs injured in the very same Hezbollah Rocket Attacks at issue here. Specifically, this Court in *Kaplan* found that Iran "assisted Hezbollah" by providing funds to it and by funneling weapons to Hezbollah. *Id*. at 197. In *Kaplan*, this Court further noted that Iran "aided in the tunnel-building process by smuggling North Koreans into Lebanon as their Asian houseboys." *Id*. at 197. Significantly, in *Kaplan*, the Court concluded after hearing Dr.

Bechtol testify that Iran and North Korea "were together engaged in the production of the M-600 rockets that give Hezbollah the ability to strike at urban centers in central Israel. *Id*. at 197. *Kaplan v. Hezbollah*, 213 F. 27 (D.D.C. 2016), DE 36, 107, Civ. No. 09-00646.

### 5.    Impact of FSIA Terrorism Judgments Against Iran

116.    Even though Iranian leaders pay close attention to civil terrorism suits, Iran has so far not been dissuaded from providing financial support for terrorism. Nevertheless, the financial pressure of past court judgments remains an element in Iran's calculation about whether and how to support terrorism. Levitt Decl. ¶¶ 71-74 in *Force v. Islamic Rep. of Iran, et al.*, DE 31, Civ. No. 16-1468.

117.    Iran has recently taken a more active stance in some terrorism-related cases. After years in which Iran has not contested such actions, Iran has engaged lawyers in several recent suits. Even so, Iran has not decreased its support for terrorism, but has dramatically increased and widened its support for terrorists, terrorist organizations, and terrorist activities throughout the world. Iran is blatant in its support of terrorism. *Id.* at ¶¶ 75-80.

118.    Iranian officials pay extremely close attention to what the outside world has to say about the Iranian government and its policies, and they generally assume that whatever is written about Iran reflects a unified government policy of the country from which a comment originates. Iranian officials have shown themselves to be sensitive to the damages levied against Iran, and they are well aware that such damages have been a common feature in actions against Iran for its support of terrorism against Americans. *Id.* at ¶ 81.

119.    Were this Court not to impose damages for a spectacular terrorist act, Iranian government officials would interpret that as indicating a significant weakening of U.S. pressure on Iran to end its support for terrorism against Americans. *Id.*

120.    On the other hand, were this Court to impose substantial damages, Iranian officials would interpret that as indicating that U.S. policy remains firmly opposed to Iranian support for terrorism against Americans. *Id.*

### 6.    Syria's Role in Assisting Hamas in Israel

121.    Plaintiffs' expert witness testimony concerning Syria's assistance to Hamas in Israel is also compelling. From this evidence certain conclusions are clear. Syria has supported Hamas by (1) facilitating the recruitment and training of Hamas, providing a safe haven and affording political credibility, and (2) providing financial assistance.

122.    Syria's relationship with Hamas has been useful to Syria in asserting its role as the 'champion of Palestinian resistance.' Syria was aligned with Hamas in opposing the Oslo Accords. Thus, Syria intensified its support for Hamas, particularly for engagement in terrorism, with the view that terrorism would help Syria fight the peace process and manipulate its own peace negotiations with Israel. The tactic of terrorism had the dual goal of harming Israel and its citizens and undermining the Palestinian Authority's influence among Palestinians. By leveraging Pan-Arab and anti-Israeli sentiments along with championing Palestinian rights, Syria was able to gain regional status and legitimacy. Declaration of Benedetta ("Berti Decl.") ¶¶ 18-23 in *Force v. Islamic Rep. of Iran, et al.*, DE 29, Civ. No. 16-1468; Declaration of Marius Deeb ("Deeb Decl.") ¶17 in *Force v. Islamic Rep. of Iran, et al.*, DE 30, Civ. No. 16-1468.

123.    After 1993, Syria also became the de facto political and communication base of all the main factions—secular and religious—that opposed Fatah and the Oslo Accords. Syria sponsored the creation of the Alliance of Palestinian Forces (APF), an umbrella group that included ten anti-Oslo factions, Hamas and the PIJ being the two Islamist, non-secular members. Berti Decl. ¶ 24 in *Force v. Islamic Rep. of Iran, et al.*, DE 29, Civ. No. 16-1468.

124. Syria's relationship with Hamas developed in the early 1990s when Hamas opened an office in Damascus. Its military wing, known as the Izsz al-Din al-Qassam Brigades, established an operational headquarters. Hamas military leaders in Syria worked closely with Syrian intelligence. Hamas gradually boosted its presence in Syria, a process that culminated in Hamas' decision to move its Political Bureau to Damascus in 2000. The relationship grew throughout the 2000s, becoming even stronger after Hamas' takeover of the Gaza strip in 2007. *Id.* ¶¶ 25, 27.

125. From 2000-2012 the safe haven provided by Syria to the Hamas and its senior leadership strengthened it as an organization. The leader of Hamas, Khalid Mash'al, moved permanently to Damascus in 2003 and Syria provided Hamas with a safe base from which to conduct its foreign relations, communicate to the world, host its military leaders and at times plan its violent operations and fundraise. It was a center for Hamas's terrorist functions –from strategic planning to command and control. In no other regional capital has Hamas had so much freedom to maneuver. In fact, the Syrian government facilitated the group's political role organizing, for example, meetings in Damascus with Iranian President Mohammad Khatami and other high-level Iranian officials. *Id*. ¶ 28, Deeb Decl. ¶¶ 15, 18 in *Force v. Islamic Rep. of Iran, et al.*, DE 30, Civ. No. 16-1468; Berti Decl. ¶ 47 in *Force v. Islamic Rep. of Iran, et al.*, DE 29, Civ. No. 16-1468.

126. The support which Syria provided to Hamas, by giving the organization and its leaders safe haven, allowing it to operate its military headquarters in Damascus and giving it access to other resources such as unrestrained access to funding, weapons, travel, communications, military training, intelligence and strategy proved significant for the terror organization's overall operational infrastructure. Hamas's external leadership based in Damascus grew so powerful that it was able to control and direct operational decisions. The resources provided by Syria enable

Hamas to develop into a more sophisticated organization. *Id.* Deeb Decl. ¶ 19 in *Force v. Islamic Rep. of Iran, et al.*, DE 30, Civ. No. 16-1468.

127.    Damascus provided safe operational space to not only Khaled Mash'al, but to Musa Abu Marzouq, and Imad al-Alami, another of Hamas' historical leaders who, from Damascus oversaw Hamas' relationship with external allies, including Iran and Syria, as well as military activities. To put this in perspective, these individuals were all designated as Specially Designated Global Terrorists (SDGTs) in 2003 by the United States Department of the Treasury. The fact that three out of the top six Hamas figures so designated in 2003 were based in Damascus is powerful evidence of how central Syria was in terms of providing safe haven for Hamas. *Id.* ¶ 15; Berti Decl. ¶ 34 (3) in *Force v. Islamic Rep. of Iran, et al.*, DE 29, Civ. No. 16-1468.

128.    Syria's support for Hamas, including the safe haven it provided and the unrestrained access to funding, weapons, travel, communications, military training, intelligence and strategy was also a factor in the success of Hamas' terrorist operations during the Second Intifada which was launched in September of 2000. At its peak, between 2001 and 2002 some of the most lethal suicide attacks against restaurants, night clubs and Universities in Israel were linked to operatives residing in Syria. *Id.* ¶ 20; Berti Decl. ¶ 41 in *Force v. Islamic Rep. of Iran, et al.*, DE 29, Civ. No. 16-1468.

129.    In the years after the end of the Second Intifada in 2005, and despite the dismantling of all Israeli communities in Gaza, Hamas continued its terrorist activities against Israel. Decisions at the highest level, concerning both military and political activities, including armed operations in the West Bank were directed from its Damascus headquarters. This included, orchestrating the kidnapping of Israeli soldier Gilad Schalit in 2006, orchestrating the Hamas takeover of Gaza in 2007, and the provocation that led to the 2008-2009 conflict in Gaza. During the war, all Syrian

cell phones received continuous updates calling for their support as if it was a surrogate Syrian war. In January 2010, Hamas leader Khalid Mash'al delivered a speech in Beirut in which he stated that it was Syrian support during that conflict that made it possible for Hamas to win the war. Deeb Decl. ¶ 21 in *Force v. Islamic Rep. of Iran, et al.*, DE 30, Civ. No. 16-1468.

130.    Military activities planned and organized from Damascus were not forcefully or systematically cracked down by the Syrian regime. To the contrary, Syria remained supportive of Hamas' militant activities. Berti Decl. ¶ 45 in *Force v. Islamic Rep. of Iran, et al.*, DE 29, Civ. No. 16-1468.

131.    Syria has served as a conduit to channel money to finance Hamas' military operations and terrorist attacks. As an example, Jamal Muhammad Farah al-Tawil—Hamas military commander in the West Bank—is reported to have received money for the group's attacks from Hamas leaders in both Damascus and Beirut. They were reportedly transferred through the ad-hoc charity the Al-Islah Charitable Society. *Id.* ¶ 52.

132.    Weapons shipments originating from Iran are reported to have been transferred on several occasions through Syria (and from there to Gaza, passing through Sudan/Sinai)—with Syria being a key channel through which to smuggle and obtain weapons. Hamas' rocket and missile arsenal has grown through the use of parts thought to originate in Syria or Iran and smuggled in through tunnels from Egypt. *Id.*  ¶¶ 53-54.

133.    Syrian support waned starting in 2012 when Hamas's support for rebel forces in the Syrian civil war caused a rift between Hamas and Syria. Deeb Decl. ¶ 22, Berti Decl. ¶ 56 in *Force v. Islamic Rep. of Iran, et al.*, DE 29, Civ. No. 16-1468.

134.    Despite this, Hamas continues to enjoy the benefits of Syria's widespread support it received prior to 2012. The substantial organizational support, military and terrorist capabilities,

strategies and training Syria provided to Hamas strengthened and legitimized the group while helping it to develop into a major player in the Palestinian political and military scene. Hamas' capabilities as they stand today are a product of the past support given by the Syrian regime. Syrian support was a major force multiplier for Hamas. Hamas continues to benefit from the effects of this support to this day. Deeb Decl. ¶¶ 22-24 in *Force v. Islamic Rep. of Iran, et al.*, DE 30, Civ. No. 16-1468; Berti Decl. ¶¶ 59-60 in *Force v. Islamic Rep. of Iran, et al.*, DE 29, Civ. No. 16-1468.

135.    The tactical know-how which Hamas gained while under Syrian protection is directly responsible for the Hamas terrorist attacks seen today. Deeb Decl. ¶ 24 in *Force v. Islamic Rep. of Iran, et al.*, DE 30, Civ. No. 16-1468.

136.    The effects of Syria's support for Hamas will continue to be relevant for years to come. Berti Decl. ¶ 60 in *Force v. Islamic Rep. of Iran, et al.*, DE 29, Civ. No. 16-1468.

137.    The Court accepts and adopts Dr. Berti's expert opinion that Syria has supplied substantial material support to Hamas, and that the continuous support which Syria provided to Hamas in the previous years contributed to giving the group the military edge and sophistication it needed to be able to carry out successful violent operations to this day. "In plain terms, without Syria's significant support, Hamas would not be the powerful, deadly organization it is today." Berti Decl. ¶ 66 in *Force v. Islamic Rep. of Iran, et al.*, DE 29, Civ. No. 16-1468.

138.    The court also accepts and adopts Dr. Deeb's expert opinion that the tactical know how which Hamas gained while under Syrian protection is directly responsible for the Hamas terrorist attacks seen today. The terrorist operations at issue in this case were all possible because of this Syrian role. Deeb Decl. ¶ 25 in *Force v. Islamic Rep. of Iran, et al.*, DE 30, Civ. No. 16-1468.

### 7.    Syrian Support for PIJ

139.    PIJ was formed in 1981, founded by Fathi Shaqaqi and Abd al Aziz Awda who were influenced by the ideology of the Islamic Revolution in Iran led by al-Khomeni. PIJ was established from the Gaza strip to serve as a revolutionary Islamist vanguard organization focused on armed struggle against Israel and dedicated to the "Liberation of Palestine." Deeb Dec. ¶ 26 in *Force v. Islamic Rep. of Iran, et al.*, DE 30, Civ. No. 16-1468; Berti Decl. ¶ 30 in *Force v. Islamic Rep. of Iran, et al.*, DE 29, Civ. No. 16-1468.

140.    Syria offered assistance to the Palestinian Islamic Jihad (PIJ, or Harakat al-Jihad al-Islami fi-Filastin, literally the Movement of the Islamic Jihad in Palestine). PIJ is a designated Foreign Terrorist Organization (FTO) in the United States and its current leader, Ramadan Shalah (Ramadan Abdullah Shallah), is a "Specially Designated Terrorist" under U.S. 141. After PIJ's leader Fathi Shaqaqi's deportation from Gaza to Lebanon in 1988, the group's leader invested in boosting PIJ's presence in both Lebanon and Syria, where the Islamic Jihad established a Damascus-based office in 1989, in the process increasing contacts with both the Iranian and Syrian governments. Since then, the group has maintained a permanent base in Syria, with Damascus serving important political and operational functions. *Id.* at 32.

141.    Syria's support for Hamas and PIJ over an extended period of time has been significant on a number of levels. After 1993 PIJ moved its main headquarters outside of the Palestinian Territories to Damascus and the group's senior leadership chose the Syrian capital as its base. For example, founder Fathi Shaqaqi himself was based in Syria in the years between the late 1980s/early 1990s and his death in November 1995. After Shaqaqi's assassination, Ramadan Shalah took over the leadership of the organization, in the process leaving the United States to take up residence in Damascus. *Id.* at ¶ 35.

142.     Syria has been a safe base for PIJ allowing the group's leadership in Damascus to meet with its counterparts based in the West Bank and Gaza in order to discuss political and strategic matters. *Id.* at ¶ 36.

143.     The advantage of this safe haven extends beyond granting Hamas and the PIJ the physical premises from which to operate. By hosting these groups, Syria offered symbolic validation, political support, legitimacy and freedom of maneuver, all of which enabled PIJ and Hamas to grow and develop, to boost regional status and credibility, as well as to increase their military capabilities and solidify themselves as major players in the Palestinian arena. *Id.* at ¶ 37.

144.     PIJ leadership conducted a vast array of communication, political, fundraising, and operational activities from Damascus. For example, in a 2005 Press Statement, the U.S. Department of Treasury stated: "According to a significant volume of information available to the U.S. Government, PIJ leadership in Damascus, Syria controls all PIJ officials, activists and terrorists in the West Bank and Gaza." *Id.* at ¶ 44.

145.     Planning and coordination between Hamas, PIJ and other factions occurred in Damascus, then trickled down at the ground level in Gaza and the West Bank, with the objective of increasing the coordination of these groups' attacks and other armed activities. During the Second Intifada, senior PIJ operatives arrested in the West Bank by Israeli Defense Forces— including Taabat Mardawi and Ali Saffuri—were directly linked to PIJ's leadership in Damascus, reportedly receiving operational directions and, at times, funds from the Syria-based leaders. *Id.*

146.     Damascus's support for PIJ enabled its armed capabilities and activities as well. *Id.* at ¶ 51.

147.     PIJ's positive relationship with Damascus continues to this day. While the Syrian regime's involvement in a protracted and bloody internal conflict has limited the degree of support

that the state is able to offer to PIJ, the PIJ has not formally distanced itself from Syria since the beginning of the 2011 Syrian revolution and the group has repeatedly denied a plan to either sever ties or move its headquarters out of Damascus. Likewise, despite repeated international appeals, the Syrian government has never taken permanent steps to oust PIJ. *Id.* at ¶ 57.

## III.

## CONCLUSIONS OF LAW

### A.    Burden of Proof

148.    The FSIA specifies that a court cannot enter a default judgment against a foreign state, or a political subdivision thereof, "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see Roeder v. Islamic Rep. of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court still has an obligation to satisfy itself that plaintiffs have established a right to relief.").[1] Section 1608(e) provides protection to foreign states from unfounded default judgments rendered solely upon a procedural default. *See Compania Interamericana Export-Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 950-51 (11th Cir. 1996). Although a court receives evidence from only the plaintiff when a foreign sovereign defendant has defaulted, § 1608(e) does not require a court to demand more or different evidence than it would ordinarily receive in order to render a decision. *See Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994). In evaluating the plaintiff's proofs, a

---

[1] This "satisfactory to the court" standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(d). Fed. R. Civ. P. 55(d) ("A default judgment may be entered against the United States, its officers, or its agencies only if the claimant establishes a claim or right to relief by evidence that satisfied the court."); *see also Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003) (a FSIA default winner must prove damages like any other default winner).

court may "accept as true the plaintiff's uncontroverted evidence," *Estate of Botvin v. Islamic Rep. of Iran*, 510 F. Supp. 2d 101, 103 (D.D.C. 2007); *see also Elahi v. Islamic Rep. of Iran, 124 F. Supp. 2d 97,* 100 (D.D.C. 2000), and a plaintiff may establish proof by affidavit. *See Weinstein v. Islamic Rep. of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002). While a plaintiff needs to demonstrate a *prima facie* case to obtain a judgment of liability in a FSIA case, a plaintiff must show entitlement to punitive damages by clear and convincing evidence. *See Peterson v. Islamic Rep. of Iran*, 264 F. Supp. 2d 46, 48 (D.D.C. 2003).

149.   Thus, to prevail on their FSIA claims, Plaintiffs must demonstrate a *prima facie* case of liability. By their failure to appear and defend themselves, Iran, MOIS, and Syria put themselves at risk that the Plaintiffs' uncontroverted evidence would be satisfactory to the Court to prove its allegations. In fact, the Court finds that Plaintiffs have presented satisfactory evidence to prove liability and damages, including punitive damages against all three Defendants.

## B.      Service

150.   Service under the FSIA is governed by 28 U.S.C. § 1608. Subsection (a) provides for service on a foreign state and subsection (b) provides for service on an agency or instrumentality of a foreign state. To determine whether a foreign entity should be treated as the state itself or as an agency or instrumentality, courts apply the core functions test: if the core functions of the entity are governmental, it is treated as the state itself; and if the core functions are commercial, it is treated as an agency or instrumentality. *Roeder*, 333 F.3d at 234.

151.   In this case, service upon all Defendants was attempted under § 1608(a), which governs service on foreign states. Obviously, Iran and Syria are foreign states. MOIS is considered to be the foreign state itself because its core functions are governmental, not commercial. *See Roeder*, 333 F.3d at 234. Specifically, service upon Syria was attempted via 28 U.S.C. § 1608(a)(3)

through delivery of the required documents (translated into Arabic) to its agent via international courier service, evidenced by a return-receipt dated September 14, 2018. (DE 13). Service upon Iran and MOIS was attempted via 28 U.S.C. § 1608(a)(3) through delivery of the required documents (translated into Farsi) on August 22 and August 27, 2018. (DE 14, 15).

## C.    Jurisdiction

152.    The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in *the courts of this country." Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989). Accordingly, this Court lacks jurisdiction over Iran, MOIS, and Syria unless one of the FSIA's enumerated exceptions applies. Here, the state-sponsored terrorism exception to sovereign immunity applies. 28 U.S.C. § 1605A(a). Additionally, the FSIA was amended in 2008 to provide a private cause of action by which a foreign state that sponsors terrorism can be held liable for certain enumerated damages arising from terrorist activities: economic damages, solatium, pain and suffering, and punitive damages. *Id.* § 1605A(c).

153.    Section 1605A(a) provides that a foreign state shall not be immune from the jurisdiction of U.S. courts in cases where plaintiffs seek money damages for personal injury or death that:

> was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). A U.S. court will hear a claim under FSIA if: (1) "the foreign state was designated as a state sponsor of terrorism at the time the act…occurred, or was so designated as a result of such act"; (2) "the claimant or the victim was, at the time the act…occurred" a national of the United States, a member of the armed forces, or "otherwise an employee of the Government

of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment"; and (3) if the act occurred in the foreign state against which the claim has been brought, the foreign state has been afforded "a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration." *Id.* § 1605A(a)(2)(A).

154.    Section 1605A(c) also provides a private right of action to recover damages for state-sponsored terrorism:

> Private Right of Action.—A foreign state that is or was a state sponsor of terrorism…shall be liable to—
>
>     (1)    a national of the United States,
>
>     (2)    a member of the armed forces,
>
>     (3)    an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or
>
>     (4) the legal representative of a person described in paragraph (1), (2), or (3), for personal injury or death caused by acts described in subsection (a)(1) [i.e., the provision of material support or resources for hostage taking, torture, or extrajudicial killing]…. In any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages. In any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

28 U.S.C. § 1605A(c). For persons covered by the private right of action in § 1605A(c) state law claims are not actionable.

155.    Under § 1605A(c), U.S. citizens who are victims of state-sponsored terrorism can sue a responsible foreign state directly. Significantly, the law of a plaintiff's U.S. state no longer controls the nature of the liability and damages that may be sought when a foreign government is sued: Congress has provided the "specific source of law" for recovery. *See Acree v. Rep. of Iraq*,

370 F.3d 41, 59 (D.C. Cir. 2004).[2] By providing for a private right of action and precisely enumerating the types of damages recoverable, Congress has eliminated the inconsistencies that arise in cases decided under state law. *Compare Jackovich v. Gen. Adjustment Bureau, Inc.*, 326 N.W.2d 458, 464 (Mich. Ct. App. 1982) (under Michigan law, exemplary damages are available but punitive damages are not) *with Todd v. Byrd*, 640 S.E.2d 652, 661 (Ga. Ct. App. 2006) (citing OCGA § 51-12-5.1(b), noting that punitive damages are available under Georgia law); *compare* 28 U.S.C. § 1605A(c) (providing for solatium damages under the FSIA) and Mich. Comp. Laws Ann. § 600.2922(6) (wrongful death damages under Michigan law include damages for loss of society and companionship of the deceased) *with Young Men's Christian Ass'n v. Bailey*, 146 S.E.2d 324, 341 (Ga. Ct. App. 1965) (wrongful death action under Georgia law does not provide damages for grief of survivors *and Runyon v. District of Columbia*, 463 F.2d 1319, 1322 (D.C. Cir. 1972) (under D.C. law, a plaintiff in a wrongful death action may not recover for grief); *see Flatow v. Islamic Rep. of Iran*, 999 F. Supp. 1, 29-30 (D.D.C. 1998) (noting many differences in the law of solatium among the states).

156.    Because the injured or murdered victims of each of the four terror attacks in this case were United States nationals,[3] Section 1605A(a)(2)(A)(ii)(I) provides that the sovereign immunity of Iran and Syria is waived, and these victims' and their families' claims can be heard.

---

[2] Further, federal courts look to the Restatement (Second) of Torts, and not state law, to provide content to Congress's express intentions. *See, e.g., Bettis v. Islamic Rep. of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (accepting the Restatement (Second) of Torts as "delineat[ing] the controlling substantive law" for intentional infliction of emotional distress "as a proxy for state common law").

[3] Under the FSIA, a U.S. national is defined as "a citizen of the United States." *See* 28 U.S.C. § 1605A(h)(5) (citing 8 U.S.C. § 1101(a)(22)).

*See* U.S. Passports or Certificates of Citizenship of Akiva Binyamin Jakubowicz, Richard Lakin, Yehuda Glick, Chana Liba Kumer and Malka Kumer. (DE 48, Exhibits 8, 1, 2). *Force v. Islamic Rep. of Iran*, Civ. No. 16-cv-1468 (DE 111 at pages 17, 24).

157.    Plaintiffs Florence Jakubowicz, mother of Akiva Jakubowicz, Yonaton Eliezer Jakubowicz, brother of Akiva Jakubowicz, Rachel Chana Anaki, sister of Akiva Jakubowicz, Ayelet Tikva Jakubowicz, sister of Akiva Jakubowicz, minor Y.L., grandson of Richard Lakin, minor D.A.B., grandson of Richard Lakin, Shachar Boteach, granddaughter of Richard Lakin, are United States citizens and, therefore, liability and damages are assessed under § 1605A(c), providing a private right of action for U.S. nationals. *See* U.S. Passports or Certificates of Citizenship. (DE 48, Exhibits 7, 10, 11, 9, 3).

158.    The following Plaintiffs are not U.S. nationals: Bernard Jakubowicz, father of Akiva Jakubowicz, Rita Avni (Ankori), daughter in-law of Richard Lakin, minors E.A., R.A. and V.A., children of Rita Avni (Ankori) and grandchildren of Richard Lakin and Avital Molodick, the stepdaughter of Yehuda Glick. Although these non-U.S. nationals do not have a private right of action under § 1605A(c), nevertheless, jurisdiction and waiver of sovereign immunity are satisfied as to these Plaintiffs because their injured or murdered family members were U.S. citizens as required under § 1605(a)(2)(A)(ii)(I). *See Worely v.*, 75 F. Supp. 3d 311, 326-327 (citing *Leibovitch*, 697 F.3d 561 572).

## D.    Liability to U.S. Citizen Plaintiffs

159.    The five elements necessary to establish liability under FSIA's state-sponsored terrorism exception are:

(1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the provision provided, by the foreign state or agent of the foreign

> state, and the act (3) "caused" (4) "personal injury or death" (5) "for which courts
> of the United States may maintain jurisdiction under this section for money
> damages."

*Bodoff v. Islamic Rep. of Iran*, 907 F. Supp. 2d 93, 101 (D.D.C. 2012) (quoting 28 U.S.C.

§ 1605A(a)(1), (c). The third and fourth elements are satisfied when a plaintiff proves a theory of

liability and justifies the damages s/he seeks, generally "through the lens of civil tort liability."

*Rimkus v. Islamic Rep. of Iran,* 750 F. Supp. 2d 163, 176 (D.D.C. 2010); *see also Roth*, 78 F. Supp.

3d 379, 399-401.

160.    Section 1605A(h)(3) defines "material support or resources" to have "the meaning

given that term in section 2339A of title 18." Section 2339A provides:

> "material support or resources" means any property, tangible or intangible, or
> service, including currency or monetary instruments or financial securities,
> financial services, lodging, training, expert advice or assistance, safehouses, false
> documentation or identification, communications equipment, facilities, weapons,
> lethal substances, explosives, personnel..., and transportation, except medicine or
> religious materials.

18 U.S.C. § 2339A(b)(1). To determine whether a defendant sovereign has provided material

support to terrorism, courts consider first, whether a particular terrorist group committed the

terrorist act and second, whether the defendant foreign state generally provided material support

or resources to the terrorist organization which contributed to its ability to carry out the terrorist

act. *See e.g., Ben Rafael v. Islamic Rep. of Iran*, 540 F. Supp. 2d 39, 46 (D.D.C. 2008). The types

of support that have been identified as "material" have included, for example, financing and

running camps that provided military and other training to terrorist operatives, *see, e.g.*, *Wachsman*

*ex rel. Wachsman v. Islamic Rep. of Iran*, 537 F. Supp. 2d 85, 90 (D.D.C. 2008); *Sisso v. Islamic*

*Rep. of Iran*, No. 05-0394, 2007 WL 2007582, at *5-6 (D.D.C. July 5, 2007); allowing terrorist

groups to use its banking institutions to launder money, *see, e.g., Rux v. Republic of Sudan*, 495 F.

Supp. 2d 541, 549-50 (E.D. Va. 2007); and allowing terrorist groups to use its territory as a meeting place and safe haven,[4] *see, e.g., Id.* Such support has been found to have contributed to the actual terrorist act that resulted in a plaintiff's damages when experts testify that the terrorist acts could not have occurred without such support, *see, e.g., Ben-Rafael*, 540 F. Supp. 2d at 47; that a particular act exhibited a level of sophistication in planning and execution that was consistent with the advanced training that had been supplied by the defendant state, *see, e.g., Sisso*, 2007 WL 2007582, at *6; or when the support facilitated the terrorist group's development of the expertise, networks, military training, munitions, and/or financial resources necessary to plan and carry out the attack, *see, e.g., Rux*, 495 F. Supp. 2d at 553 (expert testimony that the "attack might have been possible, but it would not have been as easy" without defendant's support).[5]

---

[4] *See Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 108 (D.D.C. 2006) (finding that insofar as the Sudan "affirmatively allowed and/or encouraged al Qaeda and Hizbollah to operate their terrorist enterprises within its borders," it provided a safe haven).

[5] In cases regarding the state-sponsored terrorism exception to the FSIA such as this one, courts rely extensively on expert testimony. *See, e.g., Ben-Rafael*, 540 F. Supp. 2d at 44 (in a FSIA case against Iran concerning a bombing at the Israeli embassy in Argentina by the terrorist group Hezbollah, the court relied on the testimony of an expert from the Washington Institute for Near East Policy and found that "Iran exercised control over Hezbollah through its intelligence agency"); *Wachsman*, 537 F. Supp. 2d at 90 (in a suit against Iran concerning the execution of a U.S. citizen in Israel by Hamas, the court relied on the testimony of an "expert in Islamic terrorism" and found that Iran provided military and terrorist training for approximately 400 Hamas operatives through its Revolutionary Guard); *Sisso*, 2007 WL 2007582, at *5 (in a suit against Iran concerning a Hamas suicide bombing in Israel, the court relied on testimony from two experts associated with the Washington Institute for Near East Policy in finding, "Iran has financed and run camps that provide military and other training to Hamas operatives," and "Iran further supports Hamas's terrorist activities with direct funding"); *Valore v. Islamic Rep. of Iran*, 478 F. Supp. 2d 101, 105 (D.D.C. 2007) (in a case against Iran regarding a Hezbollah bombing of a U.S. military barracks in Lebanon, the court relied on testimony of "a renowned expert on Iranian affairs" and an expert working for the Project for the Research of Islamist Movements and The International Policy Institute for Counterterrorism, finding that "Hezbollah was a creature of the Iranian

161.    The U.S. Citizen Plaintiffs have presented evidence satisfactory to the Court in support of all elements of a claim under § 1605A against Iran and Syria. Iran[6] and Syria[7] are state sponsors of terrorism, and these Plaintiffs are U.S. citizens. The critical issue in this case is whether Iran and Syria, and its officials acting within the scope of their employment, provided material support and resources to Hamas and PIJ in Israel.

162.    Iran and Syria did provide material support and resources to Hamas and PIJ in Israel, which contributed to these terror attacks. Plaintiffs provided satisfactory evidence that Defendants are legally responsible for each of these terror attacks due to the longstanding material

---

government, acting almost entirely under the order of the Iranians and being financed almost entirely by the Iranians"). This Court notes and accepts those findings as consistent with, and supportive of, the findings in this matter.

[6] The term "state sponsor of terrorism" is defined in § 1605A as:

a country the government of which the Secretary of State has determined, for purposes of section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. [§] 2405(j)), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. [§] 2371), section 40 of the Arms Export Control Act (22 U.S.C. [§] 2780), or any other provision of law, is a government that has repeatedly provided support for acts of international terrorism.

28 U.S.C. § 1605A(h)(6). Iran has been designated by the U.S. Department of State as a state sponsor of terrorism continuously since January 19, 1984, *see* U.S. Department of State, State Sponsors of Terrorism, available at https://www.state.gov/j/ct/list/c14151.htm (last visited 09/09/2019), and its continued designation as such was noted in the State Department's annual Country Reports on Terrorism in 2015, *see* U.S. Department of State, State Sponsors of Terrorism Overview, available at https://www.state.gov/j/ct/rls/crt/2015/257520.htm (last visited 09/09/2019).

[7] Syria has been designated by the U.S. Department of State as a state sponsor of terrorism continuously since December 29, 1979, *see* U.S. Department of State, State Sponsors of Terrorism, available at https://www.state.gov/j/ct/list/c14151.htm (last visited 09/09/2019), and its continued designation as such was noted in the State Department's annual Country Reports on Terrorism in 2015, *see* U.S. Department of State, State Sponsors of Terrorism Overview, available at https://www.state.gov/j/ct/rls/crt/2015/257520.htm (last visited 09/09/2019).

support provided by Iran and Syria to Hamas and the PIJ that allowed these groups to grow and flourish into terrorist organizations. The evidence demonstrated that each of the victims in these attacks were injured or murdered as part of an intentional Hamas and PIJ plan to injure or murder citizens in order to intimidate a civilian population and/or affect government policies.

163.     Further, Hamas and PIJ are agents of Iran and Syria due to the material support provided by Iran in furtherance of Hamas's and PIJ's mission to disrupt the Israeli-Palestinian peace process. The evidence demonstrates that during the time leading up to the terror attacks in this case, Iran supported Hamas and PIJ by:

> (1)     Providing political and ideological support for Hamas and PIJ through public statements in support of its mission and terrorist activities, specifically with respect to Israel;

> (2)     Providing monetary support totaling hundreds of millions of dollars;

> (3)     Providing support in the form of weapons intended for use in the West Bank and Gaza Strip. One attempted delivery of weapons was on the Klos-C ship, which was intercepted by the Israeli Navy; and

> (4)     Providing support through weapons smuggled to Hamas and PIJ.

*See Force v. Islamic Rep. of Iran, et al.*, DE 31, 32, Civ. No. 16-1468, for Levitt and Clawson Declarations.

164.     The evidence also demonstrates that during the time leading up to the terror attacks in this case, Syria supported Hamas and PIJ by:

> (1)     Providing a safe haven for Hamas and PIJ and locations for headquarters in Damascus, where they can engage in open meetings and fundraising;
> (2)     Training Hamas and PIJ members in the use of terrorist tactics;
> (3)     Providing a location where Hamas and PIJ could openly recruit members;
> (4)     Providing a public political platform and legitimacy due to Hamas's and PIJ's presence in Damascus;

(5)    Providing financial support directly through funds transmitted to the Hamas and PIJ headquarters in Damascus; and

(6)    Assisting in funneling weapons shipments by allowing them to be transported through Syria.

*See Force v. Islamic Rep. of Iran, et al.*, DE 29, 30, Civ. No. 16-1468, for Berti Decl. and Deeb Decl.

165.    The foreign policy of both the Iranian and Syrian governments have been to support Hamas and PIJ in Israel in order to disrupt the Israeli-Palestinian peace process. Both Iran and Syria supported Hamas and PIJ due to their animosity toward Israel and provided funds and weapons to allow Hamas and PIJ to carry out their missions. It was foreseeable, therefore, that Hamas and PIJ would use the training, money, and weapons provided by Iran and Syria to carry out terrorist attacks against civilians in Israel, such as Akiva Jakubowicz, Yehuda Glick and murder victim Richard Lakin. Although no evidence has been provided directly linking a weapon or dollar provided by Iran and Syria to these specific terror attacks, both Iran and Syria knew of Hamas's and PIJ's tactics and ideological goals and supported those efforts. Each of the terror attacks and resulting injuries and the death of Richard Lakin were foreseeable consequences of Iran and Syria's aid and support to Hamas and PIJ in Israel.

166.    In sum, jurisdiction over Iran and Syria is consistent with § 1605A(a), the state-sponsored terrorism exception to sovereign immunity, and the U.S. citizen Plaintiffs have provided evidence satisfactory to the Court in support of their private cause of action for damages under § 1605A(c).

## F.    Liability to Non-U.S. Citizen Plaintiffs

167.    The Court must apply District of Columbia choice of law rules to determine which jurisdiction's substantive law governs.

> The FSIA does not contain an express choice-of-law provision [for plaintiffs not covered by § 1605A(c)]. FSIA § 1606 does, however, provide that a foreign state stripped of its immunity "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. This section ensures that, if an FSIA exception abrogates immunity, plaintiffs [not covered by § 1605A(c)] may bring state [or foreign] law claims that they could have brought if the defendant were a private individual.

*Oveissi v. Islamic Rep. of Iran*, 573 F. Supp. 3d 835, 841 (D.C. Cir. 2009) (applying D.C. choice of law principles); *see also Thuneibat v. Syrian Arab Rep.*, 167 F. Supp. 3d 22, 42-44 (D.D.C. 2016) (discussing D.C. conflict of law rules). The District of Columbia applies a blend of "governmental interests analysis" (i.e., which jurisdiction's policies would be most advanced by having its law applied) and the "most significant relationship test" (looking to the factors in the Restatement (Second) of Conflict of Laws). *Oveissi*, 573 F. Supp. 3d at 842.

> The four Restatement factors are: (1) "the place where the injury occurred"; (2) "the place where the conduct causing the injury occurred"; (3) "the domicil[e], residence, nationality, place of incorporation and place of business of the parties"; and (4) "the place where the relationship, if any, between the parties is centered."

*Id.* (citing Restatement (Second) of Conflict of Laws § 145(2) (1971)). In *Oveissi*, the court concluded that French law applied to the claims of the American-citizen grandchild of an Iranian citizen assassinated in France. *Id.* In *Thuneibat* the court held that Jordanian law applied to the claims of non-American family members of an American citizen killed in a suicide bombing in Jordan. 167 F. Supp. 3d at 44.

168.    Here, the injuries occurred in Israel; the conduct causing the injuries occurred in Israel, the Palestinian territories, Iran, and Syria; the non-U.S. citizen Plaintiffs are and always have been Israeli citizens; and there is no legal relationship between any of the non-U.S. citizen Plaintiffs and any of the Defendants, Hamas, PIJ or Hezbollah. Accordingly, the Court finds that

Israel has the greatest interest in having its laws apply and the most significant relationship to the events. Israeli law will therefore apply to the claims of the non-U.S. citizen Plaintiffs.

169.    In determining the scope of applicable foreign tort law, a court may "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1; *see also Thuneibat*, 167 F. Supp. 3d at 44. Plaintiffs submitted the Declaration of Dr. Boaz Shnoor (DE 34), an attorney and law professor in Israel in *Force v. Islamic Rep. of Iran, et al.,* Civ. No. 16-cv-1468. Additionally, another court in this district has evaluated the requirements for negligence under Israeli law. *See Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010).

170.    The Israeli civil tort of negligence is codified in the Civil Wrongs Ordinance (CWO) at § 35, 2 LSI (New Version) 14-15 (1972); *see also Wultz*, 755 F. Supp. 2d at 57-58. Negligence requires a finding of the same elements as U.S. law: duty, breach, causation, and injury. Shnoor Decl. ¶ 15 (DE 34) in *Force v. Islamic Rep. of Iran, et al.,* Civ. No. 16-cv-1468; *Wultz*, 755 F. Supp. 2d at 57-58. Duty under Israeli law is divided into "duty in fact and notional duty." *Wultz*, 755 F. Supp. 2d at 58. "[E]very person owes a duty to all persons whom…a reasonable person ought in the circumstances to have contemplated as likely in the usual course of things to be affected by an act, or failure to do an act." CWO § 36, 2 LSI (New Version) 15 (1972). A court asks if a reasonable person could have foreseen the likelihood of damage when determining duty-in-fact. *See Wultz*, 755 F. Supp. 2d at 58. Furthermore, if a duty-in-fact exists but the risk of harm as it occurred was already "taken into account by normal society when engaged in a particular action," a defendant will not be liable under the tort of negligence. *Id.* at 58-59. Normative duty considers "whether a reasonable person ought, as a matter of policy, to have foreseen the

occurrence of the particular damage." *CA 145/80 Vaknin v. Beit Shemesh Local Council 37(1) PD 113, 125-26 (1982) (Isr.); see also Wultz*, 755 F. Supp. 2d at 59.

171.    The Court finds that the non-U.S. citizen Plaintiffs have demonstrated Defendants were under a duty to the victims because, as discussed above, the injury and killing of the victims were foreseeable consequences of providing material support for Hamas, PIJ and Hezbollah and supporting Hamas's, PIJ's and Hezbollah's efforts to disrupt the Israeli-Palestinian peace process. For the same reasons that the Court finds sufficient evidence to tie Iran and Syria to terrorist actions by Hamas, PIJ and Hezbollah above, it finds that a duty existed between Iran and Syria and the Plaintiffs and their families because their injuries were foreseeable consequences of the aid and support.

172.    A breach of the duty of care occurs when a party with a duty fails to take "reasonable precautionary measures." *Vaknin*, 37(1) PD at 131. Reasonable precautions are determined by balancing the interests of the plaintiff with that of the tortfeaser and considering the public interest in the continuation or cessation of the alleged tortious actions. *See Wultz*, 755 F. Supp. 2d at 62. The Court finds Iran and Syria breached their duty of care to the Plaintiffs by engaging in the continuous support and financing of Hamas, PIJ and Hezbollah, despite knowledge of Hamas's, PIJ's and Hezbollah's terrorist actions in Israel.

173.    The Non-U.S. citizen Plaintiffs have adequately demonstrated that but for the support provided by Iran and Syria, Hamas, PIJ and Hezbollah would not have been able to develop into the cohesive, organized, and deadly organizations that they are today. And, as discussed with duty, the terror attacks that injured or killed the victims in this case were a foreseeable consequence of the provision of support by Iran and Syria. The Non-U.S. citizen Plaintiffs have established

negligence and aiding and abetting of Hamas, PIJ and Hezbollah by Iran and Syria under Israeli law.

## G.      Damages for U.S. Citizen Plaintiffs

174.      Damages for a private action for proven acts of terrorism by foreign states under FSIA § 1605A(c) may include economic damages, pain and suffering, solatium, and punitive damages. 28 U.S.C. § 1605A(c). Accordingly, those who survived an attack may recover damages for their pain and suffering, as well as any other economic losses caused by their injuries; estates of those who did not survive can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages. *Valore*, 700 F. Supp. 2d at 82-83. For victims who "suffered severe emotional injury without physical injury, this Court has typically awarded the victim $1.5 million. *Harrison v. Rep. of Sudan*, 882 F. Supp. 2d 23, 49 (D.D. C. 2012) (citing *Valore*, 700 F. Supp. 2d at 85).

### 1.      Pain and Suffering

175.      Determining the appropriate amount of pain and suffering damages depends upon myriad factors, such as "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *O'Brien v. Islamic Rep. of Iran*, 853 F. Supp. 2d 44, 46 (D.D.C. 2012). Courts have awarded varying amounts of pain and suffering damages, depending upon the length of the suffering. *See, e.g., Braun*, No. 15-1136, 2017 WL 79937, at *12 (awarding $1,000,000 for pain and suffering lasting two hours); *Stern v. Islamic Rep. of Iran*, 271 F. Supp. 2d 286, 300 (D.D.C. 2003) (citing authorities awarding $1,000,000 for pain and suffering lasting between thirty seconds and several hour).

### a.     Akiva Binyamin Jakubowicz

176.     Plaintiffs presented the expert report of Dr. Alan Friedman regarding the injuries sustained by Akiva Jakubowicz during the attack on June 20, 2008, and his pain and suffering. (DE 45). Plaintiffs also presented the declaration of Dr. Rael Strous, a psychiatrist, regarding the psychological and emotional trauma suffered by Akiva Jakubowicz, as well as Akiva Jakubowicz's declaration. (DE 46, Exhibit 7; DE 33).

177.     Dr. Friedman reports that Akiva Jakubowicz was shot in the lower back near his spine and in his right thigh. It took over 2 hours after the terrorist attack for a helicopter to arrive at the scene and transport Akiva to the hospital. Akiva was in severe pain. Akiva was given antibiotics for the right thigh wound and it healed on its own. While in the hospital, Akiva was told a CT scan of his lumbar spine revealed a bullet lodged 1.5 mm to the left of his spine and sitting on a nerve and that there was nothing to do about the bullet in his back. Akiva spent several days in the hospital. Akiva experienced severe and radicular pain for months from his lower back to the left foot. Akiva performed physical therapy exercises at home and intermittently required medications for pain control. Akiva limped for months after the shooting. Akiva still feels the bullet when it is cold, is still in chronic pain and his left leg is much stiffer than his right leg. (DE 45, DE 33).

178.     After examining Akiva and reviewing Akiva's medical records, Dr. Friedman indicated Akiva has a mild disfiguration. Akiva has recovered physically from his gunshot wounds but did experience severe pain for a long period of time, including neuropathic pain. A bullet remains lodged near Akiva's lumbar spine. Akiva has small scars from the entry and exit wounds of one of the bullets on his right anterolateral thigh, as well as a small scar on the left lower lumbar paraspinal region. (DE 45).

179.    Dr. Strous examined Akiva Jakubowicz and reports that Akiva denies any previous psychiatric or psychological treatment or evaluation prior to the terror attack. (DE 46, Exhibit 7). During the attack, Akiva feared for his life and believed death was imminent. Following the attack, it was recommended to Akiva that he receive treatment for anxiety by teachers and family, but he was fearful of opening up the painful emotions of the attack he was experiencing on the inside. After being shot, Akiva could think about nothing but the attack on him for months. Due to the shooting, Akiva became more fearful and was no longer able to go on pleasurable outings (e.g. hikes). After the shooting, Akiva withdrew socially, which was a change from his behavior before the attack. Since the attack, Akiva's post-traumatic symptoms have included avoiding hikes, especially where he was shot, hypersensitive to loud noises, which made his army service much more difficult due to the exposure to frequent loud noises, flashbacks when he hears similar noises and an overwhelming sense of helplessness when he speaks about the shooting. (DE 46, Exhibit 7; DE 33). Because of the terror attack, Akiva lives in the present and cannot think of, plan for or commit to anything in the future. (DE 33).

180.    After conducting psychological testing and evaluating Akiva, Dr. Strous indicated Akiva has signs and symptoms of mild low mood, mild anxiety and moderate post-traumatic stress disorder ("PTSD") due to the terrorist shooting in 2008. (DE 46, Exhibit 7). The physical injuries caused severe pain initially and then chronic pain and worry. The chronic pain and worry adversely affected Akiva's mood and caused anxiety "with significant post-traumatic and behavioral effects ever since." (DE 46, Exhibit 7). Dr. Strous further opined that Akiva's PTSD disorder will continue to affect him on a long-term basis. (DE 46, Exhibit 7).

181.    Plaintiffs have presented evidence to the Court's satisfaction that Akiva Jakubowicz has experienced, continuously suffered and will continue to suffer the severe physical and

emotional trauma and consequences of the wounds he received as a result of the Hamas shooting attack. The Court will award the basic baseline amount of $5,000,000 to Akiva Jakubowicz.

### b.    Akiva Jakubowicz's Family

182.    **Ayelet Jakubowicz**: Plaintiffs presented the declaration of Dr. Strous regarding the psychological and emotional trauma suffered by Plaintiff Ayelet Jakubowicz when her brother was shot by a Hamas operative in June of 2008, as well as Ayelet Jakubowicz's sworn declaration. (DE 46, Exhibit 8; DE 38).

183.    According to Dr. Strous, Ayelet Jakubowicz received psychotherapy treatment after Akiva's shooting attack. (DE 46, Exhibit 8). Akiva's shooting caused Ayelet to become more anxious and she stands far away from bus stops and finds it difficult to travel to different areas of Israel where she does not feel completely safe. She worries about her family's safety, especially when any of them travel anywhere, and sleeps less when she worries. This has caused Ayelet to limit her social interactions. Ayelet and Akiva were very close to each other and she looked up to him, so it was very difficult for her to see him incapacitated. (DE 46, Exhibit 8).

184.    It is Dr. Strous' opinion that Ayelet suffered an anxiety disorder following her brother's almost death in the terror shooting in June 2018. Despite treatment, Ayelet continues to suffer from anxiety and will do so for a long period of time. (DE 46, Exhibit 8).

185.    Accordingly, the court awards the baseline amount of $1,500,000 to Ayelet Jakubowicz.

186.    **Bernard Jakubowicz**: Bernard is the father of Akiva. Plaintiffs presented the declaration of Dr. Strous, as well as the declaration of Bernard regarding the psychological and emotional trauma he suffered as a result of the terrorist attack on Akiva. (DE 46, Exhibit 9; DE 39).

187.    Bernard reported to Dr. Strous that he was in the U.S. for a visit to his mother, who was in a nursing home, when he received a call from his wife informing him Akiva had been shot and that she was on her way to the hospital. (DE 46, Exhibit 9; DE 39). Bernard was in shock. Bernard's other son called him soon after and told him Akiva was okay. Bernard tried to bottle up his emotions about the attack to help him survive the pain of the terrible event. Bernard felt guilty that he was not in Israel when the attack occurred, and he was not there for his son and family while Akiva was in the hospital. Bernard told Dr. Strous that his identity changed after the shooting as he became known as the "guy whose son got shot in a terrorist attack." (DE 46, Exhibit 9; DE 39). When feelings about the terror attack start to emerge, Bernard tries to think of "happy thoughts." (DE 46, Exhibit 9; DE 39). Bernard commented that after the shooting Akiva worked to try and overcome his fears to the point that Akiva has become less concerned for his life because he feels he has no control over fate. For months following the attack, Bernard was occupied with a desire to kill the terrorists that shot his son, but the thoughts went away. Bernard was off work for a period of time following his son's shooting due to the shooting. (DE 46, Exhibit 9; DE 39).

188.    According to Dr. Strous, Bernard suffered from anxiety and mood symptoms after his son's near-death experience after being shot by terrorists. Most of Bernard's mood effects and anxiety levels have over time diminished, but Bernard remains with some residual adjustment symptoms that will continue to affect him for a long period of time. (DE 46, Exhibit 9).

189.    Accordingly, the court will grant the baseline amount of $1,500,000 to Bernard Jakubowicz.

190. **Florence Jakubowicz**: Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Florence Jakubowicz regarding the psychological and emotional trauma

she suffered as a result of the terrorist attack on her son, Akiva, in June 2008. (DE 46, Exhibit 10; DE 34).

191.   Dr. Strous reports that following the terrorist attack on Akiva, Florence experienced significant anxiety and struggled to function properly in the months following the terrorist attack. (DE 46, Exhibit 10). Florence was unable to sleep due to intense anxiety for months after the shooting of Akiva. Subsequent to Akiva's shooting, Florence treated with her family doctor and was prescribed anti-anxiety/anti-depressant medication, Cipralex. Florence's family doctor recommended she attend psychotherapy, but she chose to continue to treat with her family doctor because she was comfortable with that doctor. (DE 46, Exhibit 10).

192.   Long term, Florence remains anxious and worries about Akiva's future due to the bullet in his back. (DE 46, Exhibit 10). Anything remotely related to the shooting of Akiva triggers Florence's anxiety and she tenses up and feels chest tightness. Florence also withdrew socially after Akiva's shooting as she feels she cannot open up to her friends about Akiva's shooting and her feelings of pain and anguish about the terrorist attack on her son. Some of Florence's post-traumatic symptoms after the shooting of Akiva include avoidance (e.g. avoiding Arab looking people on buses), flashbacks, anxiety with body tremors if she discusses Akiva's attack and less enjoyment of activities than prior to the shooting of Akiva. (DE 46, Exhibit 10). Florence denied a history of psychological treatment or medication for a psychological condition before Akiva's shooting. Dr. Strous is of the opinion that Florence suffers from PTSD and an anxiety disorder due to the terrorist attack on Akiva. Florence's anxiety issues affect many areas of her life and will continue to do so for a long period of time. (DE 46, Exhibit 10).

193.   Accordingly, the court will award the baseline amount of $1,500,000 to Florence Jakubowicz.

194. **Rachel Anaki**: Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Rachel Anaki regarding the psychological and emotional trauma she suffered as a result of the terrorist attack on her brother, Akiva, in June 2008. (DE 46, Exhibit 11; DE 37).

195. Rachel Anaki reports that upon learning of her brother Akiva's attack, she was shocked and overwhelmed upon seeing her brother in the hospital. (DE 46, Exhibit 11). Rachel recalls the intense reaction her mother had to the attack that continues to this day to affect the family dynamic. Rachel indicated her mother was so panic-stricken over Akiva's attack that she was almost in a "stupor" and "virtually non-responsive" due to her feelings. (DE 46, Exhibit 11). The stress of the attack, Rachel feels pushed her into a "zombie mode". (DE 46, Exhibit 11). It was very painful to see Akiva in such a state as Rachel was very close to Akiva.

196. After Akiva's attack, Rachel stated she became anxious and depressed. (DE 46, Exhibit 11). Rachel denied being anxious or depressed prior to Akiva's attack. Following Akiva's attack, Rachel shut down emotionally as a defense mechanism and this she feels led to her feeling anxious and depressed. Due to Rachel's inability to manage her reaction to the trauma and her depressive response, she entered psychotherapy two years after the terror attack. (DE 46, Exhibit 11). Besides psychotherapy, Rachel required the use of medication, Cipralex, for 3 months. Rachel's anxious and depressing feelings she feels contributed to significant distance between her and her husband. Rachel and her husband separated five years after the shooting of Akiva. Dr. Strous is of the opinion that Rachel has persistent depressive disorder that is mild to moderate in severity with a late onset and with pure dysthymic syndrome and an anxiety condition. Such conditions are related to the terror attack on Akiva. (DE 46, Exhibit 11). Despite the treatment Rachel received, Rachel's anxiety issues continue to affect "many areas of her personal and

interpersonal functioning" and will continue to do so for a long period of time. (DE 46, Exhibit 11).

197.    Accordingly, the court will grant the baseline amount of $1,500,000 to Rachel Anaki.

198.    **Yonatan Jakubowicz**: Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Yonatan Jakubowicz regarding the psychological and emotional trauma he suffered as a result of the terrorist attack on his brother, Akiva, in June 2008. (DE 46, Exhibit 12; DE 40).

199.    Yonatan Jakubowicz reports since his father was out of the country when Akiva was shot, he felt obligated to calm his mother down and deal with the issues and decisions since he was the oldest son. (DE 46, Exhibit 12). Yonatan stated his mother was an emotional wreck at the hospital and was stressed and anxious about Akiva's condition. Yonatan did not know if Akiva was near death until he was allowed to see Akiva in the hospital. Yonatan indicated he missed several weeks of school and the trauma affected his studies. The first few weeks after Akiva's shooting were emotionally draining for Yonatan and affected his interaction with his family and his social relationships. (DE 46, Exhibit 12; DE 40).Yonatan felt like he was a victim of terror as well. Yonatan reported various long-term effects of Akiva's shooting, including increased anxiety, fear of traveling, avoidance of certain activities and locations due to fear of a terror attack, panic attacks, inability to relax, inability to sleep in nature and being a more protective father. Yonatan denied a prior psychiatric history and indicated he declined recommended psychotherapy following the terror attack. (DE 46, Exhibit 12; DE 40).

200.  Dr. Strous is of the opinion that Yonatan Jakubowicz suffers from adjustment disorder with anxiety symptoms due to the terror attack on Akiva and that Yonatan's emotional issues affect several areas of life and will continue to do so for a long period of time. (DE 46, Exhibit 12).

201.    Accordingly, the court will award the baseline amount of $1,500,000 to Yonaton Jakubowicz.

### c.    Richard Lakin's Family

202.    **D.A.B.:** Plaintiffs presented the declaration of Dr. Rael Strous, as well as the sworn declaration of D.A.B., along with Manya Lakin's declaration, regarding the psychological and emotional trauma he suffered as a result of the stabbing and shooting of Richard Lakin on October 13, 2015. (DE 46, Exhibit 5; DE 36).

203.    D.A.B. is the 15-year old grandson of Richard Lakin. When he was told about his grandfather's attack, he was confused, shocked and overwhelmed. (DE 46, Exhibit 5; DE 36). Over the next two weeks D.A.B. struggled to cope with what happened to his grandfather and he had difficulty in school. D.A.B. remembers being alone at school a lot after the terror attack on his grandfather. (DE 46, Exhibit 5; DE 36). D.A.B. recalls his parents being at the hospital and not at home a lot during the two weeks after his grandfather's attack. The situation made the household a stressful place. D.A.B. did not go to the hospital to visit his grandfather because he feared it would be too painful, but he now regrets not visiting his grandfather before his passing. D.A.B. did not attend his grandfather's funeral because he felt it would be too overwhelming. (DE 46, Exhibit 5; DE 36).  Initially after the terror attack, D.A.B. stated his mood was low and over time he became more anxious. D.A.B. spoke to his principal at school and the school counselor about the terror attack against his grandfather but declined seeing a psychologist. (DE 46, Exhibit 5; DE 36). D.A.B. was very close to his grandfather. D.A.B.'s grandfather taught him English and how to read and write. (DE 46, Exhibit 5; DE 36). D.A.B.'s grandfather took care of him and his sister a lot growing up as his parents divorced when he was one years old. (DE 46, Exhibit 5; DE 36). D.A.B.'s grandfather lived his life trying to find peace and inclusion for all people, but the opposite

is what killed him. (DE 46, Exhibit 5; DE 36). Long term, D.A.B. indicated the following effects: sadness, withdrawal from friends, refusal to travel on buses, constant anxiety and fear of Arabs. D.A.B. frequently thinks of his grandfather. (DE 46, Exhibit 5; DE 36).

204.    Dr. Strous is of the opinion that D.A.B. suffers from adjustment disorder with anxiety symptoms. Despite the years that have lapsed since the terrorist attack that caused his grandfather's death, the trauma still affects D.A.B. significantly on a social and emotional level. D.A.B. has chronic anxiety due to the trauma. (DE 46, Exhibit 5). The emotional issues affect several areas of D.A.B.'s life and will continue to do so for a long period of time. (DE 46, Exhibit 5).

205.    Accordingly, the court will depart upward from the baseline amount of $1,500,000 and grant D.A.B. $2,000,000.

206.    **Shachar Boteach:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Shachar Boteach regarding the psychological and emotional trauma she suffered as a result of the stabbing and shooting of Richard Lakin on October 13, 2015. (DE 46, Exhibit 6; DE 32).

207.    Shachar Boteach is the granddaughter of Richard Lakin. (DE 46, Exhibit 6; DE 32). Shachar remembers being in school and receiving a text message from her grandmother that her grandfather was in the hospital undergoing surgery on October 13, 2015. (DE 46, Exhibit 6; DE 32). Shachar heard a little earlier that there had been a terror attack in Jerusalem, but she did not connect the two events. Shachar called her grandmother and was told that her grandfather had been injured in a terror attack. (DE 46, Exhibit 6; DE 32). Shachar became hysterical and her friends held her since she physically could not walk. She does not recall the details of how she got to the hospital other than her friends took her there. Shachar had a special relationship with her grandfather. Shachar stated that her grandfather helped raised her in her early years because her

parents were so busy with their studies. (DE 46, Exhibit 6; DE 32). Since her parents were divorced, her grandfather played a critical role in her life. Her grandfather taught her to read and write and how to ride a bicycle, as well as how to play games. Shachar's grandfather taught her to treat everyone living in Israel equally, especially the Arab communities. (DE 46, Exhibit 6; DE 32). Before the terror attack, Shachar had a period of time where she had a "hiccup" in her close relationship with her grandfather. Shachar feels very guilty for not making up with her grandfather before the terror attack. (DE 46, Exhibit 6; DE 32).

208.     Shachar spent almost every day at the hospital for the two weeks her grandfather was in the hospital before he died and missed school during the entire two weeks. (DE 46, Exhibit 6; DE 32). Shachar was unable to eat, dress or bathe and she hardly slept during the time her grandfather was in the hospital before his death. Shachar stated that her pain and discomfort were increased even more because the two terrorists involved in the terror attack against her grandfather were lying in beds in a hospital room opposite to her grandfather's hospital room. (DE 46, Exhibit 6; DE 32). Shachar attended her grandfather's funeral and she will never forget the image of her grandfather being placed in the ground. (DE 46, Exhibit 6; DE 32). Shachar thinks often about what it must have been like for her grandfather to be attacked by a terrorist and the pain he endured during and after the attack before his death. Since the terror attack, Shachar refuses to take buses and she became terrified and anxious. Shachar since the terror attack has come to fear Arabs and has frequent nightmares related to the terror attack. (DE 46, Exhibit 6; DE 32). During mandatory army training, Shachar had a panic attack during shooting practice because she was recalling her grandfather. Thus, she indicates that she is unable to become a combat solider as she had previously planned due to the pressure of her flashback memories regarding the terror attack. (DE 46, Exhibit 6; DE 32). Even happy milestones and achievements in Shachar's life are bitter sweet because her

grandfather is not there to share in the occasions (e.g. graduating high school, becoming a solider in the Israeli Navy). Shachar still fears being attacked and remains heartbroken over the loss of her grandfather. Psychological treatment was recommended for Shachar, but she declined it.

209.    Dr. Strous is of the opinion that Shachar Boteach suffers from adjustment disorder with anxiety symptoms and persistent complex bereavement disorder with traumatic bereavement that is moderate to severe in nature. (DE 46, Exhibit 6). Despite the years that have lapsed since the terrorist attack that caused her grandfather's death, the trauma still affects Shachar significantly on a social and emotional level. (DE 46, Exhibit 6). Shachar remains with mood and anxiety effects due to the trauma. The emotional issues affect several areas of Shachar's life and will continue to do so for a long period of time. (DE 46, Exhibit 6).

210.    Accordingly, the court will depart upward from the baseline amount of $1,500,000 and grant Shachar Boteach $2,000,000.

211.    **Rita Avni (Ankori)**: Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Rita Avni (Ankori) regarding the psychological and emotional trauma she suffered as a result of the stabbing and shooting of Richard Lakin on October 13, 2015. (DE 46, Exhibit 2; DE 50).

212.    Rita Avni (Ankori) is the daughter-in-law of Richard Lakin. Rita reported that her husband, Micah, called her on October 13, 2015, while at work to let her know that his father had been a terror victim and was in the hospital. (DE 46, Exhibit 2; DE 50). Rita was in shock and cancelled all her work meetings. She was overwhelmed and stunned by the news. Rita's mother's death anniversary was on the same day Richard Lakin had been attacked by terrorists. (DE 46, Exhibit 2; DE 50). Rita went home to wait for news regarding Richard's condition and was told he was in the ICU. Rita was unable to tell her children about what happened to Richard due to her

intense emotions about it. Rita was afraid to see Richard in the hospital, but when she did see him in the hospital, she was shaking and had immense anxiety. (DE 46, Exhibit 2; DE 50). After Richard was in the hospital for two weeks, he died. There were lots of people that came to visit them after Richard's death and the experience felt "surreal" for her. There was a wave of terror attacks at the time and every time another terror attack occurred, Rita's anxiety and fears were triggered. (DE 46, Exhibit 2; DE 50).

213.    Rita had a very good relationship with Richard, and they would call each other often and often spent time together hanging out just the two of them. (DE 46, Exhibit 2; DE 50). Rita stated that Richard was a great grandfather to her children, and he would offer valuable advice to them about their education and personal growth. Rita described Richard as the kindest person she has ever met. (DE 46, Exhibit 2; DE 50).

214.    Rita indicated she has various long term effects due to the terror attack that killed Richard, including difficulty concentrating at work, decreased energy, hyper-focused on risks, less emotionally available for her children, inability to maintain friendships, inability to watch TV or movies with violence, inability to take public transportation and physical problems. (DE 46, Exhibit 2; DE 50). Rita before the terror attack on Richard used to run twice a week, but since the terror attack Rita is unable to go for runs or exercise at all. After Richard's death, Rita became to this day extremely hypervigilant. (DE 46, Exhibit 2; DE 50). For example, Rita cannot sit in a restaurant with her back to others. Two months after Richard's death, Rita developed chronic sinusitis for which she underwent surgery, which only temporarily relieved the pressure and headaches. (DE 46, Exhibit 2; DE 50). Before the terror attack on Richard, Rita never had this nasal condition and she feels the depression and low mood due to Richard's death caused the condition. Rita has also developed "aspirin sensitive asthma" that requires surgery and

desensitization to aspirin and other non-steroidal anti-inflammatory agents. (DE 46, Exhibit 2). Rita stated that her psychologist told her that her asthma attacks/autoimmune issues are due to the trauma of the terror attack. (DE 46, Exhibit 2; DE 50). Rita cannot take anti-anxiety medications because she is allergic to them. (DE 50).

215.    Rita owns a forensic accounting firm and she hired a senior accountant to support the growth of the company before the terror attack on Richard, but after Richard was attacked, Rita stopped pursuing the growth of her company. (DE 46, Exhibit 2; DE 50). Rita also had to hire additional employees after the attack on Richard and transfer some of her work responsibilities to a senior employee, which forced her to give that employee a raise in her salary. (DE 46, Exhibit 2; DE 50). If a terror attack against Richard did not incur, Rita would not have incurred the above costs in her business, and she would have continued to work at full force to grow her business. Rita denies psychiatric or psychological treatment or evaluation before the shooting and stabbing of Richard but has treated with a psychologist since Richard's death. (DE 46, Exhibit 2; DE 50).

216.    Dr. Strous is of the opinion that Rita Avni (Ankori) suffers from persistent depressive disorder with pure dysthymic syndrome, PTSD (partial) and persistent complex bereavement disorder (moderate) with traumatic bereavement. (DE 46, Exhibit 2). Despite psychotherapy, Rita Avni (Ankori) still feels profound grief and her emotional issues that affect many areas of her personal and professional life will continue to do so for a long period of time. (DE 46, Exhibit 2).

217.    Accordingly, the court will depart upward from the baseline amount of $1,500,000 and grant Rita Avni (Ankori) $2,000,000.

218.    **E.A.:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Rita Avni (Ankori) regarding the psychological and emotional trauma E.A., who is

15 years old, suffered as a result of the stabbing and shooting of Richard Lakin on October 13, 2015. (DE 46, Exhibit 1; DE 50).

219.   E.A. is the son of Rita Avni (Ankori) and stepson of Micah Lakin. (DE 46, Exhibit 1; DE 50). E.A. was very close to his grandfather. His grandfather helped him with his studies and even attended parent teacher meetings at school. (DE 46, Exhibit 1; DE 50). While his grandfather was in the hospital after being shot and stabbed, E.A. did not function well and at his grandfather's funeral he demanded to be in the front row. (DE 46, Exhibit 1; DE 50). Although E.A. has ADHD, he had improved with intense therapy and special education teachers' input in the years before the terror attack on Richard, but after Richard was attacked, E.A. regressed two years in function, according to E.A.'s parents. (DE 46, Exhibit 1; DE 50). It took a year for E.A. to get to where he was behaviorally and educationally before the terror attack on Richard. (DE 46, Exhibit 1; DE 50). At a birthday party after Richard's death, E.A. told friends he wanted to kill himself. E.A.'s friends withdrew from E.A. and E.A. became even more socially withdrawn. E.A. was not socially withdrawn before Richard's death. For a long time after Richard's death, E.A. was closed up and he has remained a changed person ever since the terror attack on Richard, per E.A.'s parents. (DE 46, Exhibit 1; DE 50). After the terror attack on Richard, E.A. saw a clinical psychologist for 2.5 years starting in May 2016. (DE 46, Exhibit 1; DE 50).

220.   Despite no formal psychiatric evaluation, Dr. Strous is of the opinion that Richard's death has affected E.A. and is manifested with behavioral problems, depressive behavior and social withdrawal. (DE 46, Exhibit 1). The effects on E.A.'s life of the terror attack and death of Richard and growing up in such a family, has and will continue to affect E.A. for a significant period of time. (DE 46, Exhibit 1).

221.    Accordingly, the court will depart upward from the baseline amount of $1,500,000 and grant E.A. $2,000,000.

222.    **Y.L.:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declarations of Rita Avni (Ankori) and Micah Lakin (*See Force v. Islamic Rep. of Iran, et al.*, DE 55, Civ. No. 16-1468, for Micah Lakin's Declaration) regarding the psychological and emotional trauma Y.L., who is 13 years old, suffered as a result of the stabbing and shooting of Richard Lakin on October 13, 2015. (DE 46, Exhibit 1; DE 50).

223.    Y.L. is the son of Micah Avni Lakin and stepson of Rita Avni. (DE 46, Exhibit 1; DE 50). Y.L. was very close to his grandfather. His parents report that Y.S. closed up after his grandfather was stabbed and shot. (DE 46, Exhibit 1; DE 50). After his grandfather was attacked, Y.L. began to have angry outbursts and was socially withdrawn. (DE 46, Exhibit 1; DE 50). Y.L. is still unable to discuss the trauma, but cries during memorial ceremonies for his grandfather. Y.L. refused to attend psychological counseling. (DE 46, Exhibit 1; DE 50).

224.    Despite no formal psychiatric evaluation, Dr. Strous is of the opinion that Richard's death has affected Y.L. and manifested with depressive and withdrawal behavior. (DE 46, Exhibit 1). The effects on Y.L.'s life of the terror attack on Richard and his death and growing up in such a family, has and will continue to affect Y.L. for a significant period of time. (DE 46, Exhibit 1).

225.    Accordingly, the court will depart upward from the baseline amount of $1,500,000 and grant Y.L. $2,000,000.

226.    **R.A.:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declarations of Rita Avni (Ankori) and Micah Lakin (*See Force v. Islamic Rep. of Iran, et al.*, DE 55, Civ. No. 16-1468, for Micah Lakin's Declaration) regarding the psychological and emotional

trauma R.A., who is six years old, suffered as a result of the stabbing and shooting of Richard Lakin on October 13, 2015. (DE 46, Exhibit 1; DE 50).

227.    R.A. is the daughter of Rita Avni (Ankori) and Micah Avni Lakin. (DE 46, Exhibit 1). R.A.'s parents reported because of the terror attack on Richard and his hospitalization and later death, they were less available for R.A. (DE 46, Exhibit 1; DE 50). At the time of the terror attack, R.A. was almost toilet trained, but after the terror attack, she lost complete control again and remains without full control of her bowel. (DE 46, Exhibit 1; DE 50). R.A.'s parents think this is R.A.'s way of expressing her inability to feel control over her life after experiencing the loss of her grandfather in a sudden and cruel manner. (DE 46, Exhibit 1; DE 50). R.A. had been in art psychotherapy for almost a year at the time of Dr. Strous' interview of her parents, but the therapy did not help. (DE 46, Exhibit 1; DE 50). R.A. was in psychotherapy for two years as her difficulties with toilet training manifested into encopresis. (DE 46, Exhibit 1; DE 50).

228.    Despite no formal psychiatric evaluation, Dr. Strous is of the opinion that Richard's death has affected R.A. and that she has anxious and depressive behavior, which for R.A. is manifested with encopresis. (DE 46, Exhibit 1). The effects on R.A.'s life of the terror attack on Richard and his death and growing up in such a family, has and will continue to affect R.A. for a significant period of time. (DE 46, Exhibit 1).

229.    Accordingly, the court will depart upward from the baseline amount of $1,500,000 and grant R.A. $2,000,000.

230.    **V.A.:** Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declarations of Rita Avni (Ankori) and Micah Lakin (*See Force v. Islamic Rep. of Iran, et al.*, DE 55, Civ. No. 16-1468, for Micah Lakin's Declaration) regarding the psychological and emotional

trauma V.A., who is 5 years old, suffered as a result of the stabbing and shooting of Richard Lakin on October 13, 2015. (DE 46, Exhibit 1; DE 50).

231.  V.A. is the daughter of Rita Avni (Ankori) and Micah Lakin. (DE 46, Exhibit 1; DE 50). V.A.'s parents reported that she had difficulty talking as she was on track to speak before the terror attack against Richard, but the trajectory of her speech development changed after the terror attack and as of the date of Dr. Strous' report was developing her speech language. (DE 46, Exhibit 1; DE 50). V.A. was in weekly speech therapy for 1.5 years after the terror attack. (DE 46, Exhibit 1; DE 50). Her parents note that they were less available for V.A. during a critical time in her speech development during which she needed help and support, but they were unable to provide it because of their involvement in Richard's hospital management and later dealing with Richard's death. (DE 46, Exhibit 1; DE 50). V.A.'s speech therapist indicated on September 17, 2018, that R.A.'s speech is of a low level and she is a bit behind her age in this regard. (DE 46, Exhibit 1). Accordingly, the speech therapist indicated R.A. requires follow-up speech therapy. (DE 46, Exhibit 1).

232.  Despite no formal psychiatric evaluation, Dr. Strous is of the opinion that Richard's death has affected V.A. and that she has anxious and depressive behavior, which for V.A. is manifested in a speech delay. (DE 46, Exhibit 1). The effects on V.A.'s life of the terror attack on Richard and his death and growing up in such a family, has and will continue to affect V.A. for a significant period of time. (DE 46, Exhibit 1).

233.  Accordingly, the court will depart upward from the baseline amount of $1,500,000 and grant V.A. $2,000,000.

### d.    Yehuda Glick's Family

234.  **Avital Molodick**: Plaintiffs presented the declaration of Dr. Strous, as well as the

sworn declaration of Avital Molodick regarding the psychological and emotional trauma she suffered as a result of the shooting of Yehuda Glick on October 29, 2014. (DE 46, Exhibit 3; DE 35).

235.    Avital Molodick is the stepdaughter of Yehuda Glick. (DE 46, Exhibit 3; DE 35). Avital Molodick's biological father died from an illness early in her life and Yehuda Glick adopted her. (DE 46, Exhibit 3; DE 35). After being told her father had been shot and was in the hospital, Avital rushed to the hospital, but was anxious and in shock as she did not know if she was going to the hospital to say goodbye to her father or whether he would survive, but have brain damage. (DE 46, Exhibit 3; DE 35). Avital was at the hospital every day while her father was in the hospital and went back and forth between the hospital and her home. (DE 46, Exhibit 3; DE 35). She was 8 months pregnant at the time and experienced early contractions. (DE 46, Exhibit 3; DE 35). For weeks after her father's assassination attempt, Avital felt paralyzed.

236.    Avital had to stop working to devout time to her father's care. (DE 46, Exhibit 3; DE 35). Avital's mother changed when she witnessed her husband get shot and was never the same again. (DE 46, Exhibit 3; DE 35). Avital's mother became depressed. (DE 46, Exhibit 3; DE 35). Therefore, Avital had two parents to take care of after her father's shooting. (DE 46, Exhibit 3; DE 35). Avital spent a significant amount of time at her parents' home once her father was released from the hospital. (DE 46, Exhibit 3; DE 35). Avital feels that her father's shooting lead to the suicide death of her mother. (DE 46, Exhibit 3; DE 35). Avital recalls her mother distanced herself from Avital after her father's shooting and this was devastating to Avital. (DE 46, Exhibit 3; DE 35). She blames the terrorist who shot her father for her mother's death. Avital indicated she has various long-term effects since the shooting, including social withdrawal, less time with her nuclear family, low mood and difficulty relaxing. (DE 46, Exhibit 3; DE 35).

237.    Avital received psychotherapy treatment after her mother's suicide attempt while her mother was in the hospital. (DE 46, Exhibit 3; DE 35). Avital denied a prior history of psychological or psychiatric treatment before her father's shooting. Avital was there when her mother attempted suicide and saw the rescue attempts. (DE 46, Exhibit 3; DE 35). Avital stated that after her father's shooting, her mother was already gone as her mental state declined and she was no longer the mother she was prior to the terror attack. (DE 46, Exhibit 3; DE 35).

238.    Dr. Strous is of the opinion that Avital Molodick has adjustment disorder with mixed anxiety and depressed mood caused by her father's shooting. (DE 46, Exhibit 3). Avital Molodick's anxiety and stress levels were exacerbated by her mother's suicide attempt and later death of her mother that Avital believes was directly related to her father's shooting. (DE 46, Exhibit 3). Avital Molodick still has residual mood and anxiety effects from the targeting of her father for death by a terrorist. (DE 46, Exhibit 3). Avital Molodick's emotional issues affect several areas of her social and family life and will continue for a long period of time. (DE 46, Exhibit 3).

239.    Accordingly, the court will depart upward from the baseline amount of $1,500,000 and grant Avital Molodick $2,000,000.

### e.    Kumer Family

240.    Chana Liba Kumer: Plaintiffs presented the declaration of Dr. Rael Strous, as well as the sworn declaration of Chana Liba Kumer regarding the psychological and emotional trauma she suffered as a result of the rocket attacks in 2006. (DE 46, Exhibit 13; DE 41).

241.    Chana Liba Kumer is now 18-years old but was 5 years old at the time of the Hezbollah Rocket Attacks. (DE 46, Exhibit 13; DE 41). She recalls being very afraid that something was going to happen to her and her family. Chana remembers being forced to stay in the shelter for the bulk of the war and not being able to go outside for 6 weeks. (DE 46, Exhibit

13; DE 41). She recalls the frequent sirens warning of incoming rockets and she remembers the "booms" of the rockets landing. (DE 46, Exhibit 13; DE 41). Chana still remembers seeing a building be struck by a rocket causing it to be partially destroyed. (DE 46, Exhibit 13; DE 41). People left their dogs behind when they fled Tzfat and if Chana and her family did go outside, they would have to face packs of roaming dogs that had become "nearly feral" because they were abandoned and subjected to sirens and explosions. (DE 46, Exhibit 13; DE 41).

242.   Some long-term effects from the intense fear during the war Chana reported include anxiety with repeating kindergarten, unable to sleep alone, clinginess to her parents, fear of dogs, fear of traveling on buses without a close friend or family member on the bus to protect her and inability to attend social activities without someone accompanying her. (DE 46, Exhibit 13; DE 41). Chana also stated that when she sees Arab people in Israel, she wonders which one wants to kill her. (DE 46, Exhibit 13; DE 41). Chana indicated that she feels like she lost her big sister, Malka, who has problems that the family does not discuss. (DE 46, Exhibit 13; DE 41). After the war ended, Chana saw two psychologists to address her anxiety and fears and has needed regular therapy sessions ever since. (DE 46, Exhibit 13; DE 41). She had three years of art and drama therapy. With the help of therapy, Chana at sixteen years old was able to finally sleep in her bed again alone. (DE 46, Exhibit 13; DE 41). Prior to the war in 2006, Chana did not receive psychological treatment or evaluation.

243.   Chana's mother, Nechama Dina Kumer, in her declaration states that her daughter during and after the rocket attacks on their city became anxious and very clingy. (DE 43). The clinginess remained for years after the war ended. A year after the war ended, Chana was sent for cognitive behavioral therapy and psychotherapy for some time and again in high school Chana was sent for further psychotherapy. (DE 43). According to Nechama, Chana to this day remains

afraid of dogs, going out alone at night, any encounter with an Arab and any travel out of Tzfat alone. (DE 43). Nechama further stated that her daughter remains anxious and panics if she does not feel completely safe. (DE 43).

244.    Dr. Strous is of the opinion that Chana suffers from an anxiety disorder and post-traumatic stress disorder. (DE 46, Exhibit 13). Despite the years that have lapsed since the rocket attacks in Chana's neighborhood and despite Chana's treatment for her psychological conditions, Chana continues to experience anxiety that affects her and will continue to do so for a long period of time. (DE 46, Exhibit 13).

245.    Accordingly, the court will award the baseline amount of $1,500,000 to Chana Liba Kumer.

246.    **Malka Kumer**: Plaintiffs presented the declaration of Dr. Strous, as well as the sworn declaration of Malka Kumer regarding the psychological and emotional trauma she suffered as a result of the Hezbollah Rocket Attacks in 2006. (DE 51; Exhibit 14; DE 42).

247.    Malka Kumer reported that she was about seven years old when the war started and recalls hearing sirens all the time. (DE 51, Exhibit 14; DE 42). Malka remembers having to run to the community shelter and how soldiers would check on them and volunteers would bring them food. (DE 51, Exhibit 14; DE 42). Malka remembers one neighbor being injured in the war. (DE 51, Exhibit14; DE 42). The war was a very scary experience for Malka because there were rockets landing near her home. (DE 51, Exhibit 14; DE 42). Malka was unable to sleep at night and unable to socialize with friends during the day. (DE 51, Exhibit 14; DE 42). She came to fear being alone and would not even go to the bathroom alone. (DE 51, Exhibit 14; DE 42). Malka believes this affected her self-esteem at the time and that she was never able to "shake" this abnormal response. (DE 51, Exhibit 14; DE 42). After the war ended, Malka still was anxious and insecure. Since

Malka felt she could not be far from home, this had a negative impact on her social life. Malka would not go on school trips because she was afraid to be away from her home and family. (DE 51, Exhibit 14; DE 42). Malka received psychological treatment. Some long-term effects on Malka include insecurity, low self-esteem, nightmares, inability to be alone for years, difficulty being on a bus without her family for years and being fragile in social relationships. (DE 51, Exhibit 14; DE 42). Many of Malka's low mood and anxiety issues came out in behavioral problems, including the use of alcohol since age 15 in order to relieve anxiety and treat her depression. DE 51, Exhibit 14; DE 42). Malka feels she needs a male to give her a sense of security even if this means being in a destructive relationship. (DE 51, Exhibit 14; DE 42).

248.    Additionally, Malka stated that in order to escape the difficult feelings, she would behave in a counterintuitive manner. (DE 50, Exhibit 14; DE 42). For example, Malka stated she would go out to dangerous places even though she knew it was inappropriate. Following her inappropriate behavior, Malka was sent to an addiction center to manage her addiction to alcohol and males. (DE 51, Exhibit 14; DE 42). Malka remains in psychotherapy treatment on an intermittent basis. (DE 51, Exhibit 14; DE 42). Before the 2006 war, Malka denies a psychiatric history.

249.    Malka's mother, Nechama Dina Kumer, reported that her daughter has always had anxiety since the war in 2006. (DE 43). Cognitive behavioral treatment allowed Malka to sleep in her own bed and go to the bathroom alone. (DE 43) As a young teen, Nechama stated Malka would get a painful, queasy stomach on school trips and "cold feet" at slumber parties and she would have to be picked up because of 'stomach' pain. (DE 43). While Malka still suffers from anxiety, Nechama indicated that Malka at times feels 'safe' hitch hiking from strangers but is afraid to use public transportation. (DE 43). Despite having a part-time job, Malka is anxious about work and

feels nauseous every night before going to bed as she is worried about waking up on time and traveling to work without problems. (DE 43). Malka wakes up a few times every night with a nervous stomach before working. (DE 43). Nechama stated that Malka drinks to escape her anxiety to feel relaxed. (DE 43). Malka's education suffered due to the trauma of the war. (DE 43). Malka has difficulty with her school studies and needs a private tutor to do her homework or study for a test as she needs someone sitting with her to reassure her that everything is fine. (DE 43). According to Nechama, Malka feels the need to have a boyfriend, even if he is an "abusive criminal or an enmeshed 'sugar-daddy' type" to feel safe. (DE 43). Malka even told Nechama that if she breaks up with a boyfriend, she needs to find a new boyfriend right away.(DE 43).

250.    Dr. Strous is of the opinion that Malka Kumer suffers from an anxiety disorder and alcohol abuse, in remission. (DE 51, Exhibit 14). Despite the years that have lapsed since the rocket attacks in Malka's neighborhood and despite Malka's treatment for her psychological condition, Malka continues to experience anxiety that affects her, along with behavioral problems and low self-esteem, and all of which are expected to continue to affect her functioning for a long period of time. (DE 51, Exhibit 14).

251.    Accordingly, the court will award the baseline amount of $1,500,000 to Malka Kumer.

## 2.    Solatium

252.    The legal term "solatium" is a Latin word for "solace" and is defined as "[c]ompensation; esp. damages for hurt feelings or grief, as distinguished from damages for physical injury." Black's Law Dictionary 1426 (8th ed. 2004). *Flatow*, 999 F. Supp. at 30-31. Damages for solatium are awarded to close family members. Id. at 30-31. Unlike the plaintiffs' medical damages, "solatium damages, by their very nature, are unquantifiable." *Braun*, 228 F.

Supp. 3d at 85 (internal quotation marks omitted) and as such, assessing a monetary figure to the multiple layers of harm that a terror victim or the family of a terror victim suffers is extremely difficult. In determining the "reasonable estimate," courts may look to expert testimony and prior awards in the dozens of civil terrorism decisions rendered pursuant to the FSIA. *See Reed v. Islamic Rep. of Iran,* 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Rep. of Iran,* 574 F. Supp. 2d 15, 29 (D.D.C. 2008). *Haim v. Islamic Rep. of Iran,* 425 F. Supp. 2d 56, 71 (D.D.C. 2006) (Lamberth, *J.*).

253.    This Court has developed a commonly accepted standardized framework for awarding solatium damages to family members of deceased victims, known as the Heiser damages framework. *See Estate of Heiser,* 466 F. Supp. 2d 229, 269; *See also, e.g., Acosta,* 574 F. Supp. 2d at 29 ("This Court has previously set out a general framework for compensatory awards for family members of victims who were killed as a result of terrorist activity consisting of $8 million to spouses of deceased victims, $5 million to parents and children of deceased victims, and $2.5 million to siblings of deceased victims."); *Thuneibat,* 167 F. Supp. 3d at 51 (applying Heiser damages framework).

254.    In accordance with this framework, solatium awards in terrorism cases are to "be determined [primarily] by the nature of the relationship and the severity and duration of the pain suffered by the family member and the severity and duration of the pain suffered by the family member." *Brewer v. Iran,* 664 F. Supp. 2d 43, 55 (D.D.C. 2009) (Huvelle, *J.*) (quoting *Haim*). *See Wultz v. Iran,* 864 F. Supp. 2d 24, 39 (D.D.C. 2012) (Lamberth, *C.J.*). Courts award half these amounts to family members of persons who are injured rather than killed. *Id*.

255.    This formula, the foundation of the so-called "Heiser framework," merely supplies the baseline and may be subject to upward or downward adjustments as appropriate under the

circumstances. Upward adjustments from the Heiser baseline are appropriate given 1) "evidence establishing an especially close relationship between the plaintiff and decedent," 2) "medical proof of severe pain, grief or suffering," or 3) "circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Braun*, 228 F. Supp. 3d at 85.

### a.     Jakubowicz Family

256.    Two terrorists opened fire on five hikers in Wadi Zarka. Akiva was shot two times and thought he was going to die. It took over 2 hours for a helicopter to arrive and remove Akiva from the scene and bring him to a hospital. The attack was a brutal and shocking event for the Jakubowicz family that will affect them for the rest of their lives.

257.    The Jakubowicz family members claiming solatium are Florence Jakubowicz, Yonaton Jakubowicz, Rachel Anaki and Ayelet Jakubowicz. All are U.S. citizens. (DE 48, Exhibits 7, 10, 11, 9). They support their claims by their sworn declarations, describing each of their experiences and struggles coping with the terror shooting of their son and brother Akiva in 2008 while he was on a hike in Wadi Zarka, as well as the individual psychiatric evaluations and diagnoses provided by Dr. Strous. (DE 34, 40, 37, 38).

258.    The terror attack where Akiva was brutally attacked has had a devastatingly profound and lasting effect on his entire family. Akiva believed he was going to die and every year he celebrates the anniversary of his near-death experience with a meal of gratitude. The cruel, violent and random circumstances surrounding the attack and the details of his near-death experience were agonizing for his family with whom he enjoyed a particularly close relationship. His attack was unexpected, gruesome, and a horrific blow to this family. The evidence presented clearly establishes that from the day they received the devastating news until today, the family has

experienced and continues to experience severe grief and suffering. The family is still traumatized by the terrorist attack on Akiva.

259.   The severe emotional and psychological effects on each of these members of Akiva's family and their individual medical diagnoses are detailed in the expert reports of Dr. Strous, which this Court accepts and adopts in full.

260.   Based upon the foregoing, the Court orders that Defendants shall pay $2,500,000 in solatium damages to Florence Jakubowicz, $1,250,000 in solatium damages to Yonaton Jakubowicz, $1,250,000 in solatium damages to Rachel Anaki and $1,250,000 in solatium damages to Ayelet Jakubowicz.

### b.      Lakin Family

261.    The Lakin family members claiming solatium who are U.S. citizens are Y.L., the minor child Micah Lakin, D.A.B., the minor child of Manya Lakin, and Shachar Boteach, the granddaughter of Richard Lakin. (DE 48, Exhibits 3, 4, 6). Their claims are supported by the sworn declarations of D.A.B., Shachar and Manya Lakin, along with Micah Lakin's declaration (*See Force v. Islamic Rep. of Iran, et al.*, DE 55, Civ. No. 16-1468, for Micah Lakin's Declaration) that describe each of their experiences and struggles coping with the terrorist shooting and stabbing attack that ultimately claimed their grandfather's life after two heart wrenching weeks in the hospital fighting for his life, as well as individual psychiatric evaluations and diagnoses provided by Dr. Strous. (DE 36, 32).

262.   What became known as the Bus 78 Massacre where Richard Lakin was brutally shot and stabbed, ultimately succumbing to his wounds has left a profound effect on his grandchildren. Richard Lakin was a loving grandfather who enjoyed an especially close relationship with his grandchildren. On October 13, 2015, he was attacked on Bus 78 in Jerusalem when two terrorists

boarded the bus and proceeded to shoot and stab the passengers. Two passengers were killed, and several others were wounded. In their declarations Shachar Boteach and D.A.B. describe the circumstances surrounding the attack on their grandfather and its effect on their lives. (DE 32, 36).

263.    Rita Avni (Ankori) (DE 50) and Micah Lakin (*See Force v. Islamic Rep. of Iran, et al.*, DE 55, Civ. No. 16-1468) in their declarations describe the circumstances surrounding the attack on Richard Lakin and its effects on the life of their minor child, Y.L. The terrorists shot Richard Lakin in the head, sliced open his abdomen, and cut vital organs damaging his, pancreas, liver and spleen. He was conscious when the paramedics arrived. Richard Lakin was taken to the hospital in critical condition with the knife blade still lodged in his upper abdomen. Mr. Lakin was put into a medically induced coma attached to ten machines while the doctors battled to save his life. He never recovered, dying from his wounds two weeks later. (*See Force v. Islamic Rep. of Iran, et al.*, DE 33, 56, Civ. No. 16-1468). His grandchildren have suffered and continue to suffer since the day of the attack. The evidence presented establishes that the violent circumstances surrounding the attack, and the trauma of their grandfather's subsequent hospitalization and death caused and continues to cause their family severe grief and pain affecting their daily lives, their health and their relationships. The grandchildren have been traumatized by the brutal way in which they lost their grandfather. His loss still haunts them to this day. (DE 50).

264.    The severe emotional and psychological effects on each of these members of Richard Lakin's family and their individual medical diagnoses are reported in the expert reports of Dr. Strous, which this Court accepts and adopts in full.

265.    Based upon the foregoing, the Court orders that Defendants shall pay $2,250,000 in solatium damages to Y.L., $2,250,000 in solatium damages to D.A.B. and $2,250,000 in solatium damages to Shachar Boteach.

### c.    Kumer Family

266.    The Kumer family members claiming solatium who are U.S. citizens are Chana Libya Kumer and Malka Kumer. (DE 48, Exhibits 1, 2). Their claims are supported by their sworn affidavits that describe each of their experiences and struggles coping with the war and its adverse and long-lasting effects on their lives, as well as individual psychiatric evaluations and diagnoses provided by Dr. Strous. (DE 41, 42 ).

267.    Chana Kumer and Malka Kumer describe the circumstances surrounding the Hezbollah Rocket Attacks during the war near their home and the effects of the rocket attacks during the war on their lives. (DE 41, 42). The evidence presented establishes that the rocket attacks during the war caused and continue to cause Chana Kumer and Malka Kumer psychological trauma affecting their daily lives, their health and their relationships.

268.    The severe emotional and psychological effects on each of these members of Kumer family and their individual medical diagnoses are reported in the expert reports of Dr. Strous, which this Court accepts and adopts in full.

269.    Based upon the foregoing, the Court orders that Defendants shall pay $1,250,000 in solatium damages to Chana Kumer and $1,250,000 in solatium damages to Malka Kumer.

### 3.    Punitive Damages

270.    The FSIA specifically allows an award of punitive damages for personal injury or death resulting from an act of state-sponsored terrorism. 28 U.S.C. § 1605A(c). Four factors are relevant in deciding the level of punitive damages appropriate in a given case: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Bodoff*, 907 F. Supp. 2d at 105; see also Restatement (Second) Torts § 908(1)-(2) (1977). The purpose of

punitive damages is two-fold: to punish those who engage in outrageous conduct and to deter others from similar conduct in the future. *See Eisenfeld v. Islamic Rep. of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000). "This cost functions both as a direct deterrent, and also as a disabling mechanism: if several large punitive damage awards issue against a foreign state sponsor of terrorism, the state's financial capacity to provide funding will be curtailed." *Flatow*, 999 F. Supp. 1, 33 (D.D.C. 1998).

271.    Considering these factors, the Court finds an award of punitive damages is warranted.

272.    First, support for Hamas', PIJ's and Hezbollah's terrorist activities is horrific and condemnable. Second, Defendants clearly intended to cause significant harm in multiple ways when they provided material support to Hamas, PIJ and Hezbollah, known terrorist organizations that routinely carry out brutal attacks on innocent civilians. Third, prior damages have been awarded to deter Iran and Syria from related actions against civilians.

273.    Different courts calculate punitive damages using a variety of methods. One approach is to multiply a defendant's annual contributions to terrorism by a factor of between three and five. *See Roth*, 78 F. Supp. 3d at 406. Other courts award punitive damages based on a ratio between punitive and compensatory damages, *see, e.g., Spencer v. Islamic Rep. of Iran,* 71 F. Supp. 3d 23, 31 (D.D.C. 2014), while others simply award a fixed amount per victim. *See, e.g., Gates v. Syrian Arab Republic,* 580 F. Supp. 2d 53, 75 (D.D.C. 2008) (awarding $150 million each to the estates of two victims).

### a.    Jakubowicz Family

274.    Akiva was out with high school friends on a hike when he became an innocent victim of terrorism. He was shot two times and had to climb up a hill to escape the terrorists and wait over 2 hours before a helicopter could fly him to a hospital. Akiva truly believed he was going

to die that day. Every year Akiva has a meal of gratitude for his life on the anniversary of the terror attack against him. While Akiva survived the terrorist attempt to murder him, he has and continues to suffer psychological effects from the senseless attack on him and four other student hikers by terrorists. To this day Akiva has a bullet lodged in his back near his spine. The Court will award Plaintiffs $50,000,000 in punitive damages joint and severally between Iran and Syria.

### b.    Lakin Family

275.    The death here was that of a kind elderly gentleman, a grandfather on the bus on his way home from a medical appointment. He committed no offense except to be on the bus in Israel. He was brutally injured, ultimately succumbing to the wounds sustained in the attack, without regard to his individual personhood. In that sense, his murder was senseless. The Court will award Plaintiffs $50,000,000 in punitive damages joint and severally between Syria and Iran.

### c.    Glick Family

276.  The near death of Yehuda Glick was ruthless and an attempt to end his encouragement of Jewish people visiting the Temple Mount. Yehuda Glick was targeted for death in front of his wife and this sent her into a tail spin that she could not stop that ended with her tragic death. Ever since the attempt on Yehuda Glick's life, Avital Molodick's life has never been the same. The Court will award Plaintiffs $50,000,000 in punitive damages joint and severally between Syria and Iran.

### d.    Kumer Family

277.    Chana and Malka Kumer were children subjected to the Hezbollah Rocket Attacks with countless rockets landing near their home. For months, Chana and Malka Kumer were forced to spend their time in their home or in the community shelter. The targeting of Chana and Malka Kumer's hometown was because they lived in Israel. The rocket attacks were against innocent

civilians, including children, and not Israeli soldiers. The Court will award Plaintiffs $50,000,000 in punitive damages joint and severally between Syria and Iran.

## H.    Damages for Non-U.S. Citizen Plaintiffs

278.    Because the non-U.S. citizen Plaintiffs do not have a direct cause of action under 28 U.S.C. § 1605A(c), their entitlement to compensatory damages depends on Israeli law. As Dr. Shnoor explains, Israeli law provides that an immediate family member of a principal tort victim is entitled to compensatory damages for psychological and emotional harm resulting from the tort to the primary victim. *See* Shnoor Decl. ¶ 59 (DE 34) in *Force v. Islamic Rep. of Iran, et al.,* Civ. No. 16-cv-01468. The harm suffered by a secondary victim, such as the non-U.S. citizen Plaintiffs in this case, is compensable if (1) the family member witnessed the event or its consequences, (2) there is a time and space proximity between the two harms, and (3) the secondary victim suffers severe harm that disrupts daily function. Id. As described by Plaintiffs' expert, Dr. Shnoor, the Court understands that Israeli law does not allow damages to secondary victims unless the harm is so severe that is disrupts daily function. Shnoor Decl. ¶ 59 (DE 34) in *Force v. Islamic Rep. of Iran, et al.,* Civ. No. 16-cv-01468; *see also Estate of Botvin,* 873 F. Supp. 2d at 245; *Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 423 (E.D.N.Y. 2009) ("Under Israeli law emotional injury suffered as a result of the death of a loved one is generally not compensable unless it manifests as a psychiatric illness.").

### a.    Jakubowicz Family Members

279.    The non-U.S. citizen family member of Akiva Jakubowicz's family claiming damages is his father, Bernard Jakubowicz. Bernard Jakubowicz's claim is supported by his affidavit, which describes the close relationship between him and his son, Akiva, and the effect the terrorist attack on Akiva has had on Bernard and the family. (DE 39). In addition, Plaintiffs

have provided the psychiatric evaluation and expert report of Dr. Strous, which details his psychiatric evaluation and diagnosis of Bernard Jakubowicz. (DE 46, Exhibit 9).

280.    Akiva Jakubowicz was one of five hikers that were targets of two terrorists in 2008.

281.    Akiva Jakubowicz was shot twice and to get away from the terrorists and call for help the hikers had to climb up a hill. It took over 2 hours for a helicopter to arrive at the scene to take Akiva to a hospital for medical treatment. Akiva genuinely believed he was going to die on that day. Akiva was an innocent victim of hatred. The day Akiva was attacked by terrorists was the day Akiva's and his families' sense of security was shattered. Akiva and his family, including Bernard, will never be the same.

282.    Based upon the foregoing, the Court orders that Defendants pay $2,500,000 in damages to Bernard Jakubowicz.

### b.    Lakin Family Members

283.    The non-U.S. citizen family members of Richard Lakin's family claiming damages are Rita Avni (Ankori) and her minor children, E.A., R.A. and V.A. Their claims are supported by the affidavit of Rita Avni (Ankori), which describes the close family relationship between Richard Lakin and Rita, his daughter-in-law, and his grandchildren, E.A., R.A. and V.A. (DE 50). In addition, Plaintiffs have provided the psychiatric evaluations and expert report of Dr. Strous, which details his diagnosis of E.A., R.A. and V.A. (DE 46, Exhibit 1).

284.    As described above, the Bus 78 terrorist attack was a national tragedy, but the public and collective feeling of grief could not have approached the intense personal pain and grief experienced by the families of the victims, including Rita Avni and her children, E.A., R.A. and V.A. Although Richard Lakin's family did not witness the attack, they all witnessed its consequences first-hand as they prayed for two weeks for Richard, but he succumbed to his serious

injuries and they attended his funeral to say farewell to him before watching Richard's body lowered into the earth.

285.    The recurring pain and difficulties that Rita, E.A., R.A. and V.A. have experienced in the months and years after the brutal attack on Richard that caused his death demonstrate that the injury, they have suffered is severe enough to warrant damages under Israeli law. The tragedy precipitated a profound change in each of these Plaintiffs' social interactions and family relationships. They each describe an inability to adequately process and cope with their grief. Yet the grief and pain of losing Richard, in such an unexpected and horrible way, deeply affected the ability of each of these Plaintiffs to live life with a positive outlook, and to be motivated to act and succeed each day. The severe emotional and psychological effects on each of these members of Richard Lakin's family and their individual medical diagnoses are reported in the expert reports of Dr. Strous, which this Court accepts and adopts in full.

286.    Based upon the foregoing, the Court orders that Defendants pay $1,750,000 in damages to Rita Avni (Ankori), $1,750,000 in damages to E.A., $1,750,000 in damages to R.A. and $1,750,000 in damages to V.A.

### c.    Glick Family

287.    The non-U.S. citizen family member of Yehuda Glick's family claiming damages is Avital Molodick. Avital Molodick supports her claims with an affidavit, which describes the close family relationship between Yehuda Glick, her and her mother before the terrorist attack on Yehuda Glick and the devastation to their lives the terror attack has had and will continue to have for the rest of their lives. (DE 35). In addition, Plaintiff has provided the psychiatric evaluation and expert report of Dr. Strous, which details the psychiatric evaluation and diagnosis of Avital Molodick. (DE 46, Exhibit 3).

288.    Yehuda Glick was shot at point blank range by a terrorist. While Avital Molodick did not witness the assassination attempt, she witnessed its consequences first-hand and experienced the negative and long-lasting effects on her and her family, including her mother's downward spiral culminating with her death.

289.    Based upon the foregoing, the Court orders that Defendants pay $1,750,000 in damages to Avital Molodick.

## IV.

## CONCLUSION

290.    The serious injuries suffered by Akiva Jakubowicz were due to a senseless and traumatic event for which money can never fully compensate him or his family. The death of Richard Lakin was a tragic event for which money can never compensate his family. The deliberate targeting of Yehuda Glick, an advocate for Jewish visitors to the Temple Mount, for assassination was not only a trauma for Yehuda Glick, but it forever changed his family with severe and long lasting effects, including the death of Avital Molodick's mother, Yafa, who never recovered from witnessing the assassination attempt on her husband. The Hezbollah Rocket Attacks near Chana and Malka Kumer's home were fired indiscriminately at civilian populations and the resultant emotional trauma can also never be fully compensated.

291.    However, the Court finds that Iran and Syria provided material support to Hamas and facilitated the 2008 shooting attack on Akiva Jakubowicz and facilitated the Bus 78 attack where Richard Lakin was seriously wounded and later died. Additionally, the Court finds that Iran and Syria provided material support to Hezbollah and facilitated the 2006 rocket attacks near Chana and Malka Kumer's home. The Court further finds that Iran and Syria provided material

support to the Palestinian Islamic Jihad (PIJ) and facilitated the assassination attempt of Yehuda

Glick. Damages will be awarded in accordance with these findings.

So ordered:

_____

U.S.D.J.                                    date