**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AKIVA BINYAMIN JAKUBOWICZ, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>THE ISLAMIC REPUBLIC OF IRAN, *et al.*,<br><br>*Defendants*. | Civil Action No. 18-1450 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

This civil action for compensatory and punitive damages arises under the terrorism

exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.  The

seventeen plaintiffs are the direct victims of four separate terrorist attacks that took place in

Israel between July 2006 and October 2015 and their family members.  Some of the plaintiffs are

U.S. citizens (including dual U.S.-Israeli nationals), while others are not.  Defendants are the

Islamic Republic of Iran, the Iranian Ministry of Information and Security ("MOIS"), and the

Syrian Arab Republic.[1]  Plaintiffs assert that their injuries were caused by Iran and Syria's

provision of material support to three terrorist organizations: Hamas, the Palestinian Islamic

Jihad ("PIJ"), and Hezbollah.

To establish subject-matter jurisdiction, Plaintiffs invoke the state-sponsored terrorism

exception to the FSIA, 28 U.S.C. § 1605A(a)(1), arguing that Iran and Syria provided "material

support and resources" to Hamas, PIJ, and Hezbollah, which, in turn, engaged in acts of

---

[1]  For ease of reference, the Court will refer to the Islamic Republic of Iran and the Iranian
Ministry of Information and Security jointly as "Iran" and will refer to the Syrian Arab Republic
as "Syria."

extrajudicial killing or attempted extrajudicial killing in the four attacks at issue. Dkt. 57 at 25–26 (Am. Compl. ¶¶ 100–11). The ten U.S.-citizen plaintiffs also assert a cause of action under a provision of the same statute, 28 U.S.C. § 1605A(c). *Id.* (Am. Compl. ¶¶ 100–10). The non-U.S.-citizen plaintiffs assert causes of action for negligence and aiding and abetting under Israeli law. *Id.* at 26–29 (Am. Compl. ¶¶ 111–32). None of the Defendants has answered or otherwise appeared in this action. Consequently, at Plaintiffs' request, the Clerk of the Court entered defaults against all three Defendants. Dkt. 26; Dkt. 27. Plaintiffs subsequently moved for the entry of default judgments against the Defendants, Dkt. 30, and for the appointment of a special master to conduct damages proceedings, Dkt. 53 at 32–33.

The Court now concludes that all but two plaintiffs—Shachar Boteach and D.A.B.—are not entitled to relief under the FSIA. First, as explained further below, the Court recently held in *Force v. Islamic Republic of Iran*, --- F. Supp. 3d ---, 2022 WL 2452606 (D.D.C. July 5, 2022) ("*Force II*"), that the FSIA's waiver of sovereign immunity for claims of "personal injury or death that was caused by an act of . . . extrajudicial killing, . . . or the provision of material support or resources for such an act," 28 U.S.C. § 1605A(a)(1), does not include an act of "attempted extrajudicial killings when no one is, in fact, killed in the attack at issue." 2022 WL 2452606, at *1. Of the four terrorist attacks at issue in this case, only one resulted in a death—the October 13, 2015 killing of Richard Lakin. Because the record includes no evidence that anyone was killed in the other three attacks, the Court lacks subject-matter jurisdiction over Plaintiffs' claims against Iran and Syria based on the provision of material support for those non-lethal attacks.

Second, to establish standing to seek solatium damages, the remaining plaintiffs must show that they are functionally equivalent to Richard Lakin's "immediate family members." As

discussed further below, Richard Lakin's estate and his two children have already sought and obtained relief from this Court.  *See Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020) ("*Force I*").  The Lakin Plaintiffs in this case, in contrast, were not members of his "immediate family," as the phrase is understood for purposes of awarding solatium damages—they are his daughter-in-law, Rita Avni (Ankori), and his grandchildren, Shachar Boteach, D.A.B., E.A., R.A., V.A., and Y.L.  Of those plaintiffs, only Shachar Boteach and D.A.B. have shown that their relationship with Lakin was functionally equivalent to a parent-child relationship; therefore, only those plaintiffs may recover solatium damages.

The Court, accordingly, will **GRANT** the motion for entry of default judgment as to the claims of Shachar Boteach and D.A.B. and will **DENY** without prejudice the motion for entry of default judgment as to the claims of the remaining plaintiffs against the Islamic Republic of Iran, MOIS, and the Syrian Arab Republic.  *See* 28 U.S.C. § 1608(e).  The Court will **APPOINT** a special master to hear Shachar Boteach and D.A.B.'s damages claims and to report to the Court recommending the appropriate award as to those plaintiffs.

## ANALYSIS

Plaintiffs, ten U.S. nationals and seven non-U.S. nationals, bring this action for damages against Iran and Syria under the state-sponsored terrorism exception to the FSIA, 28 U.S.C. § 1605A.  Under that provision, a foreign state is not immune from the jurisdiction of the federal and state courts in cases in which

> [(1)] money damages are sought against a foreign state [(2)] for personal injury or death [(3)] that was caused by [(4)] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is [(5)] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

3

28 U.S.C. § 1605A(a)(1).  This exception, moreover, applies only to suits in which two additional requirements are met.  First, the claimant or victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor at the time the act of terrorism occurred.  28 U.S.C. § 1605A(a)(2)(A)(ii).  Second, the foreign state must be designated as a state sponsor of terrorism both at the time the act occurred (or was so designated as a result of the act) and at the time the lawsuit was filed (or was so designated within the six-month period preceding the filing of the suit).[2]  *Id.* § 1605A(a)(2)(A)(i)(I); *see also Owens v. Republic of Sudan*, 864 F.3d 751, 763–64 (D.C. Cir. 2017) ("*Owens IV*"), *vacated on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 160 (2020).

Plaintiffs allege that Iran and Syria provided "material support and resources" to Hamas, the PIJ, and Hezbollah for four terrorist attacks that caused them personal injuries for which they are entitled to money damages.  Dkt. 57 at 5–6 (Am. Compl. ¶¶ 20–22).[3]  Those four terrorist attacks are (1) the shooting of Akiva Jakubowicz on June 20, 2008, *id.* at 21 (Am. Compl. ¶¶ 83–84); (2) the murder of Richard Lakin on October 13, 2015, *id.* at 23–24 (Am. Compl. ¶¶ 94–95); (3) the shooting of Yehuda Glick on October 29, 2014, *id.* at 20 (Am. Compl. ¶ 76); and (4) Hezbollah rocket attacks in July–August 2006 that caused psychological trauma to Chana and Malka Kumer, *id.* at 23 (Am. Compl. ¶¶ 90–93).  Plaintiffs are Akiva Jakubowciz and five of his immediate family members (the "Jakubowicz Plaintiffs"); Richard Lakin's daughter-in-law, Rita Avni, and six of his grandchildren (the "Lakin Plaintiffs"); Yehuda Glick's stepchildren, Chagai

---

[2] Section 1605A(a)(2) also requires that the foreign state received "a reasonable opportunity to arbitrate the claim," but only if the act of terrorism "occurred in the foreign state against which the claim has been brought."  28 U.S.C. § 1605A(a)(2)(A)(iii).  That requirement is inapplicable to the facts of this case because none of the alleged acts of terrorism occurred in Iran or Syria.

[3] With respect to Hezbollah, Plaintiffs allege only that Iran—and not Syria—provided material support for the terrorist attack at issue.  *See* Dkt. 57 at 5–6 (Am. Compl. ¶ 20).

Molodic and Avital Molodick (the "Glick Plaintiffs"); and Malka and Chana Kumer (the "Kumer Plaintiffs").

Plaintiffs effected service on the Islamic Republic of Iran and MOIS on August 22, 2018, Dkt. 10; Dkt. 11, and on the Syrian Arab Republic on September 24, 2018, Dkt. 22.  None of the Defendants has answered, filed a motion under Federal Rule of Civil Procedure 12, or otherwise appeared.  *See* Dkt. 23; Dkt. 24; Dkt. 25.  Accordingly, at Plaintiffs' request, the Clerk of the Court declared all Defendants in default on January 28, 2019.  *See* Dkt. 26; Dkt. 27.

Plaintiffs now seek entry of default judgments with respect to liability against Iran and Syria pursuant to Federal Rule of Civil Procedure 55.  Dkt. 30.  To obtain default judgments against Defendants, Plaintiffs must (1) carry their burden of producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to the FSIA, *see* 28 U.S.C. § 1605A(a); *Owens IV*, 864 F.3d at 784; (2) establish that defendants were served in accordance with the FSIA, *see* 28 U.S.C. § 1608(a); and (3) establish their right to relief under federal, *see* 28 U.S.C. § 1605A(c), or state law, *Owens IV*, 864 F.3d at 809 ("the pass-through approach remains viable"), by offering "evidence satisfactory to the court," 28 U.S.C. § 1608(e).

As explained further below, the Court first concludes that it lacks subject-matter jurisdiction over the claims alleged by the Jakubowicz Plaintiffs, the Glick Plaintiffs, and the Kumer Plaintiffs.  Those plaintiffs have failed to allege injuries arising from "act[s] of . . . extrajudicial killing," as required under the state-sponsored terrorism exception to the FSIA, 28 U.S.C. § 1605A(a)(1), because there is no evidence that anyone died in the terrorist attacks that caused those plaintiffs' injuries.  The Court then considers whether the Lakin Plaintiffs have satisfied the remaining requirements for establishing liability against Iran and Syria —in particular, the Court considers whether the Lakin Plaintiffs, who are not Richard Lakin's

5

"immediate family members," may nevertheless recover solatium damages as "functional equivalents" of his "immediate family members." The Court concludes that Shachar Boteach and D.A.B. have made the requisite showing, while Rita Avni (Ankori), Y.L., E.A., R.A., and V.A. have not (at least thus far). The Court also concludes that Shachar Boteach and D.A.B. have established their right to relief and that the Court has personal jurisdiction over all three Defendants.

## A.    Jakubowicz, Glick, and Kumer Plaintiffs

The Jakubowicz, Glick, and Kumer Plaintiffs seek compensatory and punitive damages for injuries arising out of three terrorist attacks, respectively. The first attack involved the shooting of Akiva Jakubowicz. On June 20, 2008, two Hamas operatives opened fire on a group of five hikers in Wadi Zarka, an area northeast of the city of Modi'in, Israel. Dkt. 47 at 10 (Spitzen Decl. ¶ 36). One of the hikers was Plaintiff Akiva Jakubowicz, who was nineteen years old at the time and who was shot in the pelvis and thigh. Dkt. 33 at 1–2 (A. Jakubowicz Decl. ¶¶ 4, 12); Dkt. 47 at 10 (Spitzen Decl. ¶ 36). At the hospital, doctors declared Jakubowicz's wounds "critical." Dkt. 33 at 5–6 (A. Jakubowicz Decl. ¶ 29). The bullet in Jakubowicz's pelvis was "close to a major nerve and could not be safely removed," so it was left in his body. *Id.* at 6 (A. Jakubowicz Decl. ¶ 29).[4] Jakubowicz, his parents, and his siblings seek damages for their "severe psychological and emotional injuries." Dkt. 57 at 22 (Am. Compl. ¶¶ 88–89); *see also*

---

[4] The Akiva Jakubowicz Declaration features a minor error in paragraph numbering: there are two sets of paragraphs 28 and 29. *See* Dkt. 33 at 5–6. The first paragraphs 28 and 29 begin on page 5 of the declaration, and the second paragraphs 28 and 29 appear on page 6. *See id.* The Court will distinguish between these paragraphs by their page numbers: Dkt. 33 at 5 (A. Jakubowicz Decl. ¶ 28); Dkt. 33 at 5–6 (A. Jakubowicz Decl. ¶ 29); Dkt. 33 at 6 (A. Jakubowicz Decl. ¶ 28); and Dkt. 33 at 6 (A. Jakubowicz Decl. ¶ 29).

Dkt. 34 (F. Jakubowicz Decl.); Dkt. 37 (Anaki Decl.); Dkt. 38 (Ayelet Jakubowicz Decl.); Dkt. 39 (B. Jakubowicz Decl.); Dkt. 40 (Y. Jakubowicz Decl.).

The second attack involved the shooting of Yehuda Glick.  At approximately 10:00 p.m. on October 29, 2014, Mu'taz Ibrahim Khalil Hijazi—a PIJ operative—shot Yehuda Glick several times at close range as Glick was leaving the Menachem Begin Heritage Center in Jerusalem. Dkt. 55-4 at 122 (2d Spitzen Decl. ¶ 316).  Glick was brought to the hospital in critical condition, where "he fought for his life for several days" and miraculously survived.  *Id.* at 123 (2d Spitzen Decl. ¶ 320).  Glick's stepson Chagai Molodic and stepdaughter Avital Molodick, both Israeli citizens, allege that they suffered "severe psychological and emotional injuries" as a result of the attack.  Dkt. 57 at 21 (Am. Compl. ¶ 82); *see also* Dkt. 35 at 7 (Molodick Decl. ¶ 41).

The third attack involved a Hezbollah-led rocket onslaught that Malka Kumer and C.L.K. experienced in Tzfat, a northern city in Israel.  Dkt. 42 at 1–3 (M. Kumer Decl. ¶¶ 2–10); Dkt. 41 at 1–3 (C.L.K. Decl. ¶¶ 2–12).  Malka Kumer was six years old at the time, Dkt. 42 at 1 (M. Kumer Decl. ¶ 3), and C.L.K. was five, Dkt. 41 at 1 (C.L.K. Decl. ¶ 4).  When the first rocket fell in Tzfat on July 13, 2006, the girls' father "rushed [them] all out of the house as quickly as he could."  Dkt. 41 at 1 (C.L.K. Decl. ¶ 5); Dkt. 42 at 1 (M. Kumer Decl. ¶ 5).  They ran through the neighborhood's streets amidst the sounds of "bombs and alarms" before arriving at a community safety shelter.  Dkt. 41 at 1 (C.L.K. Decl. ¶ 5).  Malka Kumer recalls that she "couldn't see the explosions when the rockets landed," but she "heard the thunder they caused." Dkt. 42 at 1–2 (M. Kumer Decl. ¶ 5).  Over the next few weeks, the Kumer family "endured hundreds of warning sirens, followed by rocket attacks," to the extent that "[i]t felt like [they] were always in [their] house or in a shelter, waiting for the next attack."  Dkt 42 at 2 (M. Kumer Decl. ¶ 8).  Neither Malka Kumer nor C.L.K. "had been physically harmed when the war ended,"

Dkt. 41 at 3 (C.L.K. Decl. ¶ 12), but they were "diagnosed with degrees of Post-Traumatic Stress Disorder ('PTSD') and Anxiety, which manifests into panic attacks, an inability to sleep, nightmares, and an exaggerated stress response."  Dkt. 43 at 5 (N. Kumer Decl. ¶ 18).  Malka Kumer and C.L.K. "still suffer from the traumatic experience of living through the rocket attacks, even after intensive counselling."  *Id.* (N. Kumer Decl. ¶ 17).  Both are "prone to anxiety and panic attacks."  *Id.* at 8 (N. Kumer Decl. ¶ 31).

The Court has previously confronted some of the facts in this case, as well as the legal issues that bear on the Court's subject-matter jurisdiction, because this action is related to another case pending before this Court, *Force v. Islamic Republic of Iran*, No. 16-1468 (D.D.C. filed July 15, 2016).  There, fifty-seven plaintiffs brought claims against Iran, the MOIS, and Syria for damages arising out of seven separate terrorist attacks that took place between 2008 and 2016.  *Force I*, 464 F. Supp. 3d at 334–35.  Two of the terrorist attacks at issue in *Force*— the murder of Richard Lakin and the shooting of Yehuda Glick—are also at issue in this case. Indeed, in *Force*, the plaintiffs included the estate of Richard Lakin and his two children, as well as Yehuda Glick and his wife, children, and foster children.  *Id.* at 347, 350.

As here, the plaintiffs in *Force* moved for entry of default judgments against Iran, MOIS, and Syria in 2018.  *See id.* 335.  The Court initially entered default judgments as to most of the plaintiffs in *Force*, including Richard Lakin's estate, Yehuda Glick, and the Lakin and Glick family members.  *Id.* at 334–36.  The Court denied the motion for entry of default judgments as to six plaintiffs, however.  *Id.* at 335.  Four of those unsuccessful plaintiffs, Daniella Parnas and her children, had sought damages for psychological and emotional injuries caused by a rocket attack that severely damaged their home in November 2012.  *Id.* at 352–53.  Significantly, none of the Parnases were home during the attack.  *Id.* at 363.  The Court initially held that it was

"unpersuaded . . . that the FSIA's terrorism exception should be construed to encompass attempted extrajudicial killings in which no one suffered physical injuries and no one was even placed in imminent apprehension of physical harm." *Id.* at 363.  As a result, the Court denied the motion for entry of default judgment as to the Parneses for lack of subject-matter jurisdiction. *Id.*

Daniella Parnas then renewed her motion for default.  *See Force II*, 2022 WL 2452606, at *1.  She argued that she was entitled to relief "based on established case law holding that the victim of a state-sponsored terrorist attack may seek monetary relief for psychological injuries even without physical injuries." *Id.* at *3 (internal quotation marks omitted).  In response, the Court "set a hearing to address the unique issues raised by Parnas's motion and, in advance of the hearing, identified concerns regarding whether a plaintiff may avail herself of the [FSIA's] terrorism exception for injuries incurred as part of an attempted killing in which no one was killed." *Id.* (alteration in original) (internal quotation marks omitted).  In advance of the hearing, Parnas submitted a supplemental memorandum offering her response to the concerns raised in the Court's order.  *Id.*

On July 5, 2022, the Court denied Parnas's renewed motion for entry of default judgment. *Id.* at *1.  At the same time, and consistent with the concerns raised by the Court before and during the hearing on Parnas's motion, the Court reconsidered its view "about whether the waiver of foreign sovereign immunity contained in § 1605A applies to *attempted* extrajudicial killings when no one is, in fact, killed in the attack at issue." *Id.* (emphasis added).  The Court held that the FSIA "does not apply to attempts of this type." *Id.*  The Court will not repeat its legal reasoning here and, instead, refers the reader to *Force II*, 2022 WL 2452606.

The Court, accordingly, denied Parnas's renewed motion for default judgment on the ground that her injuries were not caused by an "act of extrajudicial killing" within the meaning of § 1605A. *Id.* And, in light of the Court's conclusion that § 1605A does not cover attempted extrajudicial killings "in which no one dies," *id.* at *7, the Court expressed doubt that the plaintiffs who sought damages for injuries that arose from attacks in which no one was killed—including Yehuda Glick and his family members—were entitled to recover under the FSIA. *Id.* at *9. But, because "the Court ha[d] yet to provide [Glick and other similarly situated plaintiffs] with the opportunity to argue that they remain entitled to recover for reasons that may differ from those pressed by Parnas," the Court did not enter judgment against those plaintiffs, *id.*, and, more recently, set a schedule for further briefing in light of the Court's decision in *Force II, see* Minute Entry, *Force v. Islamic Republic of Iran*, No. 16-cv-1468 (D.D.C. entered July 26, 2022).

For the reasons explained in *Force II*, the Court is persuaded that § 1605A does not apply to *attempted* extrajudicial killings, "when no one is, in fact, killed in the attack at issue." *Id.* at *1. Applying *Force II* here, the Court concludes that—at least on the present record—the attacks on Akiva Jakubowicz, the Kumers, and Yehuda Glick do not qualify as "extrajudicial killing[s]" under § 1605A(a)(1). As to the shooting of Akiva Jakubowicz, Plaintiffs allege that he was shot twice by members of Hamas, *see* Dkt. 33 at 2 (A. Jakubowicz Decl. ¶ 12); *see also* Dkt. 47 at 27 (Spitzen Decl. ¶ 94), but Plaintiffs do not allege that anyone was killed during the attack. Similarly, as to the Hezbollah rocket attacks that caused psychological and emotional injuries to Chana and Malka Kumer, Plaintiffs do not allege that their injuries were caused by "an act of . . . extrajudicial killing"—as opposed to an *attempted* extrajudicial killing—or "the provision of material support or resources for such an act." *See* Dkt. 41 at 3 (M. Kumer Decl. ¶ 12). Finally, as the Court already explained in *Force II*, and as the Court reiterated to the Glick

family's counsel at a recent status conference in that case, the Court is unpersuaded that Yehuda Glick and his family members (including the family-member plaintiffs in this case) suffered injuries caused by an act of extrajudicial killing or the provision of material support for such an act. *See Force II*, 2022 WL 2452606, at *9. The Court has, however, permitted Yehuda Glick and his family members to submit further briefing on this issue in *Force*, and the Court will provide the same opportunity to the Jakubowicz, Kumer, and Glick Plaintiffs in this case. For present purposes, however, the Court remains unconvinced that the waiver of sovereign immunity contained in § 1605A reaches their claims, none of which involve injuries caused by one of the specific "acts" of terrorism listed in the statute (or material support for one of those "acts")

The Court will, accordingly, deny Plaintiffs' motions for entry of default judgments as to the Jakubowicz, Kumer, and Glick Plaintiffs, but will do so without prejudice.

## B.    Lakin Plaintiffs

That leaves the claims of the Lakin Plaintiffs: Rita Avni, Shachar Boteach, D.A.B., Y.L., E.A., R.A., and V.A. Before granting these plaintiffs' motion for entry of default judgment, the Court must satisfy itself that they have carried their burden of producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to the FSIA, *see* 28 U.S.C. § 1605A(a); that they have established their right to relief under federal, *see* 28 U.S.C. § 1605A(c), or state law, by offering evidence "satisfactory to the court," 28 U.S.C. § 1608(e); and that they have established that Defendants were served in accordance with the FSIA, *see* 28 U.S.C. § 1608(a). The Court concludes that Plaintiffs have carried their burden as to Shachar Boteach and D.A.B. but not as to the remaining Lakin Plaintiffs.

1.      *Evidentiary Submission*

As an initial matter, the Court pauses to address Plaintiffs' evidentiary submission with respect to the Lakin Plaintiffs.  As discussed above, the plaintiffs in *Force* included Richard Lakin's estate as well as his two children.  After hearing testimony from five experts and considering additional evidence, the Court granted relief to those plaintiffs.  *See Force I*, 464 F. Supp. 3d at 335, 337.  Here, the Lakin Plaintiffs have asked the Court to take judicial notice of the evidence and testimony presented in *Force* and to grant relief on the same grounds that the Court relied upon in that case.  *See Salzman v. Islamic Republic of Iran*, No. 17-cv-2475, 2019 WL 4673761, at *3 (D.D.C. 2019).  Plaintiffs have submitted copies of expert declarations, originally filed in *Force*, submitted by: (1) Boaz Shnoor, *see* Dkt. 55-3 (Shnoor Decl.); (2) Colonel Aryeh Dan Spitzen, *see* Dkt. 55-4 (2d Spitzen Decl.); (3) Patrick Clawson, *see* Dkt. 55-5 (2d Clawson Decl.); (4) Matthew Levitt, *see* Dkt. 55-6 (Levitt Decl.); (5) Benedetta Berti, *see* Dkt. 55-7 (Berti Decl.); and (6) Marius Deeb, *see* Dkt. 55-8 (Deeb Decl.).

Although prior decisions in this district "have . . . frequently taken judicial notice of earlier, related proceedings," *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (collecting cases), that does not mean that the Court may simply accept the facts found in an earlier opinion, which would amount to a prohibited exercise of collateral estoppel, *see Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 20 (D.D.C. 2001) ("[F]indings of fact made during the course of this type of one-sided [FSIA] hearing should not be given a preclusive effect.").  The Court may, however, "review evidence considered in" a prior proceeding "without necessitating the re-presentment of such evidence."  *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010) (citing *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 264 (D.D.C. 2006)).  With this in mind, the Court has reviewed the

evidence and testimony presented in *Force* and has considered that evidence for the purposes of this proceeding.

Based on the evidence submitted by Plaintiffs in this case and in *Force*, the Court finds as follows:  First, Iran provided Hamas with significant support in the form of arms and financial assistance, as well as training and technical expertise.  *See* Dkt. 55-5 at 14–15 (2d Clawson Decl. ¶¶ 35–37); Dkt. 55-6 at 29–30 (Levitt Decl. ¶ 59).  Second, Syria provided Hamas with a safe operational base from which to run its organizations.  *See* Dkt. 55-8 at 9 (Deeb Decl. ¶ 30); *see* Dkt. 55-7 at 34 (Berti Decl. ¶ 59).  Third, Hamas carried out the October 13, 2015 bus massacre that resulted in the death of Richard Lakin.  *See* Dkt. 55-4 at 47–49 (2d Spitzen Decl. ¶ 126–27).  Against that backdrop, the Court considers whether the Lakin Plaintiffs have satisfied their burden of demonstrating that the Court has subject-matter jurisdiction.

2.      *Subject-Matter Jurisdiction*

To start, the Court concludes that the Lakin Plaintiffs have satisfied the statutory requirements to invoke the terrorism exception to the FSIA.  First, they seek "money damages." 28 U.S.C. § 1605A(a)(1); *see* Dkt. 57 at 30 (Am. Compl.).  Second, Iran and Syria were designated as state sponsors of terrorism in 1984 and 1979, respectively, *see Force*, 464 F. Supp. 3d at 358, and remain so designated to this day, *see* U.S. Dep't of State, *State Sponsors of Terrorism*, available at https://www.state.gov/j/ct/list/c14151.htm (last visited Aug. 9, 2022).  Third, the designation of Iran as a state sponsor of terrorism is sufficient to satisfy the designation requirement as to MOIS.  *See* 28 U.S.C. § 1605A(a)(2)(A)(i)(I); *Force*, 464 F. Supp. 3d at 358.  Fourth, at the time the relevant acts occurred, Richard Lakin and three of the Lakin Plaintiffs were U.S. nationals (the Court will address the non-U.S.-citizen plaintiffs below).  *See* Dkt. 48 at 1.  Fifth, the brutal murder of Richard Lakin constitutes an "act of . . . extrajudicial

killing" within the meaning of § 1605A(a)(1). *See Force*, 464 F. Supp. 3d at 360. Sixth, Iran and Syria provided "material support or resources" to Hamas for that extrajudicial killing. *See id.* at 364–65. And finally, the evidence shows that the Lakin Plaintiffs' injuries were "caused by" Defendants' "provision of material support or resources [to Hamas] for such an act." 28 U.S.C. § 1604A(a)(1); *see also Force*, 464 F. Supp. at 368–69.

Like the Lakin plaintiffs in *Force*, the Lakin Plaintiffs in this case seek damages for their emotional and psychological injuries resulting from Richard Lakin's murder. *See* Dkt. 53 at 27. But, while the plaintiffs in *Force* included Richard Lakin's estate and his two children, *see Force*, 464 F. Supp. 3d at 347, the Lakin Plaintiffs here are further removed from Richard Lakin himself; they are his daughter-in-law, Rita Avni, and his grandchildren, Shachar Boteach, D.A.B., Y.L., E.A., R.A., and V.A. Dkt. 57 at 4–5. This distinction matters because, in addition to clearing the hurdle of foreign sovereign immunity, each plaintiff bears the burden of demonstrating that he or she has Article III standing to sue, and that inquiry turns, in significant part, on each indirect victim plaintiff's relationship to the direct victim.

The question whether each indirect victim "plaintiff is [a] proper party to bring . . . suit," *Raines v. Byrd*, 521 U.S. 811, 818 (1997), necessarily merges with the merits because the Court must assess whether each plaintiff's alleged injury is "legally and judicially cognizable," *id.* at 819, and whether it is "likely . . . redress[able] by a favorable judicial decision," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). But it is not uncommon for courts to consider jurisdiction and the merits together, as "the 'merits and jurisdiction will sometimes come intertwined.'" *Brownback v. King*, 141 S. Ct. 740, 749 (2021) (quoting *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1319 (2017)). In such cases, "a court can decide 'all . . . of the merits issues' in resolving a jurisdictional question, or vice versa." *Id.*

(quoting *Helmerich*, 137 S. Ct. at 1319).  The Court's resolution of the standing question here, accordingly, "will require the Court to address the merits as well," *Gutrejman v. United States*, --- F. Supp. 3d ---, 2022 WL 856384, at *5 (D.D.C. Mar. 22, 2022), and to assess whether each of the indirect victim Lakin Plaintiffs bears a sufficiently close relationship with the direct victim, Richard Lakin, to recover solatium damages in connection with his murder.

### a.   U.S.-Citizen Plaintiffs

The Court starts with the U.S.-citizen plaintiffs, Shachar Boteach, D.A.B., and Y.L., each of whom asserts a claim for the emotional distress and loss caused by Richard Lakin's death. Claims like these, which seek solatium damages, are at times compensable under the FSIA's cause of action, § 1605A(c).  *See Salzman v. Islamic Republic of Iran*, No. 17-2475, 2019 WL 4673761 at *12 (D.D.C. Sept. 25, 2019).  But solatium claims "are traditionally limited to a [direct] victim's 'immediate family,'" which typically includes only "one's spouse, parents, siblings, and children."  *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 62–63 (D.D.C. 2018) (first quoting *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 335 (D.C. Cir. 2003), then quoting *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 28 (D.D.C. 2009)). Here, Richard Lakin's grandchildren, Shachar Boteach ("Shachar"), D.A.B., and Y.L., do not qualify as "immediate family" under that standard.

The D.C. Circuit has also recognized, however, that for purposes of pursuing solatium claims, a direct victim's "immediate family" may include relatives who are "viewed as the functional equivalents of immediate family members."  *Bettis*, 315 F.3d at 337.[5]  Under that

---

[5] *Bettis* predated Congress's enactment of the FSIA's federal cause of action in § 1605A(c).  The plaintiffs invoked the state-sponsored terrorism exception to the FSIA and sought damages against Iran for intentional infliction of emotional distress ("IIED").  *See* 315 F.3d at 330–32. *Bettis* is still good law, however, and is relevant for present purposes because "the elements of a

theory, relatives other than the victim's children, spouse, or parents have recovered "[i]n a few limited circumstances," such as when relatives "resided in the same household with the victim" or were the victim's "legal guardians." *Id.* One decision from this Court, moreover, permitted a grandchild to recover solatium damages under the "functional equivalent" theory when the "interactions between [the plaintiff and the victim] were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 27 (D.D.C. 2011). The Court must, accordingly, determine whether Shachar, D.A.B., and Y.L. have proffered "evidence satisfactory to the court," 28 U.S.C. § 1608(e), to satisfy that standard. To be sure, that evidentiary hurdle is not a high one; in light of Defendants' failure to appear, "the quantum and quality of evidence . . . can be less than that normally required" in cases where the defendant appears and defends against the plaintiff's claims. *Owens VI*, 864 F.3d at 785 (quoting *Alameda v. Sec'y of Health, Ed. & Welfare*, 622 F.2d 1044, 1048 (1st Cir. 1980)). But, at the same time, the Court cannot disregard the "immediate family member" requirement and open the door to claims that neither Congress nor the D.C. Circuit has contemplated. *Cf. Force II*, 2022 WL 2452606, at *6 (noting that "expanding the pool of eligible claimants will inevitably affect the ability of other claimants to receive prompt compensation" and that "[t]he question of how best to balance these competing interests in a limited fund is best left to Congress").

Although a close question, Shachar has shown that she was sufficiently close to Richard Lakin to meet the "functional equivalent" test. Shachar was sixteen years old when Richard Lakin died. *See* Dkt. 46-7 at 1 (Strous Decl.). According to Shachar's declaration, Richard

---

solatium claim [under § 1605A(c)] are indistinguishable from an IIED claim." *Fritz*, 324 F. Supp. 3d at 62 (quotation marks omitted). Indeed, courts in this circuit regularly rely on *Bettis* when assessing solatium claims like those asserted here. *See, e.g.*, *id.*

Lakin was a "deeply important person in [her] life" and was "very involved in [her] raising." Dkt. 32 at 2 (Boteach Decl ¶ 6). Richard Lakin "lived close to [Shachar's] mother's house and [they] met several times a week." *Id.* (Boteach Decl. ¶ 6). Notably, after Shachar's parents divorced when she was eight years old, *see* Dkt. 46-7 at 1 (Strous Decl.), Richard Lakin was "a great help to [her] family" and "practically raised [her]." Dkt. 32 at 2 (Boteach Decl. ¶¶ 8, 10). Shachar's mother, Manya Lakin, similarly attested that after her divorce, Richard Lakin, "who lived 300 meters away, played an active role in helping [her] raise [her] young children." Dkt. 44 at 6 (Manya Lakin Decl. ¶ 30). Indeed, according to Shachar, "almost every day after school" when she was young, she would go to Richard Lakin's house. Dkt. 32 at 2 (Boteach Decl. ¶ 10). To be sure, he neither "resided in the same household" with Shachar nor was her "legal guardian[]." *Bettis*, 315 F.3d at 337. But because Richard Lakin stepped in to serve a parental role after Shachar's parents divorced, because he lived so close to her family for a period of time while playing that role, and in light of the low evidentiary threshold that applies here, the Court is persuaded that Shachar and Richard Lakin had a relationship that was functionally equivalent to a parent-child relationship.

Shachar's brother, D.A.B., has likewise shown that he was sufficiently close to Richard Lakin to satisfy the "functional equivalent" test. D.A.B. was eleven years old when Richard Lakin died. Dkt. 36 at 2 (D.A.B. Decl. ¶ 7). Consistent with Shachar's declaration, D.A.B. attests that when his parents divorced, Richard Lakin "was always helping [his] mom and spent a lot of time with [him] and [Shachar], even last minute." *Id.* (D.A.B. Decl. ¶ 4). According to D.A.B., Richard Lakin would help around the house, watch the children and teach them to read, and play games with them. *Id.* at 1–2 (D.A.B. Decl. ¶¶ 3–4). He was "much more than a grandfather" to D.A.B. *Id.* at 2 (D.A.B. Decl. ¶ 4). Most significantly, Richard Lakin lived near

D.A.B. and served as a parental figure after D.A.B.'s parents divorced.  Dkt. 44 at 6 (Manya Lakin Decl. ¶ 30).  Against that backdrop, D.A.B. has cleared the low evidentiary threshold for showing that he had the functional equivalent of a father-son relationship with Richard Lakin.

On the present record, however, the Court is unpersuaded that Y.L. has satisfied the "functional equivalent" test.  Y.L. was nine years old when Richard Lakin died.  *See* Dkt. 46-2 at 5 (Strous Decl.).  According to Y.L.'s stepmother, Rita Avni, Richard Lakin "lived more than an hour away" from Y.L. but would visit "at least once a week," sometimes sleeping over.  Dkt. 50 at 5–6 (Avni Decl. ¶ 25).  Rita Avni also attests that Richard Lakin "often spent weekends with [her family] and holidays," and he would occasionally watch her children and regularly talk to them on the phone.  *Id.*  Those facts alone are insufficient to show that Richard Lakin was the "functional equivalent" of Y.L.'s parent.  Unlike Shachar and D.A.B., Y.L. lived a significant distance from Richard Lakin, and there is no evidence that Richard Lakin played the same day-to-day parental role for Y.L. that he did for Shachar and D.A.B.  Rita Avni notes, moreover, that following her marriage to Richard Lakin's son, Micah, Y.L. splits his time between the Lakin family and his mother's family.  *Id.* at 8 (Avni Decl. ¶ 39).  To be sure, Rita Avni describes Y.L. as having a "very strong relationship" with Richard Lakin.  *Id.*  But "merely claim[ing] that the [plaintiff] . . . enjoyed a close relationship with [the victim]," without more, is not enough to support a solatium claim, *Bettis*, 315 F.3d at 337, and is insufficient to bring Y.L. within the category of indirect victims with standing to recover damages for the death of the direct victim.  The Court, accordingly, lacks subject-matter jurisdiction over Y.L.'s solatium claims.

      b.    <u>Non-U.S.-Citizen Plaintiffs</u>

Like the U.S.-citizen plaintiffs, the non-U.S.-citizen plaintiffs— Rita Avni, E.A., R.A., and V.A, who are citizens of Israel—bear the burden of showing that they fall within the limited

class of indirect victims entitled to recover damages for emotional injuries resulting from the death of the direct victim.  *Cf. Ayres v. Islamic Republic of Iran*, No. 18-cv-265, 2022 WL 1438605, at *10 (D.D.C. May 3, 2022).  Non-U.S. citizens cannot rely on the federal cause of action in § 1605A(c), *see Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 152–53 (D.D.C. 2011), but they may pursue their claims under applicable state or foreign law, *see Sheikh v. Republic of Sudan*, 485 F. Supp. 3d 255, 265 (D.D.C. 2020).  Here, the non-U.S.-citizen Lakin Plaintiffs seek damages under Israeli law, Dkt 57 at 26–29 (Am. Compl. ¶¶ 111–32), which applies to their claims, *see Force*, 464 F. Supp. 3d at 374.  Despite relying upon a different source of law, however, these plaintiffs must satisfy the same "immediate family" requirements to establish subject-matter jurisdiction for two reasons.

First, Plaintiffs themselves have indicated that "Israeli law provides that an *immediate family member* of a principal tort victim is entitled to compensatory damages for psychological and emotional harm resulting from the tort to the primary victim."  Dkt. 54 at 79 (Proposed Findings of Fact ¶ 278) (emphasis added) (citing Dkt. 55-3 at 17 (Shnoor Decl. ¶ 59)).  Plaintiffs have not provided the Court with any expert opinion or legal analysis addressing what constitutes an "immediate family member" under Israeli law; although Plaintiffs cite their Israeli law expert for the proposition quoted above, his declaration says nothing about damages, let alone immediate family members.  *See* Dkt. 55-3 at 17 (Shnoor Decl. ¶ 59).  The Court, accordingly, has no reason to believe that "immediate family members" carries a different meaning under Israeli law.

Second, in cases (such as this one) where non-U.S. nationals fail to submit evidence or analysis regarding the availability or calculation of solatium damages under Israeli law, courts will "default to the application of federal law."  *Force v. Islamic Republic of Iran*, No 16-cv-

1468, 2022 WL 2965635, at *8 (D.D.C. July 27, 2022) ("*Force III*") (quoting *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 358 (D.C. Cir. 2018)).  The Court will, accordingly, apply the same U.S. tort law rules that it applied to the U.S.-citizen plaintiffs above.  That, then, brings the Court back to question whether these plaintiffs were the functional equivalents of Richard Lakin's "immediate family members."

Having reviewed Plaintiffs' evidentiary submissions, the Court finds that none of the non-U.S.-citizen Lakin Plaintiffs have (at least to date) satisfied that standard.  Rita Avni was Richard Lakin's daughter-in-law; they met around the time that Rita Avni was thirty-five years old.  *See* Dkt. 46-3 at 1 (Strous Decl.); Dkt. 50 at 7 (Avni Decl. ¶ 31).  Richard Lakin never lived in the same household as Rita Avni; according to her declaration, he lived "more than an hour away" but would visit at least once a week.  Dkt. 50 at 4 (Avni Decl. ¶ 25).  Rita Avni describes her relationship with Richard Lakin as involving trips to the movies and to go shopping; she says that they were "friends, not just relatives," and that Richard Lakin was "like a second father to [her], not just a father-in-law."  *Id.* at 2 (Avni Decl. ¶ 4).  But "'near relatives,' 'close associates,' or persons with whom the victim has 'close emotional ties'" do not fall within the meaning of "immediate family" for purposes of standing to bring a solatium claim.  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 79 (D.D.C. 2010) (quoting *Bettis*, 315 F.3d at 336).

Rita Avni's children, E.A., R.A., and V.A., also fall short of satisfying the functional equivalent test.  Like Rita Avni, her children lived more than an hour from Richard Lakin and saw him only about once a week.  50 at 5 (Avni Decl. ¶ 25).  One of Rita Avni's children, E.A., is her child from another marriage and did not meet Richard Lakin until after Rita Avni formed a relationship with Richard Lakin's son.  *Id.* at 7 (Avni Decl. ¶ 31).  None of Rita Avni's children submitted declarations, but she attests that Richard Lakin used to watch them when she and her

20

husband went away.  *Id.* at 6 (Avni Decl. ¶ 25).  She also says that they used to "[speak] to Richard on the phone regularly" and that Richard Lakin would teach them English.  *Id.* at 6–7 (Avni Decl. ¶¶ 25, 32).  Rita Avni also attests that E.A. "dedicated a big part of his [bar mitzvah] speech to the memory of Richard Lakin."  Dkt. 50 at 7 (Avni Decl. ¶ 33).  More generally, Rita Avni explains that "[a]ll of [her] children had an extremely close relationship with Richard."  *Id.* at 5 (Avni Decl. ¶ 25).  But that fact—combined with the other evidence regarding Richard Lakin's relationships with Rita Avni's children—fails to establish anything more than a close relationship between a grandfather and his grandchildren.  The Court, accordingly, concludes that E.A., R.A., and V.A. also lack standing to bring solatium claims based on their grandfather's murder.

In reaching these conclusions, the Court does not underestimate the importance of the relationship between grandchildren and their grandfather or between a daughter-in-law and her father-in-law.  The trauma and loss that they suffered is horrific.  But the same could be said of the losses that Richard Lakin's close friends and other, even more remote relatives undoubtedly suffered.  The pain caused by a brutal murder of this type reaches entire communities.  The law, however, draws a line separating those who are entitled to bring suit for their loss and those who may not, and that line permits recovery by the direct victim's "immediate family" and not others.  Here, even liberally construed, that concept is insufficiently capacious to allow those who are not the direct victim's children, spouse, or parents—or their "functional equivalent"—to bring suit.  But that legal construct in no way diminishes or demeans the actual loss suffered by the Lakin Plaintiffs or others.

The Court will, accordingly, dismiss Y.L., Rita Avni, E.A., and V.A.'s claims, but will do so without prejudice.

3.   *Federal Cause of Action*

Having concluded that the Court possesses subject-matter jurisdiction over Shachar Boteach and D.A.B.'s claims, little else is required to show that they are entitled to relief under the federal cause of action the Congress enacted in 2008 as part of the National Defense Authorization Act.  *See* Pub. L. No. 110-181, § 1083, 122 Stat. 33, 338–44 (2008) (codified at 28 U.S.C. § 1605A(c)).  There is substantial "overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017), and a U.S.-citizen plaintiff who offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) and Article III standing has also established that he is entitled to relief as a matter of federal law.

4.   *Personal Jurisdiction*

The Court also concludes that it has personal jurisdiction over Iran and Syria.  Under the FSIA, the Court has personal jurisdiction over a foreign state "as to every claim for relief over which the [Court] ha[s] jurisdiction . . . where service has been made under [§] 1608."  28 U.S.C. § 1330(b).  Thus, "[i]n order to sue a foreign state or one of its political subdivisions, a plaintiff must effect service in compliance with" 28 U.S.C. § 1608(a).  *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).

Section 1608(a) "provides four methods of service in descending order of preference," *id.*:

(1)   by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2)    if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

(3)    if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

(4)    if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services--and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

The first two means of effecting service—by delivery of the summons and complaint either "in accordance with any special arrangement for service between the plaintiff and the foreign state" under § 1608(a)(1) or "in accordance with an applicable international convention on service of judicial documents" under § 1608(a)(2)—were unavailable to Plaintiffs in this case. *See* Dkt. 53 at 10.  No "special arrangement" governs service between the United States and Iran or Syria, and neither country is party to an international convention on service of judicial documents.  *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 77–78 (D.D.C. 2017). As a result, Plaintiffs effected service under the third alternative, which requires service by mail from "the clerk of the court to the head of the ministry of foreign affairs of the foreign state."  28 U.S.C. § 1608(a)(3).  On August 10, 2018, Plaintiffs initiated service as to all Defendants under § 1608(a)(3), Dkt. 6; Dkt. 7, and, at Plaintiffs' request, the Clerk of Court mailed the relevant

documents to Syria and Iran on August 20, 2018, Dkt. 9.  The documents sent to Iran were delivered on August 22, 2018, Dkt. 10; Dkt. 11, and the documents sent to Syria were delivered on September 24, 2018, Dkt. 22.

Because Plaintiffs accomplished service on Iran and Syria pursuant to 28 U.S.C. § 1608(a)(3), the Court has personal jurisdiction over all three Defendants.  *See* 28 U.S.C. § 1330(b).

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that the motion for default judgment, Dkt. 30, is **GRANTED** with respect to Shachar Boteach and D.A.B.'s claims against Syria, Iran, and MOIS.  It is further **ORDERED** that the motion for default judgment is **DENIED** without prejudice as to the remaining Plaintiffs' claims.  Counsel for Plaintiffs is **ORDERED** to file a status report on or before August 29, 2022, proposing a schedule for any further briefing or evidentiary submissions relating to jurisdiction or the merits of this matter.  The Court will **APPOINT** a special master to hear the damages claims and to report to the Court recommending the appropriate award as to Shachar Boteach and D.A.B.  A separate order appointing a special master and setting the terms of that appointment will follow.

**SO ORDERED.**

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  August 9, 2022

24