### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AKIVA BINYAMIN JAKUBOWICZ, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 18-1450 (RDM) |
| THE ISLAMIC REPUBLIC OF IRAN, *et al.*, | |
| *Defendants.* | |

### REPORT AND RECOMMENDATION OF SPECIAL MASTER
### REGARDING COMPENSATORY DAMAGES

### BRIEF BACKGROUND

This case (overall) arises out of terrorist attacks that took place in Israel between July 2006 and October 2015. The Complaint seeks damages under Section 1605 of the Foreign Sovereign Immunities Act ("FSIA") for 17 plaintiffs, but the Court has granted a default judgment for only two of those plaintiffs. Dkt. No. 58, *Jakubowicz v. Islamic Republic of Iran*, No. CV 18-1450 (RDM), 2022 WL 3354719 (D.D.C. Aug. 9, 2022). The two remaining plaintiffs, Shachar Boteach and D.A.B., assert claims for solatium damages arising from a terrorist attack that occurred in Jerusalem on October 13, 2015, and that resulted in the death of their grandfather Richard Lakin.

The Court appointed the undersigned as Special Master for the administration of damages proceedings, to receive evidence, and to prepare proposed findings and recommendations for the disposition of Plaintiffs Shachar Boteach's and D.A.B.'s claims for compensatory damages in this matter. *See* Dkt. No. 59. The undersigned previously submitted a report and recommendation in a different case addressing compensatory damages for Mr. Lakin's estate and his surviving children.

1

*See Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20 (D.D.C. 2022) ("*Force*") (adopting special master's report and recommendation regarding compensatory damages, with minor modification).

## STATUTORY FRAMEWORK

Section 1605A(a) of the FSIA creates a private right of action for United States nationals, members of the U.S. armed forces, and United States government employees or contractors who are injured by terrorist acts carried out by officials, employees or agents of a foreign state. 28 U.S.C. § 1605A(a). Family members of those injured or killed in such terrorist acts may also seek money damages for their own injuries. Qualified plaintiffs may seek compensatory damages including economic damages, solatium damages, and pain and suffering damages.

Generally, plaintiffs must submit information and evidence to support an award of damages. The damages recommendations and awards may be based on uncontroverted evidence in the form of deposition testimony, sworn statements, authenticated documents, and expert reports. *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits.").In preparing this report, I have reviewed and relied on the Court's Memorandum Opinion and Order granting the motion for default judgment with respect to Plaintiffs Shachar Boteach and D.A.B.'s claims, declaration testimony provided by the two plaintiffs and the mother of the two plaintiffs, reports of an expert psychiatrist, the Court's decision in *Force* which details the relevant circumstances of Mr. Lakin's death, and all applicable case law under Section 1605.

## FACTUAL FINDINGS

The plaintiffs' claims arise out of the murder of Richard Lakin by the Hamas terrorist organization on October 13, 2015. Mr. Lakin's estate and other family members received

compensatory damages awards in another action. *See Force*, 617 F. Supp. 3d at 36-39. Because the circumstances of Mr. Lakin's death are relevant to the analysis of solatium damages for the plaintiffs here, I provide a brief summary of the facts surrounding the attack and Mr. Lakin's death.

Mr. Lakin was attacked on Bus 78 in Jerusalem on October 13, 2015. Mr. Lakin was shot in the head and stabbed in the abdomen. The intake notes from the hospital state that Mr. Lakin was "brought [in] conscious breathing spontaneously with active bleeding from the head and abdomen and unstable hemodynamically." *See* Report and Recommendation of Special Master Deborah Greenspan, *Force v. Islamic Republic of Iran*, No. 16-1468 (RDM), Dkt. 119 at 12 (D.D.C Apr. 23, 2021) ("*Force* Report"). Mr. Lakin underwent multiple surgical procedures, including a pancreatectomy, an exploratory laparotomy, and partial gastrectomy. *Id.* He remained intubated and in intensive care and then developed acute renal failure and severe liver failure. *Id.* On October 18, 2015, five days after the attack, he underwent another operation including a gastrojejunostomy. *Id.* He was treated with multiple transfusions, but he continued to deteriorate and on October 27, 2015, he passed away. *Id.* His family, including plaintiff Shachar Boteach, maintained vigil at the hospital throughout the period.

A.    SHACHAR BOTEACH

Shachar Boteach is Richard Lakin's granddaughter. She submitted declaration testimony in support of her claim. Declaration of Shachar Boteach, Dkt. No 32 ("Boteach Decl."). She is a dual citizen of Israel and the United States. Boteach Decl. at ¶ 2. She was in high school when her grandfather was killed. *Id* at ¶ 5. She testified in her declaration that her grandfather had a central role in her life when she was growing up, and that he was very involved in her life and upbringing. *Id.* at ¶¶ 6-7. He lived nearby and cared for her when she was sick, taught her games, and read to her. *Id.* at ¶¶ 8, 10. She states that he practically raised her, that she loved him very

much, and that he was a central figure in her life. *Id.* at ¶ 10. She states that "almost every day after school" when she was young, she would go to Richard Lakin's house. *Id.* She reported in her interview with the expert psychiatrist (addressed *infra*) that her grandfather "predominately raised her." Expert Report of Dr. Rael Strous ("Strous Report"), Psychiatric Evaluation of Shachar Boteach ("Boteach Evaluation"), Dkt. No. 46-7, at 4. He taught her about the importance of equality. Boteach Decl. at ¶ 11. He taught her values and about kindness and acceptance of others. *Id*. at ¶ 12. She describes him as an amazing person. *Id.* at ¶ 13. She states that her life changed forever on the day her grandfather was attacked. *Id.* at ¶ 14. When she learned of the attack she started to cry and went immediately to the hospital where her grandfather was fighting for his life. *Id.* at ¶ 16. She recalls hearing the doctor describe her grandfather's wounds – describing them as "slaughter". *Id.* at ¶ 16. When she thinks of her grandfather, she pictures him in the hospital – with tubes, an open stomach, and a bandage over his head wound. *Id.* at ¶ 19. She cannot stop thinking about how he must have felt when he was attacked. *Id.* at ¶ 21. She is angry about his suffering, she misses him, and thinks about him every day. *Id.* at ¶ 24. She feels ongoing guilt because she had a disagreement with her grandfather shortly before the attack and had not had a chance to follow up with him. The attack has altered every part of her personal life. *Id.* She feels his absence in her life – at her high school graduation, and at birthdays and holidays in particular. *Id.* at ¶¶ 26-27. She states that every happy occasion is bittersweet. *Id.* at ¶ 27. In her army training, she panicked when she first had to shoot a gun. *Id.* at ¶ 29. She says fear is taking over her life. *Id.* at ¶ 33. The attack caused her to fear the Arab community – something that is contrary to her grandfather's teachings. *Id.* at ¶¶ 34-35. Her grandfather's funeral was one of the hardest moments in her life. *Id.* at ¶ 37. She cannot understand how two people who grew up near her could murder

an unarmed elderly man simply riding the bus. *Id.* She and her family have not recovered from her grandfather's murder and she remains heartbroken and fearful of attacks. *Id.* at ¶¶ 38-39.

Shachar's mother, Manya Lakin, provided declaration testimony that supports Shachar's testimony. *See* Declaration of Manya Lakin, Dkt. No. 44 ("Lakin Decl."). Manya Lakin states that after her divorce, Richard Lakin, "who lived 300 meters away, played an active role in helping [her] raise [her] young children." *Id.* at ¶ 30.

**B.    D.A.B.**

D.A.B. is Richard Lakin's grandson. D.A.B. provided declaration testimony in support of his claim. *See* Declaration of D.A.B., Dkt. No. 36. D.A.B. was 11 years old when his grandfather was killed. *Id.* at ¶ 11. D.A.B. states that he was very close with his grandfather and that his grandfather 'meant the world' to him. *Id.* at ¶ 2. He was very young when his parents were divorced and Richard Lakin served as a parental figure. *Id.* at ¶¶ 3-4. He was more than a grandfather to D.A.B. *Id.* at ¶ 4. D.A.B. attests that when his parents divorced, his grandfather "was always helping [his] mom and spent a lot of time" with him and his sister. *Id.* D.A.B. states that, Richard Lakin would help around the house. *Id.* He watched D.A.B. and his sister, taught them to read and played games with them. *Id.* at ¶ 3. D.A.B. learned that his grandfather had been attacked when he came home from school on the day of the attack. *Id.* at ¶ 7. He was afraid to go to the hospital. *Id.* at ¶ 8. He went to school during the time his grandfather was in the hospital but could not concentrate. *Id.* He was afraid that his grandfather would die. *Id.* After two weeks he arrived home and everyone was crying so he knew his grandfather had died. *Id.* at ¶ 9. He had to go back to school but stayed alone and did not participate in any events. *Id.* He is scared to go to public places and is afraid when he hears Arab voices. *Id.* at ¶ 11. He forces himself to go on buses, but he is afraid. *Id.* at ¶ 12. He wants to have a way to defend himself. *Id.* at ¶¶ 13-14. He misses his

grandfather at certain holidays and the anniversary of his death. *Id.* at ¶ 16. When he sees things that remind him of his grandfather, he is sad. *Id.*

D.A.B.'s mother, Manya Lakin, also provided declaration testimony relevant to his claim. *See* Lakin Decl. She states in her declaration that D.A.B.'s grandfather was an integral part of the family's life. *Id.* at ¶ 30. Because Manya Lakin was divorced, Richard Lakin helped raise the children. *Id.* at ¶ 30. He taught the children to read English. *Id.* at ¶ 31. He played games with them. *Id.* He was with them multiple days each week. *Id.* He celebrated all events and holidays with them. *Id.* at ¶ 38. She states that since his grandfather's death D.A.B. feels insecure and thinks about how to defend himself in a terrorist attack. *Id.* at ¶ 34. For over a year, D.A.B. was afraid to leave the house alone. *Id.* at ¶ 36. He asked how his grandfather felt when he was being attacked. *Id.* at ¶ 35. He worries if his mother does not come home on time. *Id.* at ¶ 36. He is afraid to ride the bus. *Id.* He is nervous around Arab people and when he hears Arabic. *Id.* at ¶ 37.

### C.    EXPERT REPORTS REGARDING PLAINITFFS' INJURIES

Plaintiffs have submitted reports prepared by Dr. Rael Strous in support of their claims. Report of Dr. Rael Strous, *See Strous Report*, Dkt. No. 46. Dr. Strous is a medical doctor specializing in psychiatry. *Id.* at 1. Dr. Strous is the Director of the Department of Psychiatry at Maayenei Hayeshua Medical Center in Bnei Brak, Israel. *Id.* He is a Full Professor Emeritus, Department of Psychiatry at the Sackler Faculty of Medicine at Tel Aviv University. *Id.* He also maintains a private practice. *Id.* He received his medical degree from the University of Witwatersrand in Johannesburg, South Africa. *Id.* at ¶ 2. He completed his residency in psychiatry at Albert Einstein College of Medicine in the Bronx, New York. *Id.* He performed a clinical research fellowship in psychopharmacology at the Commonwealth Research Center, Massachusetts Mental Health Center affiliated with Harvard Medical School. *Id.* He has published

approximately 150 peer-reviewed publications including several in the area of chronic Post-Traumatic Stress Disorder. *Id.* at ¶ 4. He has provided expert reports in numerous cases and has testified as an expert at trial. *Id.* at ¶ 5. He conducted clinical interviews and psychiatric evaluations of the two plaintiffs – and has submitted written evaluations of each based on his examination and review of testimony and other relevant documents related to this case. *Id.* at ¶¶ 7-8. His evaluations address the extent to which the plaintiffs have suffered and/or continue to suffer from any psychiatric disorders pursuant to the diagnostic formulations provided by the Fifth Edition of the Diagnostic and Statistical Manual of Mental Health Disorders. *Id.* at ¶ 9. Specifically, he determined the extent to which the plaintiffs suffer from one or more of the following conditions: Persistent Complex Bereavement Disorder,[1] Post-Traumatic Stress Disorder,[2] Major Depressive

---

[1] Persistent Complex Bereavement Disorder (also known as Pathological Grief or Complicated Mourning), currently in the appendix of the DSM 5, refers to a description of the normal mourning process that leads to chronic or ongoing mourning. The term "Pathological Grief" is applied to people who are unable to get over their grief despite the passage of time. It can take most people up to several years to get past a serious loss especially when the loss is associated with a violent and unexpected death. The person may experience intrusive distressing preoccupation with the deceased and wish to be reunited with the deceased. They may feel a sense of futility about the future, difficulty acknowledging the death, excessive irritability, bitterness or anger about the unfairness of the death and, most significantly, impaired social/occupational functioning. A pathological grief reaction is usually diagnosed after a long time (one or more years) has passed and the grieving person is not improving Strous Report at ¶ 12.

[2] Post-Traumatic Stress Disorder ("PTSD") is a condition which develops from having been exposed to, or witnessing, life-threatening events. In addition, the traumatic event may be indirect, by hearing of a relative or close friend who has experienced the life-threatening event. Indirectly experienced death must be accidental or violent. PTSD is characterized by distinct types of symptoms. These symptoms include avoidance, re-experiencing the event, and hyper-vigilance. Avoidance is the active escape from situations that the PTSD victim associates with the event. Re-experiencing is reliving the memory of the event. Hypervigilance is a cluster of symptoms that includes exaggerated startled response, inability to fall asleep and inability to stay asleep. The disorder is also characterized by negative alterations in mood or cognitions which indicate a decline in someone's mood or thought patterns. This can include memory problems that are exclusive to the event, negative thoughts or beliefs about one's self or the world, distorted sense of blame for one's self or others related to the event, being stuck in severe emotions related to the trauma (e.g., horror, shame, sadness), severely reduced interest in pre-trauma activities and feeling detached, isolated or disconnected from other people. Due to their suffering and symptoms, educational and employment prospects for PTSD victims are often lowered. Some have difficulty interacting with others. Younger victims and females may be more likely to be susceptible to PTSD. Overall effects on PTSD patients from this illness are severe. Patients are easily distractible due to their exaggerated response to stimuli. Individuals face considerably lowered employment prospects and increased likelihood of difficulty in forming and maintaining interpersonal relationships. For those who are married or who are able to marry and have children the stress of childrearing will be compounded. The inability to relax and have a good time is extremely common with PTSD patients. Expert Report of Dr. Rael Strous, Dkt. 35 at ¶¶ 13-17, dated January 31, 2018. Strous Report at ¶¶ 13-17.

Disorder,[3] Persistent Depressive Disorder,[4] Anxiety Disorder,[5] Obsessive Compulsive Disorder,[6] and Adjustment Disorders.[7] *Id.* at ¶¶ 8, 11.

Dr. Strous is qualified to provide an expert opinion on the plaintiffs' emotional injuries pertinent to these claims and circumstances. I conclude, therefore, that I may rely on the expert

---

[3] Depression (major depressive disorder or clinical depression) is a common but serious mood disorder. It is a real illness and affects people in different ways. It causes severe symptoms that affect how a person feels, thinks, and handle daily activities, such as sleeping, eating, or working. To be diagnosed with depression, the symptoms must be present for at least two weeks. It is a condition where an individual experiences persistent feeling of sadness and worthlessness and a lack of desire to engage in formerly pleasurable activities. Other symptoms of depression include feelings of guilt, helplessness and hopelessness, appetite or weight changes, sleep changes, anger or irritability, loss of energy, self-loathing and reckless behavior. Clinical depression poses a high risk of accidental injury, self-harm and suicide. Depression can also suppress the immune system and weaken the body, making you more susceptible to physical ailments and chronic illness. Depression can happen at any age. Strous Report at ¶ 18. .

[4] Persistent Depressive Disorder (previously known as Dysthymic Disorder) is a chronic (long-lasting), mild form of depression. However, calling it "mild" is misleading; because it can last for years and it can be just as debilitating as a more acute episode of major depression (clinical depression), even leading to thoughts of, or attempts at, suicide. Many of the symptoms of dysthymia are the same as those of major depression; however, they may be less severe or intense. Dysthymia also has some symptoms that may not occur with major depression. The hallmark of dysthymia is the length of time that it persists. In adults, dysthymia is diagnosed when the symptoms continue for two or more years; in children or teens, the symptoms last for a year or more. Dysthymia is a serious condition that needs to be treated. Dysthymia may include the experience of the following symptoms: sad mood, difficulty falling sleeping (or sleeping too much), increased or decreased appetite or weight, feelings of worthlessness, feelings of hopelessness, thoughts of suicide, anxiety, decreased motivation, loss of interest (anhedonia), irritability or anger, restlessness (especially in children) and vague physical symptoms. Strous Report at ¶ 19. .

[5] The essential feature of anxiety disorder is excessive anxiety and worry (apprehensive expectation) about a number of events or activities. The intensity, duration, or frequency of the anxiety and worry is out of proportion to the actual likelihood or impact of the anticipated event. The individual finds it difficult to control the worry and to keep worrisome thoughts from interfering with attention to tasks at hand. During the course of the disorder, the focus of worry may shift from one concern to another. The worries are excessive and typically interfere significantly with functioning. Individuals with anxiety disorder report distress due to constant worry and related impairment in social, occupational, or other important areas of functioning. Strous Report at ¶ 20.

[6] Obsessive-compulsive disorder (OCD) is an anxiety disorder in which people have recurring, unwanted thoughts, ideas or sensations (obsessions) that at times may make them feel driven to do something repetitively (compulsions). The obsessive thoughts and repetitive behaviors can significantly interfere with a person's daily activities and social interactions. For people with OCD, thoughts are persistent and routines are rigid and not doing them causes great distress. In most cases, People with OCD know or suspect their obsessions are not true. Even if they recognize their obsessions are irrational, those suffering with OCD struggle keeping their focus off the obsessions or stopping the compulsions. A diagnosis of OCD requires the presence of obsession and/or compulsions that are time-consuming, cause major distress, and impair work, social or other important function. Strous Report at ¶ 21.

[7] Adjustment disorder is an emotional and behavioral reaction which develops within 3 months of a life stress. The response is stronger or greater than what would be expected for the type of event that occurred. For a diagnosis of adjustment disorder, a person's symptoms must be severe enough to affect his or her work or social life. Symptoms may vary and include agitation, depressed mood, anxious mood and physical complaints. The main goal of treatment is to relieve symptoms and help the person return to a similar level of functioning as before the stressful event occurred. Strous Report at ¶ 22.

reports of Dr. Strous in recommending entitlement to and the amount of solatium damages for the plaintiffs.

    **1.**     **Dr. Strous's Report on Plaintiff Shachar Boteach.**

Dr. Strous conducted a clinical interview and psychiatric evaluation of plaintiff Shachar Boteach *See* Strous Report, Psychiatric Evaluation of Shachar Boteach ("Boteach Evaluation"), Dkt. No. 46-7. Dr. Strous's summary of the interview with plaintiff Boteach is consistent with and echoes the testimony provided in Shachar Boteach's own declaration. *See generally id.* at 1-5. Based on his clinical interview and testing, Dr. Strous concluded, to a reasonable degree of medical certainty, that Shachar Boteach suffers from chronic anxiety and emotional disorders. *Id.* at 7. Dr. Strous diagnosed plaintiff Shachar Boteach with Adjustment disorder with anxiety symptoms and Persistent Complex Bereavement Disorder (moderate to severe) with traumatic bereavement. *Id.* Dr. Strous concludes that these emotional injuries are expected to affect plaintiff Boteach for a long period of time. *Id.*

    **2.**     **Dr. Strous's Report on Plaintiff D.A.B.**

Dr. Strous conducted a clinical interview and formal psychiatric evaluation of plaintiff D.A.B. *See* Strous Report, Psychiatric Evaluation of D.A.B., Dkt. No. 46-6. Dr. Strous's summary of his interview is wholly consistent with the declaration testimony provided by D.A.B. Dr. Strous found that "the event, including the initial two weeks of his grandfather's hospitalization before he succumbed to his injuries and died, led to marked features of initial low mood and anxiety which affected various aspects of his life including his schooling, social and family life. At present he remains with anxiety effects following his difficult adjustment to the trauma and shock of his grandfather's stabbing and shooting followed by his death." *Id.* at 5. Based on the clinical interview and testing, Dr. Strous diagnosed D.A.B. with Adjustment disorder with anxiety symptoms. *Id.* He

further found: "With the trauma coming in his vital informative[8] [*sic*] adolescent years, it is clear that he has been affected immensely at a social and emotional level. While some of his mood issues have diminished over time, he remains with chronic anxiety. Due to the range of effects on his life, it is not expected that his emotional issues affecting several areas of his life will resolve in the short term, and they will continue to affect him for a long period of time." *Id.*  Dr. Strous states his opinions to a "reasonable degree of medical certainty."  *Id.*

## SOLATIUM DAMAGES CLAIMS OF THE PLAINTIFFS

### A.    SOLATIUM DAMAGES: APPLICABLE CASE LAW

Section 1605A(c) expressly provides for solatium damages to immediate family members of the victims. Solatium damages provide compensation for mental anguish, grief, and loss of society and comfort. *See Valore v. Islamic Republic or Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010) ("Under the FSIA, a solatium claim is indistinguishable from an IIED claim. Solatium is awarded to compensate the the [*sic*] mental anguish, bereavement, and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort.") (internal citations, quotation marks, and alterations omitted)).

The immediate family is defined as the victim's spouse, parents, siblings, and children. *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 28 (D.D.C. 2009) ("*Heiser II*") (citing *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 n.8 (D.D.C. 2001), *aff'd sub nom. Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003) ("*Bettis*")).

In granting default judgment in this case, the Court determined that the two plaintiffs in this action satisfied the 'functional equivalence' theory adopted in this Circuit under which the

---

[8] Based on the context, I believe that Dr. Strous intended to use the word 'formative' rather than 'informative'.

immediate family – for purposes of damages under Section 1605 – may also include other individuals where the evidence supports a determination that they are properly viewed as the functional equivalent of an immediate family member.  *See Bettis*, 315 F.3d at 337 (observing that precedent supports damages awards to "functional equivalents of immediate family members"); *see also Oveissi v. Islamic Republic of Iran*, 768 F.Supp.2d 16, 27 (D.D.C. 2011) ("the interactions … were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"); *Cabrera v. Islamic Republic of Iran*, No. CV 18-2065 (JDB), 2023 WL 3496303 at *5 (D.D.C. May 16, 2023) ("A plaintiff may only bring a solatium claim if they are an immediate family member of a direct victim—i.e., parents, siblings, spouses, and children or the 'functional equivalent' thereof, even if they are not legally or biologically related.") (internal quotation marks omitted); *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 62-63 (D.D.C. 2018), (awarding solatium damages to a step mother and a step brother based on evidence that the relationships were the functional equivalent of a parent or sibling). Accordingly, the two plaintiffs here are deemed to be immediate family members - which in this context means that they are essentially the equivalent of a "child" of the victim for purposes of assessing damages.

In general, there is a presumption that immediate family members suffer grief and emotional injury as a result of a terrorist attack on another family member. *See Kaplan*, 213 F. Supp. 3d at 38 ("The guidelines emerging from prior decisions begin with the 'presumption' that family members in direct lineal relationship 'suffer compensable mental anguish and testimony proving a close relationship will usually be sufficient to sustain an award of solatium damages.'") (quoting *Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 290 (D.D.C. 2015)) (internal alterations omitted).  Immediate family members need not be present at the attack to be

eligible for solatium damages. *See Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 84 (D.D.C. 2017) (*Cohen I*) ("Solatium claims are typically brought by family members who were not present or injured themselves"). *Id*. at 85.

Accordingly, an immediate family member who provides credible testimony about the effect on him or her of the attack is eligible for an award of solatium damages. *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72-73 (declaration that victim's detention and torture caused claimant significant "mental anguish" supported awarding solatium damages consistent with framework of *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006) ("*Heiser I*")).

There is a significant body of case law in this Circuit outlining the considerations to be applied in determining the appropriate amount of solatium damages for family members of victims of terrorist attacks.   In *Heiser I*, the court conducted a survey of decisions of the district courts in the District of Columbia circuit and found that "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse[,] approximately $5 million to a parent whose child was killed[,] and approximately $2.5 million to a plaintiff whose sibling was killed."  466 F. Supp. 2d at 269 (footnotes omitted). Courts applying *Heisier I* also typically award $5 million to children whose parents were killed. *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 260 (D.D.C. 2014) ("[T]his Court has previously held that children of deceased and injured victims should receive awards akin to those given to parents (i.e., $5 million where the victim died, and $2.5 million where the victim suffered injury)"). Courts have applied these amounts as guideposts in evaluating damages and have concluded that these amounts, while relevant, are neither mandatory nor applicable in all cases.  *See Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs, et al.*, 892 F.3d 348, 361-62 (D.C. Cir. 2018) ("While past solatium awards from

comparable cases are appropriate sources of guidance for district courts, 'different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards.'"). It is important to maintain consistency – so that similarly situated victims receive comparable awards. In each case, however, the award must be based on the specific facts and circumstances, and must take into consideration the multiple relevant factors and the evidence provided.

Courts have awarded higher amounts of solatium damages where there are more extreme circumstances – such as where a family member is under medical care for depression or where the testimony makes clear that the family member continues to experience and feel the loss and change or where the family member is aware that the victim suffered horribly. *See, e.g., Valore*, 700 F. Supp. 2d at 85–86 ("The Court may award greater amounts in cases with aggravating circumstances, indicated by such things as testimony which describes a general feeling of permanent loss or change caused by decedent's absence or medical treatment for depression and related affective disorders") (internal citations, quotation marks, and alterations omitted).; *Cabrera,* 2023 WL 3496303 at * 9 ("[W]hen courts award upward departures, they usually do so because of an unusual circumstance beyond the ordinary anguish that results from losing a family member or having a family member injured in a terrorist attack.") (internal quotation marks omitted); *Bernhardt v. Islamic Republic of Iran*, No. CV 18-2739 (TJK), 2023 WL 2598677 at *15 (D.D.C. Mar. 22, 2023) ("Deviations may be warranted when evidence establishes an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant is presented; and circumstances surrounding the terrorist attack rendered the suffering particularly more acute or agonizing.") (internal quotations and alterations

omitted); *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 90-91 (D.D.C. 2002) (noting that courts have acknowledged that anguish is exacerbated when family members live with the knowledge of the suffering of their loved ones.); *Taitt v. Islamic Republic of Iran*, No. CV 20-1557 (RC), 2023 WL 2536518, at *9 (D.D.C. Mar. 16, 2023) ("An upward adjustment may be appropriate in cases with aggravating circumstances, indicated by such things as testimony which describes a general feeling of permanent loss or change caused by decedent's absence or medical treatment for depression and related affective disorders.").

Generally, such enhancements range from approximately 20% to 50% in more extreme situations. *Cabrera*, 2023 WL 3496303 at *9-10 (awarding upward variance of 25% from baseline solatium damages award to wife of terror attack victim for her "particularly brutal suffering" and upward variance of 20% from baseline award to victim's children for the time spent without their parents during their "formative years" and the depression they suffered following their father's death); *Bernhardt*, 2023 WL 2598677 at *15 (awarding 25% enhancement to solatium damages for victim's family members for their "severe mental distress"); *Oveissi*, 768 F.Supp 2d at *29-30 (awarding enhancement of 50% over baseline award to the grandson of the victim due to the grandson's lifelong emotional trauma including depression, anger, and struggles with alcoholism following his grandfather's death).

B.    ANALYSIS OF SOLATIUM DAMAGES

Initially I note that in considering solatium damages in the related case involving damages to family members for the death of Richard Lakin, the Court adopted enhanced solatium damages for Mr. Lakin's adult children (the parents of the plaintiffs in the instant action). *Force*, 617 F. Supp. 3d at 36-39. The enhancement was based on two primary factors: first, the fact that the adult children – while not present at the actual terrorist attack – were present at the hospital and

14

witnessed first-hand the extreme injuries Mr. Lakin suffered and the subsequent trauma of the multiple surgeries and medical efforts, experienced the grief and pain of seeing him undergo multiple painful surgeries, and then observed his decline into death; and second, the fact that these adult children continued to suffer from psychological injuries diagnosed by an expert psychiatrist. *See Force* Report at 104-05.

Similarly, Shachar Boteach has testified that she too went to the hospital and learned the truth about the brutality of the attack on her grandfather from the doctors, saw the wounds, waited in the hospital, and observed the multiple surgeries and efforts made to save her grandfather. While plaintiff D.A.B. did not go to the hospital, his testimony makes clear that he was strongly affected and that he was acutely aware of the precarious nature of his grandfather's condition during the two-week effort to save his life. He states that he struggled in school and felt overwhelmed thinking about his grandfather's medical condition.

### 1.    Solatium Damages for Shachar Boteach.

Shachar Boteach's declaration testimony details the trauma, grief, and pain of seeing her grandfather hooked up to medical equipment, watching him undergo surgery after surgery, and finally seeing him deteriorate into death. The evidence shows that Richard Lakin was a central parental figure for Shachar and her testimony demonstrates the ongoing grief and pain resulting from his death and the circumstances of his death. The psychiatric evaluation evidences that Shachar Boteach continues to suffer from psychological and emotional injuries that are expected to continue for a long time. Based on this uncontroverted evidence, I recommend an enhancement of the typical solatium award. Here, because Mr. Lakin served as a father figure for Shachar, the baseline solatium damage award, consistent with the *Heiser* framework, is $5 million. Because Shachar watched her grandfather die slowly from horrific wounds and has been diagnosed with

ongoing psychological injuries the expert psychiatrist, I recommend an enhancement of 25% over the baseline value of $5 million for a solatium award for the child of a deceased victim for a total award of $6,250,000. This recommendation is consistent with the case law cited above and the determination by the Court to award a similar enhancement to the children of Richard Lakin. *See Force*, 617 F. Supp. 3d at 36-37.

  2. **Solatium Damages for D.A.B.**

  D.A.B.'s testimony along with the testimony of his mother Manya Lakin, details his grief and trauma. Richard Lakin functioned as a parent to D.A.B. and was a central, important figure in his life. In recommending a solatium award for D.A.B. I again start with the principle that the baseline award should be consistent with that typically provided for a child of a victim killed in a terrorist attack which is $5 million. Three factors lead me to recommend an enhanced award for D.A.B. First, D.A.B. has been diagnosed with long term psychological injuries by an expert psychiatrist who concluded that these injuries will continue to affect D.A.B. for a long period of time. Second, while D.A.B. did not personally observe his grandfather's injuries and suffering, he was certainly aware of the severity and life-threatening nature of the injuries and in fact testified that he was unable to function during that two-week period and was afraid that his grandfather would die. The expert psychiatrist found that D.A.B. suffered from low mood and anxiety during that period of time. Finally, as indicated by the psychiatric report, D.A.B. was still very young when Richard Lakin was killed – and as a result lost the benefit of Mr. Lakin's parental guidance during his formative years. Based on these factors, I recommend an enhancement of 25% over the 'baseline' award. This recommendation is consistent with the case law cited above and the determination to provide a similar enhancement to Shachar Boteach and the children of Richard Lakin. Accordingly, I recommend an award for D.A.B. of $6,250,000.

C.    **PRE-JUDGMENT INTEREST**

The plaintiffs requested an award of prejudgment interest in their complaint. *See* Plaintiffs' Amended Complaint, Dkt. No. 57, at 30. Several decisions in this Circuit, including this Court's decision awarding solatium damages to Richard Lakin's children in *Force*, have held that prejudgment interest is appropriate on pain and suffering and solatium awards. *See Force*, 617 F. Supp. 3d at 42 (awarding prejudgment interest because this Court had already "concluded that prejudgment interest was appropriate on both 'past economic loss' and on the non-economic pain and suffering and solatium damages suffered by the victims' estates and families.'") (citing *Fritz*, 324 F. Supp. 3d at 64); Wamai, 60 F. Supp. 3d at 98; *Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29, 34 (D.D.C. 2014); *Amduso*, 61 F. Supp. 3d at 53; *Mwila v. slamic Republic of Iran*, 33 F. Supp. 3d 36, 46 (D.D.C. 2014); *Owens*, 71 F. Supp. 3d at 261; *Baker*, 775 F. Supp. 2d at 86; *Belkin*, 667 F. Supp. 2d at 24. As the court in *Wamai* reasoned:

> Awards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks. Because plaintiffs were unable to bring their claims immediately after the attacks, they lost use of the money to which they were entitled upon incurring their injuries. Denying prejudgment interest on these damages would allow defendants to profit from the use of the money over the last fifteen years. Awarding prejudgment interest, on the other hand, reimburses plaintiffs for the time value of money, treating the awards as if they were awarded promptly and invested by plaintiffs.

60 F. Supp. 3d at 98.   I recommend that, consistent with precedent, prejudgment interest be awarded starting from the date of the respective attacks through the date of final judgment at the applicable federal prime rate. *Id.*; *see also Sheikh*, 485 F. Supp. 3d at 274-75; *Christie v. Islamic Republic of Iran*, 2020 WL 3606273, at *19-20 (D.D.C. 2020); *Ewan v. Islamic Republic of Iran*,

466 F. Supp. 3d 236, 250-51 (D.D.C. 2020); *Kinyua v. Republic of Sudan*, 466 F. Supp. 3d 1, 12 (D.D.C. 2020); *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 82-83, n. 10-12 (D.D.C. 2014).[9]

I have provided such a calculation below through the end of August 2023 for the Court's convenience.  Prejudgment interest is calculated at the prime rate for each year from the date of the incident (October 13, 2015) through August 2023 using the methodology described in *Fritz, supra*, 324 F. Supp. 3d at 64, 67 n. 2.  A multiplier was calculated using the Federal Reserve's data for the average annual prime rate. *See* Bd. of Governors of the Fed. Reserve Sys. Historical Data, available at https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15 (last accessed on August 30, 2023).  Consistent with *Fritz*, I estimated that rate from January through August 2023 to be 8.5%, which is the current rate.[10]

To calculate the multiplier, I determine the prime rate in 2015, then multiply that rate by the percentage of the days of the year remaining as of the date of the incident.  This results in a multiplier expressed as 1.007 as of the end of 2015.  Next, I multiply 1.007 by the prime rate for 2016, which yields .035.  Adding the .035 to the 1.007 yields the multiplier as of the end of 2016

---

[9] I note that some courts have declined to award prejudgment interest, concluding that the compensatory awards provide full compensation for pain and suffering. *See, e.g., Akins v. Islamic Republic of Iran, 549 F. Supp. 3d 104* (D.D.C. 2021) ("Akins II"), (denying motion to, inter alia, add prejudgment interest to baseline awards finding that the "majority of Judges confronted with this issue have concluded…that 'pain and suffering and solatium damages are both designed to be fully compensatory.'") Id. at 121-22 (quoting *Barry v. Islamic Republic of Iran*, 437 F.Supp.3d 15, 60 (D.D.C. 2020)); .*Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012), aff'd, 554 F. App'x 16 (D.C. Cir. 2014) (deciding that the plaintiffs were already fully compensated from the pain and suffering and solatium damages); *Roth*, 78 F. Supp. 3d at 404 (holding that "the *Heiser* framework represents a calculation of the appropriate level of compensation, regardless of an attack's timing"); *Thuneibat*, 167 F. Supp. 3d at 48 (holding that "the solatium damages awarded are complete and prejudgment interest is not necessary to make the plaintiffs whole").
[10]   The rates applied are as follows:
        2015: 3.26 (applied from date of incident)
        2016: 3.51
        2017: 4.10
        2018: 4.91
        2019: 5.28
        2020: 3.54
        2021: 3.25
        2022: 4.86
        2023: 8.50 (current rate)

(1.042). Continuing this iterative process through August 2023 yields a multiplier of 1.416. I then apply this multiplier to the recommended solatium damages award to obtain the total recommended award including the prejudgment interest. As the Court explained in *Wamai* and *Opati*, "[t]he product of the multiplier and the base damages amount includes both the prejudgment interest and the base damages amount; in other words, applying the multiplier calculates not the prejudgment interest but the base damages amount plus the prejudgment interest, or the total compensatory damages award." *Wamai*, 60 F. Supp. 3d at 99 n. 16; *Opati*, 60 F. Supp. 3d at 83 n. 12. The results of these calculations are set forth in the summary chart below showing the recommended awards for each plaintiff without the prejudgment interest and the recommended awards with prejudgment interest.

## SUMMARY OF RECOMMENDATIONS

| | SOLATIUM DAMAGES | PREJUDGMENT INTEREST[11] | TOTAL AWARD (including prejudgment interest) |
|---|---|---|---|
| Shachar Boteach | $6,250,000 | $2,600,000 | $8,850,000 |
| D.A.B. | $6,250,000 | $2,600,000 | $8,850,000 |

Dated: September 1, 2023

Respectfully Submitted,

By: /s/ Deborah E. Greenspan
    Deborah E. Greenspan, Esq.
    Special Master

---

[11]  The Prejudgment Interest is the difference between the "Total Award (Including Prejudgment Interest)" and the recommended base Solatium Damages.  As noted above, the Total Award is the result of applying the multiplier to the base damages and includes both the base damages and the prejudgment interest.